## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LYNNE ANNE-BRIGITTE RUSSELL**<br>11 Perimeter Center E, Apt. 2202<br>Atlanta, GA 30346<br><br>**CHARLES JOHN DE CARO**<br>11 Perimeter Center E, Apt. 2202<br>Atlanta, GA 30346<br><br>**LEANNE CHRISTINE REILLY**<br>1550 Henry Thomas Way, NE, Apt. 105<br>Washington, DC 20002<br><br>**ERIC N. CHRISTIAN, JR.**<br>1319 S Street SE<br>Washington, DC 20020<br><br>**TIMOTHY R. BECK**<br>625 Monroe Street NE # 340<br>Washington, DC 20011<br><br>Plaintiffs,<br><br>v.<br><br>**DISTRICT OF COLUMBIA**<br>Serve Office of the Attorney General<br>400 6th Street NW<br>Washington, DC 20001<br><br>**CHIEF PAMELA A. SMITH**<br>300 Indiana Avenue, NW<br>Washington, DC 20001<br><br>**COMMANDER JAMES M. BOTELER**<br>1620 V Street, NW<br>Washington, DC 20009 | Case No. 2024-cv-1820 |

**3RD DISTRICT OFFICER WILSON**              )
**FIRST NAME UNKNOWN**                       )
**BADGE NUMBER 4699**                        )
1620 V Street, NW                            )
Washington, DC 20009                         )
                                             )
**MULTIPLE UNKNOWN 3RD DISTRICT**            )
**OFFICERS, DENOMINATED JOHN**               )
**AND JANE DOES 1-12**                       )
1620 V Street, NW                            )
Washington, DC 20009                         )
                                             **)**
                    Defendants.              )

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

Former CNN Headline News Anchor Lynne Russell is convinced a handgun in her purse saved her life and the life of her husband. Yet, a District regulation prohibits purse carry and all other forms of "off-body" carry on pain of revocation of Metropolitan Polie Department ("MPD") issued Concealed Pistol Licenses ("CPL") and potential arrest. *See* DCMR § 24-2344.2. The District actively enforces this provision and has sought to revoke the CPLs of Plaintiffs Eric Christian and Timothy Beck for alleged violation of this provision. Because the provision in question is not consistent with the Nation's history and tradition of firearms regulation, Plaintiffs bring this action for declaratory and injunctive relief and for damages to vindicate their Second Amendment rights. In addition, Plaintiff Beck brings this action for damages resulting from his false arrest and false imprisonment at the hands of MPD and officers of MPD's Third District.

**Introduction.**

1.      The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. Const. amend. II.

2.      In spite of the unambiguous text of the Constitution and binding Supreme Court precedent, including the Supreme Court's decision in *New York State Rifle and Pistol Association*

*v. Bruen*, 142 S.Ct. 2111 (2022) ("*Bruen*"), the District, unconstitutionally and under pain of criminal sanctions, and revocation of the right to carry, bans common methods of firearm carry, including in a purse, a sling bag, a backpack or in a vehicle glove box or console.

3.      Defendants have and will continue to enforce the District's off-body carry ban, making it a criminal offense for law-abiding citizens to exercise their fundamental right to keep and bear arms in this manner.

4.      Defendant's enforcement of its off-body carry ban violates Plaintiffs' fundamental, individual right to keep and bear commonly possessed arms.

5.      In *Bruen*, the Supreme Court expressly rejected all interest balancing and the D.C. Circuit's prior "two-step" approach in the context of Second Amendment claims. "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S.Ct. at 2127. Indeed, "*Heller* … demands a test rooted in the Second Amendment's text, as informed by history." *Id*.

6.      It is patently plain that *Bruen* did not create a new test but instead applied the very test the Court established in *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller*"). "The test that [the Court] set forth in *Heller* and [we] apply today [in *Bruen*] requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131.

7.      "*Heller's* methodology centered on constitutional text and history. Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, *Heller* relied on text and

history. It did not invoke any means-end test such as strict or intermediate scrutiny." *Id.* at 2128-29.

8.      Plaintiffs are among the People referred to in the Second Amendment. The plain text of the Second Amendment covers the conduct in which Plaintiffs wish to engage, keeping and bearing arms. 142 S.Ct. at 2132. And "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." 142 S.Ct. at 2126.

9.      It is irrelevant whether the regulation may have a salutary effect for the public good or would otherwise pass a traditional interest balancing analysis. The Constitution reflects the balance already struck by the people. *See Heller,* 554 U.S. at 634-35.

10.      To meet its burden to justify a firearms regulation the District must point to a well-established analogue from the founding period, possibly up to the period of the adoption of the 14th amendment, "distinctly similar" to its regulation.

11.      As *Bruen* explains:

[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Bruen,* 142 S.Ct. at 2131. Here the issue is plainly one of firearm safety and the problem of lost or stolen firearms. That is not a new issue but a general societal problem that has persisted since the founding. Accordingly, the District must show a well-established *distinctly similar* historical

analogue to support DCMR § 24-2344.2. It will not be possible for the District to justify its regulation under *Brien*, for no distinctly similar well-established analogue exists.

12.     Throughout this Nation's history the only well-established regulation respecting the manner of carrying firearms has been restrictions on the concealed carry of firearms, provided that open carry of firearms was not prohibited. *See Heller*, 554 U.S. at 612-13 & 626; *Bruen*, 142 S.Ct. at 2143-44 & 2146-47.[1]  No regulations in the relevant period – whether that be the founding era or the period around the adoption of the 14th Amendment mandated that handguns must be carried in a holster on the body. And our research shows that holster regulations currently are exceedingly rare with only New Jersey having a regulation approaching that of the District's.[2]

13.     One outlier state, Tennessee in the late 1800s severely limited the carrying of handguns, providing that they must be carried only in the hand, a regulation unthinkable today that would result at the very least in public alarm if not innocent deaths. *See* 1879 Tenn. Pub. Acts 231, ch. 186, § 1 (An Act to Amend the Criminal Laws of this State upon the Subject of Carrying Concealed Weapons). That statute read in pertinent part, "[I]t shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol used in warfare, which shall be carried openly in hand, or loaded cane, slung-shot, brass knucks[.]"

14.     Another outlier state statute, this one in Georgia, banned the possession and carry of a number of weapons including most pistols except for horse pistols; these were large pistols

---

[1] *See, e.g.,  State* v. *Chandler*, 5 La. Ann. 489, 490 (1850); *Nunn* v. *State*, 1 Ga. 243, 251 (1846); *Aymette* v. *State*, 21 Tenn. 154 (1840).

[2] New Jersey is a well-known outlier in terms of firearms regulation. For example, it is the only state to ban the carry for personal protection of hollow point ammunition, ammunition employed by almost every law enforcement agency in the Nation, and legal for civilian use in the 49 other states and in the District.

generally not carried by individuals, sold as a pair and carried in pouches draped over a horse. *See* Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837, pp. 90-91 (Milledgeville: P. L. Robinson, 1838) (Dec. 25, 1837). Thus, that statute sanctioned a form of off-body handgun carry while drastically restricting both open and concealed handgun carry. The Georgia Supreme Court, however, found this statute unconstitutional in all its applications except as to its prohibition on concealed carry of pistols and other weapons. *See Nunn v. State,* 1 Ga. 243. *Heller* extols *Nunn* because the "opinion perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause. *See* 554 U.S. at 612. *See also Bruen,* 142 S.Ct. at 2147.

15.    Because the District cannot justify its regulation under *Bruen,* Plaintiffs may not be prohibited from exercising their right to bear arms through off-body carry. Thus, under the Supreme Court's precedents, the constitutionally relevant history, and the proper analysis, Plaintiffs must prevail here.

16.    Plaintiffs therefore bring this challenge to vindicate their rights, and to immediately and permanently enjoin enforcement of the District's Ban on off-body carry and to award them damages for the deprivation of their Constitutional rights.

**Jurisdiction and Venue.**

17.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution.

18.    This action, based on a violation of Plaintiffs' constitutional rights, is brought under 42 U.S.C. § 1983 and seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as attorneys' fees, costs, and damages pursuant to 42 U.S.C. § 1988.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the District of Columbia.

**Parties.**

20.     Plaintiff Russell is a natural person and a citizen of the State of Georgia. She is a former Georgia deputy sheriff and private detective and holds two black belts in martial arts. She is a former news anchor for CNN and current author. Plaintiff Russell holds an MPD issued CPL as well as carry licenses and permits from other jurisdictions.

21.     Plaintiff Russell and her husband Plaintiff de Caro were on a cross-country trip from Washington, D.C. to California and were spending the night of June 30, 2015, at a Motel 6 in Albuquerque, New Mexico. As Plaintiff Russell was returning to her room from her car an armed man on parole from a previous armed robbery conviction snuck up from behind her, pushed her through the door and forced his way into her and her husband's room. Plaintiff de Caro, hearing the disturbance, emerged from the bathroom where he was taking a shower and was confronted with the gunman demanding their valuables. During an intense standoff, Plaintiff Russell handed Plaintiff de Caro her purse that contained a handgun and stated there might be something in the purse Plaintiff de Caro could give the man. Plaintiff de Caro then withdrew the firearm from the purse and engaged the armed robber. Both men emptied their weapons. The robber was shot four times (with three additional rounds entering Plaintiff de Caro's laptop computer the robber was holding. Plaintiff de Caro was hit three times and survived the incident. The robber threw his empty gun at Plaintiff de Caro, ran out into the parking lot, and died.

22.     Plaintiff Russell credits the gun in her purse with saving her and her husband's life.

23.     Due to limitations on women's fashion, Plaintiff Russell often carries a handgun in a purse or other device designed for off-body carry. Plaintiff Russell would likewise carry a

handgun in the District in a purse or other bag specifically designed for firearm carry but refrains from doing so in light of DCMR § 24-2344.2, fearing loss of her CPL, arrest and prosecution.

24.     Plaintiff de Caro is a natural person and a citizen of the State of Georgia. He is a graduate of the Air Force Academy, a former army ranger and former member of the 20th Special Forces Group. He was also a special investigative reporter for CNN where among other things he reported on site with the Contras in Nicaragua.

25.     Plaintiff de Caro holds an MPD issued CPL and carry permits and licenses from other jurisdictions.

26.     Plaintiff de Caro credits the gun in his wife's purse with saving his and her life.

27.     Plaintiff de Caro regularly carries a firearm outside the District in a manner that would violate  DCMR § 24-2344.2. He would likewise carry within the District of Columbia but refrains from doing so in light of DCMR § 24-2344.2 fearing loss of his MPD issued CPL, arrest and prosecution.

28.     Plaintiff Reilly is a natural person and a citizen of the District. She formerly served in the United States Army. She is also a member of the organized militia of the United States, holding the rank of sergeant (E-5) in the Pennsylvania National Guard. Plaintiff Reilly holds an MPD issued CPL as well as carry licenses and permits issued by other jurisdictions.

29.     Due to limitations on women's fashion, Plaintiff Reilly often carries a handgun in a purse or other device designed for off-body carry when not in the District of Columbia.

30.     Plaintiff Reilly would carry a handgun in the District of Columbia in a purse or other bag designed for firearm carry but fearss loss of her CPL, arrest and prosecution in light of DCMR § 24-2344.2

31.     In addition, Plaintiff Reilly and her husband have learned they are expecting a child. As Plaintiff Reilly's pregnancy progresses, carrying a firearm in a holster secured on a belt around her waist will become increasingly uncomfortable and infeasible. Thus, DCMR § 24-2344.2 will prevent Plaintiff Reilly from protecting herself and her unborn child while in the District.

32.     Plaintiff Christian is a natural person and a citizen of the District. He is a member of the unorganized militia of the United States. *See* 10 U.S.C. § 246. Plaintiff Christian holds an MPD issued CPL.

33.     Plaintiff Christian regularly carries his firearm in accordance with DCMR § 24-2344.2. On or about January 16, 2024, however, Mr. Christian was carrying his firearm outside his vehicle which was parked. He got in his vehicle and temporarily took his gun off for comfort. He started his car and pulled out into traffic. He then made a left hand turn and was stopped by MPD officers who asserted he had not signaled his turn. Mr. Christian maintains he in fact did activate his turn indicator and that the stop was a pre-textual stop as often happens to Black men in the District like himself.

34.     In the course of the traffic stop, MPD officers discovered that his firearm was not on his person and took possession of the firearm. MPD subsequently issued Plaintiff Christian a notice of proposed revocation of his CPL based on the alleged violation of DCMR § 24-2344.2.That notice has been administratively appealed to the DC Office of Administrative Hearings ("OAH") and is pending. Because his timely appeal is pending, his CPL remains valid.

35.     In similar circumstances, Plaintiff Christian would temporarily take his gun off and exercise off-body carry, but for DCMR § 24-2344.2 fearing additional sanctions from Defendants including arrest and prosecution.

36.     Plaintiff Beck is a natural person and a citizen of the District. He is a member of the unorganized militia of the United States. *Id.* He holds an MPD issued CPL. Plaintiff Beck is also a Black man.

37.     On or about January 11, 2024, Plaintiff Beck was driving his personal vehicle in the vicinity of 12th Street and Massachusetts Avenue NW. The time was approximately 12:30 am. While Plaintiff Beck's vehicle was stopped in traffic a female on the sidewalk waved at him and approached his stopped vehicle. She said words to the effect of, "Hey, how you doing?" Plaintiff Beck replied, "I'm doing fine, how are you? She replied, "I'm doing fine just trying to have some fun." Plaintiff Beck replied that he was headed to Unity Lounge at 9th & U Streets and told the woman it was not safe for her to be out alone. She repeated she was looking to have some fun. And he repeated he was headed to Unity Lounge. At no point were any sexual services discussed between the individuals, nor was there a discussion concerning the exchange of money.

38.     At this point, police – including one or more of Officers Doe 1-12 – initiated a traffic stop of Plaintiff Beck with lights and sirens. The woman uttered "oh shit!" and left the scene. Police directed Plaintiff Beck not to move his vehicle. Multiple officers – including one or more of Does 1-12 – then surrounded the vehicle with at least four officers – including one or more of Officers Does 1-12 – approaching the driver's side window. Those four plus officers directed Plaintiff Beck to exit his vehicle and attempted to open the driver's side door. Plaintiff Beck asked the officers words to the effect of, "Why, what's going on?" The officers responded saying words to the effect of "get out of the car now, cut the engine off."  While turning the engine off, Plaintiff Beck again asked what was going on. One or more of these officers opened his car door and said to Mr. Beck words to the effect of, "You are being arrested for sexual solicitation" and began

pulling him out of the vehicle. Plaintiff Beck replied that his seat belt was still on, that he had a CPL and that his firearm was inside his sling bag that was strapped about his person.

39.    These officers then pulled Plaintiff Beck out of his vehicle while saying "stop resisting." Plaintiff Beck denied he was resisting and said that he did not do anything wrong. These officers then arrested and handcuffed him. Plaintiff Beck warned the officers that he had a sore wrist. These officers took the sling bag off his person, as well as his jacket, searched his person and the vehicle and placed Mr. Beck in a patrol car.

40.    Officers – including one or more of officers Doe 1-12 – then took Plaintiff Beck to the DC Convention Center and ordered him out of the patrol car. Plaintiff Beck observed that this was not the police station and asked why he was being taken to the Convention Center. The Officers did not explain why he was not being taken to the police station.

41.    Plaintiff Beck was taken to an officer who appeared to be in charge, Defendant Officer Wilson. At this point there were more than 15 officers tactically loitering while Defendant Officer Wilson began speaking to Plaintiff Beck.

42.    Defendant Officer Wilson asked Plaintiff Beck if he knew why he was being arrested. Plaintiff Beck told Defendant Officer Wilson he was told he was being arrested for sexual solicitation but that could not be possible because he and the woman never spoke about anything sexual nor anything about money, only that he was headed to Unity Lounge.

43.    Defendant Officer Wilson then stated that this was a sting operation. Plaintiff Beck then told Defendant Officer Wilson, words to the effect that he did not have a problem because the woman was working for the police and presumably she had a recording device and he would be cleared when the police listened to it. He repeated that there was never a conversation about anything sexual or anything regarding money.

44.     Officers standing around then began looking at each other sheepishly and Defendant Officer Wilson began talking about Plaintiff Beck's firearm. Plaintiff Beck explained that he had a CPL. Defendant Officer Wilson told Plaintiff Beck that he was being arrested for improperly carrying a firearm for not having it holstered. Plaintiff Beck responded that the firearm was in his sling bag, it was on his person and it was in a holster in the sling bag. Nonetheless Defendant Officer Wilson stated that the firearm was supposed to be holstered on the waist or in a lockbox with the ammunition separated from the firearm.

45.     DCMR 24-2344.2 says nothing about a requirement that a firearm must be located on the waistline.

46.      Plaintiff Beck explained to Defendant Officer Wilson that the sling bag was on his body and that the firearm was in a holster inside the sling bag. That explanation apparently had no effect on Officer Wilson.

47.     Plaintiff Beck was then taken in a patrol car to a holding location where he was asked if he had any injuries. Plaintiff Beck told the officers his wrist was sore from the handcuffs.

48.     On or about 3:00 am on January 11, 2024, Plaintiff Beck was taken to another holding location. He was asked again if he had any injuries, and he replied, "yes," that due to the handcuffs,  his wrist was worse and that he could not rotate his wrist. Officers then said, "you were asked if you had any injuries." Plaintiff Beck said he told them earlier that his wrist was sore but that it got worse. He was then taken to Howard University Hospital where he was given medical attention for his wrist, including wrapping and pain medication.

49.     Plaintiff Beck was then taken to a holding facility where he stayed until approximately 12:30 pm and was taken to a holding facility called the "Bullpen."

50.    In the bullpen facility US Marshals had him strip down to his underwear and he was searched. Plaintiff Beck was then taken to a holding cell.

51.    Plaintiff Beck was released around 4:30 pm with the charges of sexual solicitation and improper carrying alleged by Defendant Officer Wilson no papered. Defendant Officer Wilson also charged Plaintiff Beck with "failure to disclose that he had a CPL, despite that he had so identified to the MPD officers when he was stopped. That charge too was no papered.

52.    Upon release Plaintiff Beck was told he could recover his property at the "Waterfront Facility." When he arrived there he was told the property clerk had left for the day and that he would have to come back tomorrow. He explained his house keys, identification documents, etc. were in MPD's custody and he needed them to go home. The clerk repeated to come back tomorrow.

53.    Plaintiff Beck then talked to an MPD officer outside his residential building and discovered he had been given incorrect information and that his property was at the Third District Police Station at 1620 V Street NW. By this time it was approximately 11:00 pm.

54.    Plaintiff Beck traveled to the MPD station to retrieve his belongings. Officer Kassar #5031 assisted him with his property. Upon receiving his property, Plaintiff Beck noticed that his firearm was not present and so advised Officer Kassar.

55.    Officer Kassar advised Plaintiff Beck that the firearm had been  "warranted" by the arresting officer. Officer Kassar was unable to explain why the firearm was being held when all charges had been dropped.

56.    Plaintiff Beck did not receive his firearm back until February 1, 2024.

57.    Defendant District of Columbia is a jural entity established under the Constitution of the United States as the seat of government of the Nation.

58.     Defendant Smith is Chief of the MPD and is responsible for overseeing, implementing, and enforcing the District's off-body carry ban, regulatory programs, and related policies, practices, and customs designed to propagate the same and all other matters relevant to this proceeding. Defendant Smith is sued in her official capacity as Chief of MPD.

59.     Defendant Boteler is the Commander of MPD's Third District. He is responsible for training, supervision, and discipline of the officers under his command. He is sued individually and in his official capacity as the Third District Commander which respect to the false arrest, false imprisonment and related claims of Plaintiff Beck.

60.     Defendant Officer Wilson is a police officer who on information and belief was assigned to MPD's Third District on or about January 11, 2024. On information and belief officer Wilson had a supervisory role over the events occurring with respect to the denial of Plaintiff Beck's civil rights, including the false arrest, false imprisonment and related claims of Plaintiff Beck. He is sued individually and in his official capacity.

61.     Defendants Doe 1-12 on information and belief are officers assigned to MPD's Third District on or about January 11, 2024, and who participated in the denial of civil rights, including false arrest, false imprisonment and related claims to Plaintiff Beck. They are sued individually and in their official capacities with respect to the false arrest, false imprisonment and related claims of Plaintiff Beck. Plaintiff Beck intends to identify these officers through discovery.

62.     Defendants Boteler, Wilson, and Does 1-12 are collectively referred to herein as the 3rd District Defendants.

**Standing.**

63.     Plaintiffs have standing to maintain this action. "[U]nder Article III, a federal court may resolve only 'a real controversy with real impact on real persons.' *American Legion v.*

*American Humanist Assn.*, [139 S.Ct. 2067, 2103 (2019)]." *TransUnion LLC v. Ramirez*, 141 S.Ct.

2190, 2203 (2021). As Justice Kavanaugh put it,

> For there to be a case or controversy under Article III, the plaintiff must have a "'personal stake'" in the case—in other words, standing. *Raines [v. Byrd*,] 521 U.S. [811,] 819, 117 S.Ct. 2312 [1997]. To demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question: "'What's it to you?'" Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983).

*Transunion LLC v. Ramirez*, 141 S.Ct. at 2203. The "what's it to" Plaintiffs here is the right to

exercise their Second Amendment rights through off-body carry without being subject to fear of

arrest, prosecution, or revocation of their CPLs, and, as to Plaintiff Beck, not to be falsely arrested

on charges lacking probable cause.

64.    "To satisfy the irreducible constitutional minimum of Article III standing,"

Plaintiffs must "establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct"

of Defendants and "seek (3) a remedy that is likely to redress that injury." *Uzuegbunam v.

Preczewski*, 141 S.Ct. 792, 797 (2021) (cleaned up). Plaintiffs have demonstrated standing here.

As with "any other matter on which the plaintiff bears the burden of proof," the "manner and

degree of evidence required" varies based on the "stage[] of the litigation." *Lujan v. Defenders. of

Wildlife*, 504 U.S. 555, 561 (1992).

65.    "[I]n evaluating whether a complaint adequately pleads the elements of standing,

courts apply the same analysis used to review whether a complaint adequately states a claim."

*Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). *Accord In re Schering Plough Corp.

Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3rd Cir. 2012). In the same way a

court must "accept all well-pleaded factual allegations as true and draw all reasonable inferences

in favor of the plaintiff" when considering a motion to dismiss, the court must apply the same

standard when evaluating whether a plaintiff "sufficiently alleged a basis of subject matter

jurisdiction." *Silha,* 807 F.3d at 173 (internal quotation marks omitted). And, in doing so, the Supreme Court has instructed that a court is to "presume[] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

66.    Each of the Plaintiffs has alleged an adequate basis for standing.[3] Plaintiffs Russell, de Caro, and Reilly possess District MPD issued CPLs and intend to engage in off-body carry within the District, but refrain from doing so fearing arrest, prosecution, and/or revocation of their carry licenses.

67.    Plaintiffs Christian and Beck have in the past engaged in off-body carry as defined by the District and that they have been singled out by the District which is proposing to revoke their CPLs for alleged violation of DCMR §24-2344.2.[4] Plaintiffs demonstrate they have a sufficient "personal stake" in the case for standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. at 2203.

68.    An injury in fact must be "concrete, particularized, and actual or imminent." *TransUnion,* 141 S.Ct. at 2203. The denial of Plaintiffs' Second Amendment right to carry for self-defense "outside the home" is one such injury in fact. *Bruen*, 142 S. Ct. at 2122. *See TransUnion,* 141 S.Ct. at 2004 (injuries "may include harms specified by the Constitution itself.")  Plaintiffs have alleged injuries in fact in that DCMR § 24-2344.2 prohibits them from engaging in off-body carry.

69.    "For an injury to be 'particularized,'" it "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at

---

[3] Of course, this Court's jurisdiction is secure if a single plaintiff has standing, and therefore once the Court determines that is the case it need not evaluate the standing of other plaintiffs. *See Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006).

[4] *See Seegars v. Gonzales,,* 396 F.3d 1248 (D.C. Cir. 2005), reh. en banc denied 413 F.3d 1.

560 n.1). Here, the alleged injury is the denial of Plaintiffs' Second Amendment rights when utilizing off-body carry. That is an injury occurring to each Plaintiff, so it is plainly particularized. DCMR § 24-2344.22 prohibits off-body carry, and the cases of Plaintiffs Christian and Beck show conclusively that this provision is actively enforced.

70.     It is beyond dispute that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592). Here, Plaintiffs are denied the individual right to carry firearms for self-defense if they choose to carry off-body. Indeed, even if they had a purse, or a bag, or a backpack attached to their body with a holstered firearm located therein, they are subject to arrest and revocation of their CPLs as happened to Plaintiff Beck.

71.     "Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be 'concrete.'" *Spokeo,* 578 U.S. at 339. The alleged denial of an individual constitutional right is one such concrete injury. By "concrete," the Supreme Court has explained that the alleged injury must be "'real, and not abstract.'" *Id*. at 340. As Justice Kavanaugh explained in *TransUnion*, 141 S. Ct. at 2204, "Various intangible harms can . . . be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." Traditional harms include those "specified by the Constitution itself." *Id. See also Spokeo*, 578 U.S. at 340 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (free speech); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) (free exercise of religion)). An alleged violation of the Second Amendment is no less concrete than the violation of any other individual constitutional right. *Ezell v. Chicago*, 651 F.3d 684, 695 (7th Cir. 2011) ("[T]he City's ban on firing ranges inflicts continuous harm to their claimed right to engage in range training and interferes with their right to possess firearms for self-

defense. These injuries easily support Article III standing."). *See Bruen*, 142 S. Ct. at 2130 (analogizing the standard applicable to the Second Amendment to "how we protect other constitutional rights" including the First Amendment). And plainly, Plaintiffs Christian and Beck face concrete injuries as MPD is proposing to revoke their CPLs for off-body carry.

72.     Moreover, for evaluating standing, it is insignificant that the off-body carry ban may turn out to be constitutional (it is not). That is because "[f]or standing purposes," the Court "must accept as valid the merits of [Plaintiffs'] claims." *FEC v. Ted Cruz for Senate*, 142 S.Ct. 1638, 1648 (2022). *See also Warth v. Seldin*, 422 U.S. 490, 500 (1975) (explaining that "standing in no way depends on the merits of [Plaintiffs'] contention that particular conduct is illegal"). The Court "must assume" the off-body carry ban "unconstitutionally burdens" the Second Amendment rights of Plaintiffs. *Id.*

73.     The unconstitutional deprivation of Plaintiffs' Second Amendment rights has created injuries that are both actual and imminent for purposes of standing. For one, Plaintiffs have suffered the loss of their Second Amendment rights when, by virtue of the threatened enforcement of the off-body carry ban, they decline to so carry. *See Ezell*, 651 F.3d at 695. *See also Lewis v. Casey*, 518 U.S. 343, 349 (1996) (explaining "actual harm" stems from "official interference" with a claimed constitutional right). For another, there is the "continuous harm to [Plaintiffs'] claimed right to" carry firearms for self-defense going forward as they continue to avoid carrying in the manner most conducive to their situations when they carry for self-protection in public. *Virginia v. Amer. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("[T]he alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution."); *Ezell*, 651 F. 3d at 695. "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief"—as Plaintiffs do here—"to prevent the harm from occurring,

at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion,* 141 S.Ct. at 2210 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013)).

74.    For standing purposes, it is irrelevant that one or more Plaintiffs are law-abiding and have not promised to break the law, or whether they actually violate the off-body carry ban. As the Supreme Court reaffirmed recently, a break-the-law threshold for standing "finds no support in our standing jurisprudence." *Cruz*, 142 S. Ct. at 1648. Instead, when an individual is subject to "a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 158 (2014). Indeed, it is not even necessary for an individual to "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). *See also MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128–29 (2007).

75.    Thus, in *Steffel*, the plaintiff had standing to challenge a criminal trespass statute that had caused him to refrain from engaging in certain hand billing activities: he "alleged . . . that . . . he had not done so because of his concern that he . . . would be arrested for violation of" the challenged law. 415 U.S. at 456. As the Seventh Circuit has previously explained, "[i]t is well-established that 'pre-enforcement challenges are within Article III.'" *Ezell*, 651 F.3d at 695 (citing *Brandt v. Vill. of Winnetka, Ill*., 612 F.3d 647, 649 (7th Cir. 2010) (cleaned up). This makes sense because the promulgation of a criminal statute is itself a credible threat of prosecution that is sufficient to chill constitutionally protected conduct. *See Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 687 (7th Cir. 1998) ("The Supreme Court has instructed us that a threat of prosecution is credible when a plaintiff's intended conduct runs afoul of a criminal statute, and the Government fails to indicate affirmatively that it will not enforce the

statute."). *Accord Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010) ("[p]re-enforcement challenges are proper, because a probability of future injury counts as 'injury' for purpose of standing"). As the 10th Circuit explained,

> [T]he Supreme Court has often found a case or controversy between a plaintiff challenging the constitutionality of a statute and an enforcement official who has made no attempt to prosecute the plaintiff under the law at issue. In *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the Court found a justiciable controversy between doctors subject to prosecution under criminal abortion statutes and the state attorney general, "despite the fact that the record does not disclose that any one of [the doctors] has been prosecuted, or threatened with prosecution." *Id.* at 188, 93 S.Ct. at 745. Recently, in *Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), the Court stated that "[t]he conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law is a classic 'case' or 'controversy' within the meaning of Art. III." *Id.* 106 S.Ct. at 1704. [476 US at 64].

*Wilson v. Stocker*, 819 F.2d 943, 946-47 (10th Cir. 1987). *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 302 (1979) sets the test of a "credible threat of prosecution" as "when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative . . ." *See Amer. Booksellers Ass'n,* 484 U.S. at 393 ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise.")

76.    Although it is true there is "some element of chance" in any pre-enforcement challenge—for instance because there is no guarantee a police officer would actually catch Plaintiffs were they to violate the off-body carry ban at some point in the future—nevertheless, "[i]njury" stemming from actual prosecution "need not be certain." *Brandt,* 612 F.3d at 649.[5] Instead, "[c]ourts frequently engage in pre-enforcement review based on the potential cost that compliance (or bearing a penalty) creates." *520 Michigan Ave. Assocs., Ltd. v. Devine*, 433 F.3d

---

[5] In fact, if a prosecution were truly temporally imminent, a federal court might well abstain on comity grounds." *See Younger v. Harris*, 401 U.S. 37, 91 (1971). The Supreme Court explicitly provided that courts avoid *Younger* abstention by engaging in pre-enforcement review of state statutes imposing criminal penalties. *See Steffel*, 415 U.S. at 461.

961, 963 (7th Cir. 2006). Here the cost of compliance in the face of a criminal penalty and/or CPL revocation is more than sufficient for standing. *Id. See also Doster v. Kendall*, 54 F.4th 398, 415 (6th Cir. 2022) ("Parties often allege that they plan to engage in an activity (for example, speech protected by the First Amendment), but that a law bars that activity. In that situation, parties need not first undertake the activity and risk punishment for violating the law before seeking review over whether they have a right to do so." (citations omitted)). "When [a] plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Babbitt*, 442 U.S. at 298, quoting *Doe v. Bolton*, 410 U.S. at 188.

77.    Plaintiffs' allegations demonstrate this is the case here. Each would carry off-body when such is the most convenient means to do so. This is conduct arguably protected by the Second Amendment. It is proscribed by statute. And there exists no evidence Defendants would not enforce the statute.

78.    This case is to be contrasted with a case where the government has disclaimed prosecution, or the statute has fallen into dormancy. In that situation there is no "credible threat of prosecution." *Susan B. Anthony List,* 573 U.S. at 159. *See Graham v. Butterworth,* 5 F.3d 496, 499 (11th Cir. 1993), *cert. denied* 511 U.S. 1128 (1994) (A credible threat of prosecution exists where "at the time the [plaintiffs] filed [the] action . . . they intended to engage in arguably protected conduct, which the statute seemed to proscribe");  *N.H. Right to Life Political Action Comm. v. Gardner,* 99 F.3d 8, 15 (1st Cir.1996) ("courts will assume a credible threat of prosecution in the absence of compelling contrary evidence").

> "The mere existence of a state penal statute would constitute insufficient grounds to support a federal court's adjudication of its constitutionality in proceedings

brought against the State's prosecuting officials if real threat of enforcement is wanting." *Poe v. Ullman*, 367 U.S. 497, 507, 81 S.Ct. 1752 1758, 6 L.Ed.2d 989 (1961). "If the prosecutor expressly agrees not to prosecute, a suit against him for declaratory relief . . . is not such an adversary case" as will support Article III jurisdiction. *Id.*

*Delaware Women's Health Organ., Inc. v. Wier*, 441 F. Supp. 497, 501 (D. Del. 1977).

79.     Standing is not defeated, however, where the government fails to disavow prosecution, where the disavowal is equivocal, or where the government merely states its view that the plaintiff's intended conduct is not proscribed by the statute. *See Woodhull Freedom Foundation v. United States,* 948 F.3d 363, 373 (D.C. Cir. 2020) (DOJ did not disavow any intention of invoking criminal penalties against persons who operate web sites like plaintiffs'. "And although the Department has maintained in the instant litigation that plaintiffs' intended conduct is not proscribed by § 2421A, 'there is nothing that prevents the [Department] from changing its mind,' *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000)."); *Rhode Island Assoc. of Realtors v. Att'y General*, 199 F.3d 26, 35 (1st Cir. 1999) ("[T]he cautious phrasing of the Attorney General's statements (e.g., 'does not appear') is a far cry from a flat commitment not to prosecute in this particular instance."); *Wilson v. Stocker*, 819 F.2d at 947 & n.3 (finding a credible threat of prosecution notwithstanding the Attorney General's affidavit which stated that "he did not presently believe the [plaintiff's] proposed conduct . . . was prohibited by the statute").

80.     Here Plaintiffs Christian and Beck have specifically been singled out for enforcement action. There is no reason to believe the other plaintiffs would not similarly be treated.

**COUNT ONE: VIOLATION OF THE SECOND AMENDMENT.**

**REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF.**

**(42 U.S.C. § 1983)**

**(All Plaintiffs v. all Defendants)**

81.     The Second Amendment provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. Const. amend. II.

82.     The Second Amendment guarantees "an individual right to keep and bear arms," *Heller*, 554 U.S. at 595. It is "a fundamental constitutional right guaranteed to the people," *id.*, which is and always has been key to "our scheme of ordered liberty." *McDonald v. City of Chicago,* 561 U.S. 742, 767-68 (2010).

83.     DCMR § 24-2344.2 provides: "A licensee shall carry any pistol in a holster on their person in a firmly secure manner that is reasonably designed to prevent loss, theft, or accidental discharge of the pistol. DCMR § 24-2344.2 is thus a limitation on the right to bear arms within the District of Columbia as it bans off-body carry.

84.     Off-body carry is a common means of carrying a handgun. *See, e.g.,* Eliabeth Bienas, "The Pros and Cons of Off Body Carry," *Guns.com* (March 7, 2023) available at https://www.guns.com/news/off-body-concealed-carry-pros-cons-CCW; Travis Pike, "Off-Body Carry: Pros, Cons and Best Practices," *Maglife Blog, GunMagWarehouse.com* (Nov. 10, 2023), available at https://gunmagwarehouse.com/blog/off-body-carry-pros-cons-and-best-practices/; Travis Pike, "The Art of Off-Body Carry – How To and Why," *Crossbreed Holsters.com* (undated), available at https://www.crossbreedholsters.com/blog/the-art-of-off-body-carry-how-to-and-

why/; "Opening Up To Off-Body Carry," *American Rifleman* (Nov. 25, 2013), available at
https://www.americanrifleman.org/content/opening-up-to-off-body-carry-1/.

85.     Police officers often utilize off-body carry. A study of off-duty use of lethal force

by Los Angeles Police Department officers found a number of instances in which off-body carry

was utilized; LAPD determined these instances were within policy. Indeed, an LAPD firearms

training module for off duty carry explains "The holstered firearm shall be securely attached to the

officer or may be carried concealed in a container under the officer's immediate control. Such a

container may include, but is not limited to, purses and briefcases." Los Angeles Police Department

Stand Alone 7 – LD 35 Firearms Session No. 41 and 42- Back-up/Off-Duty Handguns &

Department               Qualifications,               (I)(D)(4),               available               at

https://lapdonlinestrgeacc.blob.core.usgovcloudapi.net/lapdonlinemedia/2021/09/SA07_S41_42_

LD35_SA_07S_41_and_42_TEST_back_up_gun.pdf#:~:text=The%20LAPD%20does%20not%

20require%20an%20officer%20to,off-

duty%20for%20protection%20against%20an%20unexpected%20deadly%20threat.

86.     There are many reasons why one would desire to employ off-body carry. One author

explains, "There are times, places, user groups, and activities where modern and functional discreet

packs offer the only effective means for carrying or transporting a firearm." Andrew Jordan, "Off-

Body Carry Pros and Cons," *ConcealedCarryAndrew.com* (undated), available at

https://concealedcarryandrew.com/off-body-carry-pros-and-cons/. An example would be

bicycling. "[T]he great number of casual or average-attired street riders peddling around America

these days would be better-served by a conveniently sized, well-positioned, stable and readily

accessible waist pack. One that is comfortable and as unobtrusive as possible will still allow the

gun to be drawn with relative ease." *Id.* The author suggests the same thing is true for

motorcyclists. "A modern, non-contrasting pack or pouch might not only work [with casual cloths]

but might also ease mounting and dismounting the bike. While carrying a gun and other valuables,

such a bag might also attract less attention when momentarily stepping away from the bike to eat,

stretch out or go to the restroom." *Id,*

    87.    The author likewise thinks waist packs also have an advantage for certain

vacationers.

> Consider the activities you might find yourself doing when the family heads off for
> a week of car-based sightseeing. How many times might you (sometimes in a single
> day) be in and out of the car or changing clothes to suit the climate and activity.
> Also in the course of that single day, you're likely to be sitting as much as standing:
> perhaps confined behind the wheel of a car or by a booth in a diner.

*Id.*

    88.    Off-body carry offers an easy way to conceal a firearm without the potential of

inadvertent disclosure. This is especially a factor for ladies who tend to wear more form fitting

clothing.

    89.    Comfort is often a reason for off-body carry as well. However, off-body carry can

have tactical advantages. "A fanny pack is perhaps the most surprising place to keep a pistol. It's

the most un-stylish bag there is. Fanny packs are all practical and seeming un-tactical. It is also a

place a mugger is going to expect money and for his victim to reach into."  *Id.* As the author

explains further, "An attacker is likely going to expect men to carry a pistol around the waist. He

won't expect a gun to be in his face after he hears 'here take my wallet.'" *Id.*

    90.    The author further explains that:

> A pistol in a bag can reduce the advantage an attacker has. A violent criminal is
> always going to attack first and surprise his victim. With a bag, somebody walking
> through a seedy area can hold a pistol and keep it concealed. This can even be done
> while pointing it in the direction an attacker might present his thugself. A very close
> attacker can be shot at through a bag for a surprise counter attack. An on-body

carried pistol cannot be gripped without brandishing it. Just walking around with a gripped and visible pistol is usually very illegal.

*Id.*

91.     There are a variety of products specifically designed for off-body carry. These include purses, fanny packs, sling bags, and backpacks. *See* Bob Boyd, "5 CCW Products Built for Off-Body Carry," *NRAShootingIllustrated.com* (May 8, 2018); Annette Evans & David Lane, "Best CCW Fanny Packs: Off-Body Carry The Right Way," *Recoil* (undated), available at https://www.recoilweb.com/best-ccw-fanny-pack-172879.html;

92.     To be sure there are disadvantages to off-body carry as well. However, under *Bruen,* a court is forbidden to engage in an interest balancing analysis. Rather, it must find a firearms regulation unconstitutional if it is not consistent with the Nation's historical tradition of firearms regulation. DCMR § 24-2344.2 is not consistent with the Nation's historical tradition of firearms regulation and it is therefore unconstitutional.

93.     "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634–35.

94.     "The very enumeration of the right [to keep and bear arms] takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634 (emphasis in original).

95.     To justify a law that limits Plaintiffs' Second Amendment rights, the government bears the affirmative burden of proving that the regulation is consistent with our nation's history and tradition. *Bruen*, 142 S.Ct. at 2126. As a matter of law, any statute or regulation infringing on the right to carry a firearm for personal protection is unconstitutional unless it comports with the

Nation's historical tradition of firearms regulation. *Id.* DCMR § 24-2344.2 does not comport with the Nation's historical tradition of firearms regulation because traditionally the government has not dictated how citizens physically carry personal protection firearms with the sole exception of limitations on the carrying of firearms concealed.

96.     There is an actual and present controversy between the parties.

97.     The Second Amendment to the United States Constitution guarantees ordinary, law-abiding citizens of the United States their fundamental right to keep and bear arms, both in the home and in public.

98.     42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under color of state law.

99.     Defendants, acting under color of state law at all relevant times, have deprived the fundamental constitutional rights of Plaintiffs and other persons holding District CPLs through enforcement of the District's regulation banning off-body carry of constitutionally protected arms.

100.     The District's ban of off-body carry inflicts irreparable harm on Plaintiffs by prohibiting conduct protected under the Second Amendment individual right to keep and bear arms.

101.     Plaintiffs lack an adequate remedy at law for this burden on their Second Amendment rights, and the harm Plaintiffs would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon Defendants. The public interest favors enjoining unconstitutional statutes, including those underlying the District's Ban ban on off body carry.

102.     Therefore, as a direct and proximate result of the above infringement of and impermissible burden on the rights of Plaintiffs protected under the Second Amendment, Plaintiffs

and all similarly situated DC CPL holders have suffered an unlawful deprivation of their fundamental constitutional right to keep and bear arms, and they will continue to suffer such injury unless and until granted the relief Plaintiffs seek herein.

103.    Thus,    declaratory and injunctive relief is appropriate to protect against the irreparable harm of the ongoing deprivation of Plaintiffs' Second Amendment rights.

104.    Defendants, having acted under color of law, policy, custom or practice to subject Plaintiffs to the deprivation of their right to keep and bear arms, are liable under 42 U.S.C. § 1983 "in an action at law, suit in equity, or other proper proceeding for redress[.]"

105.    For all the reasons asserted herein, Defendants have acted in violation of, and continue to act in violation of, 42 U.S.C. § 1983, which compels the relief Plaintiffs seek herein, including declaratory and injunctive relief.

**COUNT TWO: VIOLATION OF THE SECOND AMENDMENT**

**DAMAGES**

**(42 U.S.C. § 1983)**

**All Plaintiff's v. Defendant District of Columbia**

106.    Plaintiffs reallege the allegations set forth in the foregoing paragraphs.

107.    By infringing upon Plaintiffs' Second Amendment rights, the District has damaged Plaintiffs. Defendant District of Columbia is therefore liable to Plaintiffs for damages to be proven at trial, and if unable to prove actual damages, then the District if liable for nominal damages.

**COUNT THREE: VIOLATION OF SECOND AND FOURTH AMENDMENTS, FALSE ARREST, FALSE IMPRISONMENT, ASSAULT, BATTERY, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**DAMAGES**

**(42 U.S.C. § 1983)**

**Plaintiff Beck v. All Defendants**

108.    Plaintiff Beck realleges the allegations as relevant to him set forth in the foregoing paragraphs.

109.    The stop, arrest and confinement of Plaintiff Beck, including the harmful and offensive touching of him by arresting and confining officers on January 11, 2024, was without probable cause in that police had no evidence Plaintiff Beck had solicited sexual relations from the woman who approached his vehicle, nor evidence that there was any discussion of the exchange of money for sexual relations.

110.    Likewise, the arrest and confinement of Plaintiff Beck for failure to disclose that he was carrying a firearm was without probable cause because he in fact made such disclosure to the arresting officers.

111.    To the extent the woman who approached his vehicle was an undercover police officer as implied by Officer Wilson, Defendants MPD, Officer Wilson and Does 1-12 would have been aware of such fact, and charging Plaintiff Beck with sexual solicitation under the circumstances could only be described as a gross and malicious abuse of authority.

112.    Any reasonably trained police officer under these circumstances would have known that arresting and charging Plaintiff Beck with sexual solicitation lacked probable cause and thus violated the Fourth Amendment to the Constitution. Thus, as to Officer Wilson and those Does 1-12 who participated in the arrest of Plaintiff Beck, they lack qualified immunity from damages for their actions.

113.    If on the other hand the woman in question was not associated with MPD, then MPD completely lacked any information concerning the discussion between the woman who

approached Mr. Beck's vehicle and Plaintiff Beck. As such, Officers Doe 1-12 and Officer Wilson knew they lacked probable cause to charge Plaintiff Beck with sexual solicitation yet did so anyway in violation of the Fourth Amendment.

114.    Any reasonable officer would have known that no probable cause existed to arrest and charge Plaintiff Beck under the circumstances and that such an arrest violated Plaintiff Beck's constitutional and civil rights. So again, such officers do not enjoy qualified immunity for their actions.

115.    The actions of Defendant Officer Wilson and Defendants Doe 1-12 indicate a gross failure of Third District Commander Boteler to properly train and supervise the officers under his command. Any reasonable Commander would have taken steps to properly supervise officers under his command and protect the public from such constitutional and civil rights violations. Accordingly, Commander Boteler cannot claim qualified immunity from damages suffered by Plaintiff Beck as set forth herein.

116.    Likewise, Officer Wilson's charging of Plaintiff Beck for failure to disclose that he had a CPL and was carrying a firearm lacked probable cause as Plaintiff Beck plainly so disclosed to the officers who stopped him, albeit without probable cause. Any reasonable officer would have known that he cannot charge a suspect with failure to disclose if the suspect had in fact disclosed to the officers who stopped him. Officer Wilson thus cannot claim qualified immunity from damages for this blatant misconduct nor any officers who lied to officer Wilson with respect to whether Mr. Beck so disclosed that he was carrying a firearm. When Plaintiff Beck advised Officer Wilson he did in fact disclose to arresting officers that he was carrying a firearm, Officer Wilson was under a duty to investigate Mr. Beck's statement and apparently failed to do so. He may not claim qualified immunity under the circumstances.

117.    As indicated above, arresting Plaintiff Beck for carrying his firearm in a holster, in a sling bag attached to his body violated his Second and Fourth Amendment rights. However, as to this aspect of the incident, we do not contest that 3rd District Officers and the MPD Chief enjoy qualified immunity from damages since the unconstitutionality of DCMR § 24.2344.2 has not been definitively established. Nonetheless, the District itself is not immune from damages for the false arrest, false imprisonment, assault, and battery of Plaintiff Beck for carrying in the way he carried his firearm that evening.

118.    As a result of Defendants' unlawful and unconstitutional action, Plaintiff was wrongfully arrested, handcuffed, suffered physical injuries, and was unconstitutionally incarcerated until the US Attorney and the DC Attorney General's offices declined to charge him.

119.    As a result of Defendants' unconstitutional actions, Plaintiff was also wrongfully deprived of his firearm for 20 days in violation of the Second and Fourth Amendments.

120.    The actions of Defendants were wrongful, malicious, and designed to embarrass, humiliate and damage Plaintiff Beck. Plaintiff Beck suffered extreme mental and emotional anguish as a result of Defendants' wrongful actions. Plaintiff Beck has also incurred attorneys' fees defending his CPL as a result of Defendants' deliberate and malicious unlawful conduct.

121.    Plaintiff Beck has suffered harm to his reputation, humiliation, embarrassment, mental anguish, and distress by being arrested and incarcerated on the false charges brought by Defendants.

122.    Defendants are liable to Plaintiff Beck for his damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants, and award them:

a) A declaratory judgment that DCMR § 24-2344.2 on its face and as applied to Plaintiffs infringes their fundamental right to keep and bear arms, as guaranteed under the Second Amendment to the United States Constitution, and is therefore unconstitutional;

b) A preliminary and permanent injunction prohibiting Defendants, and Defendants' respective employees, officers, agents, representatives, and all those acting in concert or participation with them, from enforcing DCMR § 24-2344.2.

c) Attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other applicable law; and,

d) Damages as proven at trial, including nominal damages in the amount of $10, against the District of Columbia in favor of each Plaintiffs for denial of their Second Amendment rights; and

e) Compensatory damages in favor of Plaintiff Beck against the District of Columbia and the 3rd District Defendants in the amount of $100,000; and,

f) Punitive damages against the District of Columbia and each of the 3rd District Defendants in favor of Plaintiff Beck in the amount of $1,000,000.

g) Any and all other and further legal and equitable relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper.

Jury trial demanded as to damages.

Respectfully submitted,

**LYNNE ANN BRIGITTE RUSSELL**

**CHARLES JOHN DE CARO**

**LEANNE CHRISTINE REILLY**

**ERIC N. CHRISTIAN, JR.**

**TIMOTHY R. BECK**

By: /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

Dated:  June 24, 2024          *Attorneys for Plaintiffs*