## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **LYNNE ANNE-BRIGITTE RUSSELL, ET AL.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2024-cv-1820-JDB |
| | ) | |
| **DISTRICT OF COLUMBIA, ET AL.** | ) | |
| | **)** | |
| Defendants. | ) | |

## MEMORADUM OF POINTS AND AUTHORITIES IN SUPPORT
## OF MOTION FOR PARTIAL SUMMARY JUDGMENT

**LYNNE ANNE-BRIGITTE RUSSELL**

**CHARLES JOHN DE CARO**

**LEANNE CHRISTINE REILLY**

**ERIC N. CHRISTIAN, JR.**

**TIMOTHY R. BECK**

By: /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

Dated:  February 20, 2025          *Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.    Introduction …………………………………………………………..…….…….… 1

II.   Jurisdiction and venue …………………………………………………………… 1

III.  Legal standard for summary judgment ……………………………………….... 2

IV.   Plaintiffs have standing to challenge DCMR § 24.2344.2 ……………………….. 3

V.    DCMR § 24.2344.2 is inconsistent with the Nation's history and tradition
      of firearms regulation and is thus unconstitutional ……………………………… 15

   A. Plaintiffs' proposed conduct is encompassed within
      the Second Amendment's text …………………………………………….…. 15

   B. The Nation's history and tradition of firearms regulation
      does not support DCMR § 24.2344.2 …………………………………………… 18

   C. Off Body Carry is a common means of handgun carry and is thus
      consistent with *Heller's* common use principle ………………………………… 30

VI.   The Court should grant summary judgment in Plaintiffs' favor …………….…….…… 40

Exhibits

   1. Elizabeth Bienas, "The Pros and Cons of Off-body Carry," *Guns.com* (March 7, 2023).

   2. Travis Pike, "The Art of Off-Body Carry – How To and Why," *Crossbreed Holsters.com* (undated).

   3. "Opening Up To Off-Body Carry," *American Rifleman* (Nov. 25, 2013).

   4. Declaration Under Penalty of Perjury of Claude Werner.

   5. Los Angeles Police Department Stand Alone 7 – LD 35 Firearms Session No. 41 and 42- Back-up/Off-Duty Handguns & Department Qualifications, (I)(D)(4).

   6. Melody Lauer, "Armed and Pregnant, The guide to carrying a firearm while pregnant."

   7. Vicki Farnum, FlexCCarry Solutions, A Positive Guide for Off-Body Carry (2024).

   8. Declaration Under Penalty of Perjury of Jerah Dawn Hutchins.

   9. Declaration Under Penalty of Perjury of Karrie Ann Auclair.

10. Andrew Jordan, "Off-Body Carry Pros and Cons," *ConcealedCarryAndrew.com* (undated).

11. USA Carry, "Off-Body Carry: The Pros and Cons" (Oct. 7, 2024).

12. Bob Boyd, "5 CCW Products Built for Off-Body Carry," *NRAShootingIllustrated.com* (May 8, 2018).

13. Annette Evans & David Lane, "Best CCW Fanny Packs: Off-Body Carry The Right Way," *Recoil* (undated).

14. Claude Werner, *Serious Mistakes Gunowners Make and the Decisions That Led Up to Them,* "Unintentional Discharges."

15. *Elkhart Co. court security officer hospitalized after gun discharges* (Mar. 1, 2023).

16. *Lansing man recovering after shooting himself while holstering gun* (Mar. 19, 2023).

17. AP, *IndiStar,* "Indiana police officer accidently shoots himself (Aug. 1, 2018).

18. Luke McCoy, *USACarry,* "Instructor Shoots Himself in the Leg While Holstering (Nov. 5, 2019).

19. AP, *Police 1,* "NYC officer stable  after shooting self" (Aug. 19, 2013).

# TABLE OF AUTHORITIES

## Cases

*520 Michigan Ave. Assocs., Ltd. v. Devine,*
    433 F.3d 961 (7th Cir. 2006) ................................................................8

*Action on Smoking and Health v. C.A.B.,*
    713 F.2d 795 (D.C. Cir. 1983) .............................................................17

*American Legion v. American Humanist Assn.,*
    139 S.Ct. 2067 (2019) ..........................................................................3

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ..............................................................................2

*AT&T Info. Sys., Inc. v. Gen. Servs. Admin.,*
    810 F.2d 1233 (D.C. Cir. 1987) ...........................................................17

*Aymette v. State,*
    21 Tenn. 154 (1840) .................................................................22, 24, 25

* *Babbitt v. UFW Nat'l Union,*
    442 U.S. 289 (1979) ............................................................8, 12, 13, 14

*Bauer v. Shepard,*
    620 F.3d 704 (7th Cir. 2010) .................................................................7

*Bevis v. City of Naperville,*
    85 F.4th 1175 (7th Cir. 2023) ..............................................................22

*Brandt v. Vill. of Winnetka, Ill.,*
    612 F.3d 647 (7th Cir. 2010) .............................................................7, 8

*Camp v. Pitts,*
    411 U.S. 138 (1973) ..............................................................................17

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ..............................................................................2

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
    508 U.S. 520 (1993) ..............................................................................5

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 1971) ..............................................................................17

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ..................................................................................6

*Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n,*
149 F.3d 679 (7th Cir. 1998) ....................................................................7

*Consumer Data Indus. Ass'n v. King,*
678 F.3d 898 (10th Cir. 2012) ..................................................................12

*DHS v. Regents of the University of California,*
591 U.S. __, 140 S.Ct. 1891, 1907-08 (2020) ........................................17

*Diamond v. Charles,*
476 U.S. 54 (1986) ....................................................................................7

\* *District of Columbia v. Heller,*
554 U.S. 570 (2008) ................................................4, 12, 15, 17, 18, 22, 25, 27, 30

*Doe v. Bolton,*
410 U.S. 179 (1973) ..........................................................................7, 9, 13

*Doster v. Kendall,*
54 F.4th 398 (6th Cir. 2022) ....................................................................8

*Duncan v. Bonta,*
695 F. Supp. 3d 1206 (S.D. Cal. 2023) ..................................................22

*End Citizens United PAC v. Fed. Election Comm'n,*
69 F.4th 916 (D.C. Cir. 2023) ................................................................17

*Epperson v. Ark.,*
393 U.S. 97 (1968) ..................................................................................7

\* *Ezell v. City of Chi.,*
651 F.3d 684 (7th Cir. 2011) ..........................................................5, 6, 7, 12

\* *FEC v. Ted Cruz for Senate,*
142 S.Ct. 1638 (2022) ..........................................................................5, 6

*First Nat'l Bank of Ariz. v. Cities Serv. Co. ,*
391 U.S. 253 (1968) ................................................................................2

*GeorgiaCarry.org, Inc. v. Georgia,*
687 F.3d 1244 (11th Cir. 2012) ..............................................................12

*Graham v. Butterworth,*
5 F.3d 496, 499 (11th Cir. 1993), *cert. denied* 511 U.S. 1128 (1994) ........................................14

*Hanson v. Smith*,
120 F.4th 223 (D.C. Cir. 2024) ........................................................................................22, 29

*Hedges v. Obama,*
724 F.3d 170 (2d Cir. 2013) ..............................................................................................14

*Jackson v. City & Cnty. of S.F.,*
746 F.3d 953 (9th Cir. 2014) ............................................................................................12

*Lewis v. Casey,*
518 U.S. 343 (1996) ............................................................................................................6

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ............................................................................................................4

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ..........................................................................................................26

* *MedImmune, Inc. v. Genentech, Inc.,*
549 U.S. 118 (2007) ............................................................................................................7

*Mobil Oil Corp. v. Att'y Gen. of Va.,*
940 F.2d 73 (4th Cir. 1991) ..............................................................................................12

*Moore v. Madigan,*
702 F.3d 933 (7th Cir. 2012) *reh. en banc denied,* 708 F.3d 901 (7th Cir. 2013) ......................2, 3

*N.H. Right to Life Political Action Comm. v. Gardner,*
99 F.3d 8 (1st Cir.1996) ....................................................................................................14

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
804 F.3d 242 (2d Cir. 2015) ..............................................................................................12

* *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
142 S.Ct. 2111 (2022) ........................4, 5, 15, 16, 17, 18, 19, 20, 21, 22, 26, 27, 29, 30, 39, 40

* *Navegar, Inc. v. United States,*
103 F.3d 994 (D.C. Cir. 1997) ..............................................................................9, 10, 11, 12

* *Nunn* v. *State,*
1 Ga. 243 (1846) ........................................................................................................22, 25, 27

* *Ord v. District of Columbia,*
   587 F.3d 1136 (D.C. Cir. 2009) ........................................................................15

*Palmer v. District of Columbia,*
   59 F. Supp. 3d 173 (D.D.C. 2014) ...................................................................12

*Parker v. District of Columbia,*
   478 F.3d 370 (D.C. Cir. 2007) .........................................................................13

*Peoples Rights Org., Inc. v. City of Columbus,*
   152 F.3d 522 (6th Cir. 1998) ...........................................................................12

*Pleasant Grove City v. Summum,*
   555 U.S. 460 (2009) ...........................................................................................5

*Raines v. Byrd,*
   521 U.S. 811 (1997) ...........................................................................................3

*Rhode Island Assoc. of Realtors v. Att'y General,*
   199 F.3d 26 (1st Cir. 1999) ..............................................................................14

*Rodway v. United States Dep't of Agriculture,*
   514 F.2d 809 (D.C.Cir.1975) ...........................................................................17

*Rumsfeld v. FAIR,*
   547 U.S. 47 (2006) .............................................................................................3

*Samia v. United States,*
   599 U.S. 635 (2023) .........................................................................................19

*Seegars v. Ashcroft,*
   396 F.3d 1248 (D.C. Cir. 2005) .................................................9, 10, 11, 12, 13

*Seegars v. Gonzales,*
   413 F.3d 1 (D.C. Cir. 2005) ............................................................................ 13

*Spokeo, Inc. v. Robbins,*
   578 U.S. 330 (2016) .......................................................................................4, 5

* *State v. Chandler,*
   5 La. Ann. 489 (1850) ........................................................................22, 24, 41

*State v. Huntley,*
   25 N.C. 418 (1843) ...........................................................................................23

*State v. Reid,*
    1 Ala. 612, 35 Am. Dec. 44 (1840) .......................................................................................24

\* *Steffel v. Thompson,*
    415 U.S. 452 (1974) ...............................................................................................7, 8, 13

*Stockdale v. State*,
    32 Ga. 225 (1861) .................................................................................................................25

\* *Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ...............................................................................................4, 6, 9, 14

\* *TransUnion LLC v. Ramirez,*
    141 S.Ct. 2190 (2021) ......................................................................................3, 4, 5, 6, 15

\* *United States v. Rahimi,*
    144 S.Ct 1889 (2024) ...............................................................................18, 19, 21, 22, 30

*Uzuegbunam v. Preczewski,*
    141 S.Ct. 792 (2021) ..............................................................................................................3

*Vermont Right to Life Comm., Inc. v. Sorrell,*
    221 F.3d 376 (2d Cir. 2000) ...........................................................................................`14

*Vidal v. Elster*,
    602 U.S. 286 2024) ..............................................................................................................19

\* *Virginia v. Am. Booksellers Ass'n,*
    484 U.S. 383 (1988) ..........................................................................................................6, 8

*Warth v. Seldin,*
    422 U.S. 490 (1975) ..........................................................................................................5, 6

*Watson v. Stone*,
    148 Fla. 516 (Fla. 1941) .....................................................................................................26

\* *Whole Woman's Health v. Jackson,*
    595 U.S. 30 (2021) ...........................................................................................................4, 9

*Wilson v. Stocker*,
    819 F.2d 943 (10th Cir. 1987) ........................................................................................7, 15

*Woodhull Freedom Found. v. United States,*
    948 F.3d 363 (D.C. Cir. 2020) ...........................................................................................14

*Wrenn v. District of Columbia,*
  864 F.3d 650 (D.C. Cir. 2017) ........................................................................3

*Younger v. Harris*,
  401 U.S. 37 (1971).........................................................................................8

**Statutes and Rules**

1836 Ohio Laws 18, 30–31 ................................................................. 27

1839 Ala. Acts 67 ............................................................................. 24

1879 Tenn. Pub. Acts 231, ch. 186 .................................................... 26

1925 Or. Laws 468, 469-471 ........................................................ 27, 28

28 U.S.C. § 1331 ...........................................................................1

28 U.S.C. § 1343 ................................................................................ 1

28 U.S.C. § 1391 ................................................................................ 2

28 U.S.C. § 2201 ................................................................................ 2

28 U.S.C. § 2202 ................................................................................ 2

42 U.S.C. § 1983 ................................................................................ 2

42 U.S.C. § 1988 ................................................................................ 2

Acts of the General Assembly of the State of Georgia Passed in Milledgeville
  at an Annual Session in November and December, 1837, pp. 90-91
  (Milledgeville: P. L. Robinson, 1838) (Dec. 25, 1837) ............................... 27

D.C. Code § 7-2501.01 .................................................................... 16

D.C. Code § 7-2502.03 .................................................................... 16

D.C. Code § 7-2509.07 .................................................................... 41

DCMR § 24.2344.1 ....................................................................... 41

DCMR § 24.2344.2 ................................................................... passim

Fed. R. Civ. P. 56 ............................................................................ 2

New Jersey Criminal Justice Code § 2C:58-4.4 ………………………………………………… 23

United States Statutes at Large, Volume  I, Chapter 33 (May 8, 1792) …………………………… 20

**Other Authorities**

John Barsness, "A Short History of Handgun Cartridges,
  *Handloader Magazine* (April 2025),
  available at https://www.handloadermagazine.com/a-short-history-of-handgun-cartridges … 20

Chuck Hawks, Early Metallic Cartridges,
  available at https://www.chuckhawks.com/early_metallic_cartridges.htm ……………..……. 20

*Duncan v. Bonta,*
  Case No. 17-cv-01017 BEN-JLB (S.D. Cal.), Doc. 139-1 (Jan. 11, 2023) …………..……… 23

Samuel Kimball, Charter, Other Powers, and Ordinances of the
  City of Lawrence Page 149, Image 157 (1866) available at
  The Making of Modern Law: Primary Sources ………………………………….………… 28

A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers,*
  17 Suffolk U. L. Rev. 881, 882 (1983) …………………………………………………………… 3

K. Whittington, Originalism: A Critical Introduction,
  82 Ford. L. Rev. 375, 378 (2013) …………………………………………………………... 19

https://www.nramuseum.org/guns/the-galleries/a-prospering-new-republic-1780-to1860/case-10-
california-gold-rush/colt-model-1849-pocket-revolver.aspx ………………………………..…… 20

*https://www.nramuseum.org/guns/the-galleries/a-prospering-new-republic-1780-to-1860/case-
11-firearms-innovations/smith-wesson-no-1-1st-issue-revolver-w-original-gutta-percha-
case.aspx* ……………………………………………………………………………………...... 20

,

## MEMORADUM OF POINTS AND AUTHORITIES IN SUPPORT
## OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs summit this memorandum of points and authorities in support of their motion for partial summary judgment and show the following:

### I.    Introduction.

Plaintiffs seek a declaratory judgment that DCMR § 24.2344.2 on its face and as applied to limit the off body carry of a holstered firearm is contrary to the history and tradition of firearms regulation in this Nation and is therefore unconstitutional. Plaintiffs likewise request the Court to issue a permanent injunction prohibiting enforcement of DCMR § 24.2344.2. Plaintiffs also seek damages against the District, which claim is not at issue in this summary judgment motion.

Plaintiffs are four individuals holding MPD issued licenses to carry concealed pistols, and one individual reapplying for his expired CPL. All would carry their holstered pistols in violation of DCMR § 24.2344.2 when expedient when in the District but fear arrest, prosecution and revocation of their CPLs from MPD's enforcement of the regulation. MPD previously arrested Plaintiff Beck inter alia for allegedly improperly carrying his holstered handgun in a sling bag, despite that it was attached to his body with a strap, and MPD sought to revoke his CPL. MPD also sought to revoke the CPL of Mr. Christian, but his license expired during his appeal to the Office of Administrative Hearings ("OAH"). He is in the process of reapplying for his CPL.

### II.    Jurisdiction and venue.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution. This action, based on a violation of Plaintiffs' constitutional rights, is brought under 42 U.S.C. § 1983 and seeks declaratory and injunctive relief pursuant to

1

28 U.S.C. §§ 2201 and 2202, as well as attorneys' fees, costs, and damages pursuant to 42 U.S.C. § 1988. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the District of Columbia.

### III.    Legal standard for summary judgment.

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[A] material fact is genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (internal quotations omitted). "[T]he substantive law will identify which facts are material[,]" and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

A party seeking summary judgment must inform the court of the basis for its motion and identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 4 77 U.S. 317, 323 (1986). A party opposing summary judgment must then set forth specific facts showing there is a genuine issue for trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co. ,* 391 U.S. 253, 270 (1968). "If reasonable minds could differ as to the import of the evidence," then the court should deny the motion. *Anderson,* 477 U.S. at 250.

Here, the questions before the Court are of a purely legal nature or as necessary to demonstrate standing. To the extent any questions of disputed fact exist, those questions involve only "legislative facts" that bear on the historical justification for legislation, not "adjudicative facts" that must be determined at trial. *See Moore v. Madigan,* 702 F.3d 933 942 (7th Cir. 2012) *reh. en banc denied,* 708 F.3d 901 (7th Cir. 2013) ("The constitutionality of the challenged statutory

provisions does not present factual questions for determination in a trial."). *See also Wrenn v. District of Columbia,* 869 F.3d 650, 667 (D.C. Cir. 2015).

### IV.    Plaintiffs have standing to challenge DCMR § 24.2344.2.

Plaintiffs have standing to maintain this action. "[U]nder Article III, a federal court may resolve only 'a real controversy with real impact on real persons.' *American Legion v. American Humanist Assn.,* [139 S.Ct. 2067, 2103 (2019)]." *TransUnion LLC v. Ramirez,* 141 S.Ct. 2190, 2203 (2021). As Justice Kavanaugh put it,

> For there to be a case or controversy under Article III, the plaintiff must have a
> "'personal stake'" in the case—in other words, standing. *Raines [v. Byrd,]* 521 U.S.
> [811,] 819, 117 S.Ct. 2312 [1997]. To demonstrate their personal stake, plaintiffs
> must be able to sufficiently answer the question: "'What's it to you?'" Scalia, *The
> Doctrine of Standing as an Essential Element of the Separation of Powers*, 17
> Suffolk U. L. Rev. 881, 882 (1983).

*TransUnion,* 141 S.Ct. at 2203. The "what's it to" Plaintiffs here is the right to exercise their Second Amendment right to carry a handgun for personal protection in public through off body carry without being subject to fear of arrest, prosecution, or revocation of their CPLs, as has already happened to Plaintiffs Christian and Beck.

"To satisfy the irreducible constitutional minimum of Article III standing," Plaintiffs must "establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct" of Defendants and "seek (3) a remedy that is likely to redress that injury." *Uzuegbunam v. Preczewski,* 141 S.Ct. 792, 797 (2021) (cleaned up). Plaintiffs have demonstrated standing here. Each of the Plaintiffs has alleged an adequate basis for standing.[1] Plaintiffs Russell, de Caro, and Reilly possess District MPD issued CPLs and intend to engage in off body carry within the District, but refrain from doing

---

[1] Of course, this Court's jurisdiction is secure if a single plaintiff has standing, and therefore once the Court determines that is the case it need not evaluate the standing of other plaintiffs. *See Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006).

so fearing arrest, prosecution, and/or revocation of their carry licenses. Pursuant to the Supreme Court's decisions, inter alia, in *Susan B. Anthony List v. Driehaus,* 573 U.S. 149 (2014), and *Whole Woman's Health v. Jackson,* 595 U.S. __, 141 S.Ct. 2494 (2021) that is sufficient to confer standing on them to contest DCMR § 24-2344.2.

An injury must be "concrete, particularized, and actual or imminent." *TransUnion,* 141 S.Ct. at 2203. The denial or in this case limitation of Plaintiffs' Second Amendment right to carry a firearm for self-defense "outside the home" is one such injury in fact. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2122 (2022). *See TransUnion,* 141 S.Ct. at 2004 (injuries "may include harms specified by the Constitution itself.") Plaintiffs have alleged injuries in fact in that DCMR § 24-2344.2 prohibits them from engaging in off body carry, a common means of firearm carry, *see* discussion *infra,* within the District, thereby burdening and infringing their right to bear arms in defense of themselves and loved ones.

"For an injury to be 'particularized,'" it "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 n.1 (1992)). Here, the alleged injury particularly affects Plaintiffs who would utilize off body carry within D.C. but refrain from doing so in light of DCMR § 24-2344.2. That is an injury occurring to each Plaintiff, so it is plainly particularized. DCMR § 24-2344.2 prohibits off body carry, and the cases of Plaintiffs Christian and Beck as well as the Declaration of MPD Lt. Amadeo, *see* ECF 21-13, show conclusively that this provision is actively enforced.

It is beyond dispute that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Bruen*, 142 S.Ct. at 2127 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)). Here, Plaintiffs are denied the individual right to carry firearms for self-defense in the District if they choose to carry off body. Indeed, even if they

had a purse, or bag, or backpack physically attached to their body with a holstered firearm located therein, they are subject to arrest and revocation of their CPLs as happened to Plaintiff Beck.

"Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be 'concrete.'" *Spokeo,* 578 U.S. at 339. The alleged denial of an individual constitutional right is one such concrete injury. By "concrete," the Supreme Court has explained the alleged injury must be "'real, and not abstract.'" *Id*. at 340. As Justice Kavanaugh explained in *TransUnion*, 141 S.Ct. at 2204, "Various intangible harms can . . . be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." Traditional harms include those "specified by the Constitution itself." *Id. See Spokeo*, 578 U.S. at 340 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (free speech); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) (free exercise of religion)). An alleged violation of the Second Amendment is no less concrete than the violation of any other individual constitutional right. *Ezell v. Chicago*, 651 F.3d 684, 695 (7th Cir. 2011) ("[T]he City's ban on firing ranges inflicts continuous harm to their claimed right to engage in range training and interferes with their right to possess firearms for self-defense. These injuries easily support Article III standing."). *See Bruen*, 142 S.Ct. at 2130 (analogizing the standard applicable to the Second Amendment to "how we protect other constitutional rights" including the First Amendment). Moreover, for evaluating standing, it is irrelevant that DCMR § 24.2344.2 may turn out to be constitutional (it is not). That is because "[f]or standing purposes," the Court "must accept as valid the merits of [Plaintiffs'] claims." *FEC v. Ted Cruz for Senate*, 142 S.Ct. 1638, 1648 (2022). *See Warth v. Seldin,* 422 U.S. 490, 500 (1975) ("standing in no way depends on the merits of [Plaintiffs'] contention that particular conduct is illegal"). The Court "must assume" the off body carry ban "unconstitutionally burdens" Plaintiffs' Second Amendment rights. *Id*.

The unconstitutional deprivation of Plaintiffs' Second Amendment rights has created injuries that are both actual and imminent for purposes of standing. For one, Plaintiffs have suffered the loss of their Second Amendment rights when, by virtue of the threatened enforcement of the off body carry ban, they decline to so carry. *See Ezell*, 651 F.3d at 695. *See also Lewis v. Casey,* 518 U.S. 343, 349 (1996) (explaining "actual harm" stems from "official interference" with a claimed constitutional right). For another, there is the "continuous harm to [Plaintiffs'] claimed right to" carry firearms for self-defense going forward as they continue to avoid carrying in the manner most conducive to their situations when they carry for self-protection in public in the District. *See Virginia v. Amer. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("[T]he alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution."); *Ezell*, 651 F. 3d at 695. "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief"—as Plaintiffs do here—"to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion,* 141 S.Ct. at 2210 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013)).

For standing purposes, it does not matter that one or more Plaintiffs are law-abiding and have not promised to break the law, or whether they actually violate the off-body carry ban. As the Supreme Court reaffirmed recently, a break-the-law threshold for standing "finds no support in our standing jurisprudence." *Cruz*, 142 S.Ct. at 1648. Instead, when an individual is subject to "a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List,* 573 U.S. at 158. It is not even necessary for an individual to "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). *See also MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128–29 (2007).

Thus, in *Steffel*, plaintiff had standing to challenge a criminal trespass statute that caused him to refrain from engaging in certain hand billing activities: he "alleged . . . he had not done so because of his concern that he . . . would be arrested for violation of" the challenged law. 415 U.S. at 456. As the 7th Circuit has previously explained, "[i]t is well-established that 'pre-enforcement challenges are within Article III.'" *Ezell*, 651 F.3d at 695 (citing *Brandt v. Vill. of Winnetka, Ill*., 612 F.3d 647, 649 (7th Cir. 2010) (cleaned up). This makes sense because the promulgation of a criminal statute is itself a credible threat of prosecution sufficient to chill constitutionally protected conduct. *See Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 687 (7th Cir. 1998) ("The Supreme Court has instructed us that a threat of prosecution is credible when a plaintiff's intended conduct runs afoul of a criminal statute, and the Government fails to indicate affirmatively that it will not enforce the statute."). *Accord Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010) ("[p]re-enforcement challenges are proper, because a probability of future injury counts as 'injury' for purpose of standing"). As the 10th Circuit explained,

> [T]he Supreme Court has often found a case or controversy between a plaintiff challenging the constitutionality of a statute and an enforcement official who has made no attempt to prosecute the plaintiff under the law at issue. In *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the Court found a justiciable controversy between doctors subject to prosecution under criminal abortion statutes and the state attorney general, "despite the fact that the record does not disclose that any one of [the doctors] has been prosecuted, or threatened with prosecution." *Id.* at 188, 93 S.Ct. at 745. Recently, in *Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), the Court stated that "[t]he conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law is a classic 'case' or 'controversy' within the meaning of Art. III." *Id.* 106 S.Ct. at 1704. [476 US at 64].

*Wilson v. Stocker*, 819 F.2d 943, 946-47 (10th Cir. 1987). *See also Epperson v. Ark*., 393 U.S. 97 (1968) (record showed there had been no attempt to enforce the statute that prohibited the teaching of evolution). *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979) sets the test of a "credible threat of prosecution" as "when fear of criminal prosecution under an allegedly

unconstitutional statute is not imaginary or wholly speculative . . ." *See Amer. Booksellers Ass'n,* 484 U.S. at 393 ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise.")

Although it is true there is "some element of chance" in any pre-enforcement challenge—for instance because there is no guarantee a police officer would actually catch Plaintiffs were they to violate the off body carry ban at some point in the future—nevertheless, "[i]njury" stemming from actual prosecution "need not be certain." *Brandt,* 612 F.3d at 649.[2] Instead, "[c]ourts frequently engage in pre-enforcement review based on the potential cost that compliance (or bearing a penalty) creates." *520 Michigan Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 963 (7th Cir. 2006). Here the cost of compliance in the face of a criminal penalty and/or CPL revocation is more than sufficient for standing. *Id. See also Doster v. Kendall*, 54 F.4[th] 398, 415 (6th Cir. 2022) ("Parties often allege that they plan to engage in an activity (for example, speech protected by the First Amendment), but that a law bars that activity. In that situation, parties need not first undertake the activity and risk punishment for violating the law before seeking review over whether they have a right to do so." (citations omitted)). "When [a] plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Babbitt*, 442 U.S. at 298, quoting *Doe v. Bolton*, 410 U.S. at 188. Plaintiffs' allegations demonstrate this is the case here. Each would carry off body in the District when such is the most expeditious means to do so. This

---

[2] If a prosecution were truly temporally imminent, a federal court might well abstain on comity grounds." *See Younger v. Harris*, 401 U.S. 37, 91 (1971). The Supreme Court explicitly instructed courts to avoid *Younger* abstention by engaging in pre-enforcement review of state statutes imposing criminal penalties. *See Steffel*, 415 U.S. at 461.

is conduct arguably protected by the Second Amendment. It is proscribed by statute. And there exists no evidence Defendants would not enforce the rule in question. Indeed, they have already attempted to do so.

We acknowledge the D.C. Circuit's *Navegar* lines of cases. *See Navegar v. United States,* 103 F.3d 994 (1994); *See also Seegars v. Gonzales,* 396 F.3d 1248 (D.C. Cir. 2005), *reh. en banc den.* 413 F.3d 1. The holdings in *Navegar* and *Seegars* requiring a plaintiff in a non-First Amendment pre-enforcement challenge to have been singled out for enforcement or threatened with arrest to have standing have been effectively arrogated by the Court's holdings in *Susan B. Anthony List, 5*73 U.S. 149 and *Whole Woman's Health,* 595 U.S. __, 141 S.Ct. 2494 (explaining that the court employs the same standing analysis whether the case involves claims under, inter alia, the First Amendment or the Second Amendment).

In any event, applied faithfully, the *Navegar* line does not control the outcome here as to any of the Plaintiffs. In *Navegar*, firearm manufacturers brought a pre-enforcement challenge against a federal law prohibiting the manufacture, transfer, or possession of certain semiautomatic firearms. 103 F.3d at 996. The Act explicitly listed certain banned firearms made solely by certain companies, and it also listed several gun features that could render a firearm illegal. *Id.* at 997. For the latter restriction, if a firearm had two of the five specified features, it was prohibited. *Id*. After visits from the ATF, the *Navegar* plaintiffs "ceased the manufacture and transfer of the outlawed weapons" and "expressed no intention to violate the Act in the future." *Id*. Rather than risk criminal sanction, the *Navegar* plaintiffs sued, arguing that the Act exceeded Congress's delegated powers, was an unconstitutional bill of attainder, and was void for vagueness. *Id.* at 996.

The Court held that, because the *Navegar* plaintiffs' "enumerated powers challenge [and] Bill of Attainder claims[] involve[d] portions of the Act that single[d] out specific weapons

9

manufactured only by the" plaintiffs, the plaintiffs had standing to advance those claims. *Id*. at 999–1000. In the Court's view, because the plaintiffs were the only manufactures to make those specific firearms, the "Act in effect single[d] [them] out." *Id*. at 1000. "[F]or those weapons," the Court reasoned, "the threat of prosecution could be deemed speculative 'only if it is likely that the government may simply decline to enforce these provisions at all.'" *Seegars*, 396 F.3d at 1253 (quoting and discussing *Navegar*, 103 F.3d at 1000).

Critically, the *Navegar* Court considered a stricter pre-enforcement standing rule, *i.e.*, "we're not yet arresting people for violating this law, so you can't challenge it." *See* 103 F.3d at 999–1001. In response, the *Navegar* Court quipped: "To imagine that the government would conduct itself in so chimerical a fashion would be to declare in effect that federal courts may never, in the absence of an explicit verbal 'threat,' decide pre[-]enforcement challenges to criminal statutes." *Id.* at 1000. And to be certain, *Navegar* emphasized that "[t]his has *never* been the law." *Id*. (emphasis added). Instead, the *Navegar* Court correctly observed that "[t]o require litigants . . . to violate the law and subject themselves to criminal prosecution before their challenges may be heard would create incentives that are perverse from the perspective of law enforcement, unfair to the litigants, and totally unrelated to the constitutional or prudential concerns underlying the doctrine of justiciability." *Id*. at 1000–01.

The harder question for the *Navegar* Court was whether the Act's list of firearms *features* created an imminent risk of injuring plaintiffs. The plaintiffs' primary argument was that "provisions that outlaw firearms 'known as . . . revolving cylinder shotguns' and semiautomatic pistols that have two out of five listed characteristics" failed the Due Process Clause's void-for-vagueness doctrine. For purposes of this argument, the Court declined to find that "a genuine threat of enforcement ha[d] given rise to the requisite 'injury in fact.'" *Id.* at 1001.

*Navegar*'s conclusion, however, was driven by the uniquely murky nature of void-for-vagueness challenges. According to the Court, "because the general nature of the language in these portions of the Act makes it impossible to foretell precisely how these provisions *may be applied*, the issues presented in these challenges are less fit for adjudication, suggesting additional concerns as to their ripeness." *Id.* (emphasis added). Because the Court could find the Act "impermissibly vague on its face only if [it] conclude[d] that [the Act] is capable of no valid application," the "absence of an enforcement action either commenced or specifically threatened" meant there existed "no actual or imminent concrete application of the statute in which to anchor [the Court's] inquiry into whether any valid application is possible." *Id.* at 1001–02.

In other words, the *Navegar* plaintiffs argued law enforcement may (or may not) *interpret* the Act in a way that would subject them to criminal liability for manufacturing certain firearms, and the uncertainty about whether they were in fact violating the Act was what transgressed their due process rights. But because it remained speculative whether (1) law enforcement would *interpret* the Act in such a way as to sweep them under its umbrella, and even if it did, (2) law enforcement may still decline to *enforce* its new interpretation of the Act against them, this conjectural stack attenuated the argument that the plaintiffs were at risk of being punished for violating the law. Viewing *Navegar* through this lens is proof positive that it does not control the outcome here.[3] In stark contrast to the Act in *Navegar*, the rule Plaintiffs here challenge cannot be

---

[3] Judge Sentelle, in dissent in *Seegars*, agreed: "While I acknowledge that the majority is correct that *Navegar* can be read as controlling the case before us and barring standing, I think it is distinguishable. The allegedly constitutionally protected conduct in the record before us is clearly defined and clearly unlawful under a statute that the District apparently enforces regularly, and under which there is certainly no doubt that plaintiffs reasonably apprehend enforcement. I would therefore find the line of cases represented by *American Booksellers*, rather than *Navegar*, controlling." 396 F.3d at 1258 (Sentelle, J., dissenting).

misunderstood. Each Plaintiff would carry a holstered firearm off body but for DCMR § 24.2344.2. At bottom, their choice is binary: either forgo what they believe to be is constitutionally protected activity or violate a criminal law and hope the District declines to punish them for it.

Even the *Navegar* Court found this situation untenable. There, the Court clarified that "[a] credible threat of imminent prosecution can injure the threatened party by putting her between a rock and a hard place—absent the availability of pre[-]enforcement review, she must either forego possibly lawful activity because of her well-founded fear of prosecution, or willfully violate the statute, thereby subjecting herself to criminal prosecution and punishment." 103 F.3d at 998 (citing *Babbitt*, 442 U.S. at 298–99). And the *Navegar* court made clear it was not creating a hard-and-fast rule, but instead had reached its holding based on the unique nature of the claims the *Navegar* plaintiffs advanced: "The question of whether a threat of prosecution adequate to satisfy the requirements of justiciability is present in any particular pre[-]enforcement challenge is a factual and case-specific one." *Id.* at 999. On its terms, then, *Navegar* is distinguishable from this case.

Nearly ten years after *Navegar*, the Court decided *Seegars*, a case involving a Second Amendment pre-enforcement challenge to the D.C. handgun ban (the same one struck down in the Supreme Court's watershed *Heller* decision, *see Heller*, 554 U.S. 570). "No plaintiff in" *Seegars* had "been arrested and prosecuted for violating the disputed provisions of the Code, so plaintiffs' case constitute[d] a 'pre[-]enforcement' challenge." 396 F.3d at 1251. After acknowledging "that

---

We note further that every circuit to have addressed the issue, rejects the idea that to have standing in a non-First Amendment pre-enforcement challenge, one must have been singled out or threatened directly with enforcement. *See, e.g., N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); *Mobil Oil Corp. v. Attorney Gen. of Va.*, 940 F.2d 73 (4th Cir. 1991); *Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522 (6th Cir. 1998); *Ezell v. City of Chicago*, 651 F.3d 684; *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014); *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898 (10th Cir. 2012); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012).

*Navegar*'s analysis is in sharp tension with standard rules governing pre[-]enforcement challenges to agency regulations," *id.* at 1253, and with the Circuit's "cases upholding pre[-]enforcement review of First Amendment challenges to criminal statutes," *id.* at 1254, the *Seegars* Court nonetheless applied *Navegar* and held that the *Seegars* plaintiffs lacked standing. *Id.* at 1255–56.

      *Seegars* does not control the outcome here either. Fundamentally, pre-enforcement challenges exist to avoid a situation where a "hapless plaintiff" finds himself thrust "between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding." *Steffel*, 415 U.S. at 462. And in *Seegars* (as with most cases challenging a District law banning possession of a particular arm), the plaintiffs there had a readily available avenue for seeking relief without risking criminal prosecution—they could have applied to register a banned firearm and then challenged the subsequent denial. *See Seegars v. Gonzales*, 413 F.3d 1, 1–2 (D.C. Cir. 2005) (Ginsburg, C.J., concurring in the denial of rehearing en banc). Dick Heller followed this course in overturning the District's unconstitutional handgun ban. *See Parker v. District of Columbia*. 478 F.3d 370, 375–76 (D.C. Cir. 2007). In contrast, Plaintiffs here have no other avenue—they remain the "hapless plaintiff[s]" who must either acquiesce or risk criminal sanction.

      This distinction matters. In *Babbitt*, the Supreme Court stressed that plaintiffs "'should not be required to await and undergo a criminal prosecution as *the sole* means of seeking relief,'" 442 U.S. at 298 (emphasis supplied) (quoting *Doe v. Bolton*, 410 U.S. at 188)), and in *Seegars*, risking criminal prosecution was not the "sole means" of advancing their Second Amendment challenges. For Plaintiffs here, they do not have this alternative route; risking criminal prosecution is indeed *their sole* means of seeking relief other than a pre-enforcement challenge. That is why, in circumstances like those here, the Supreme Court has emphasized that pre-enforcement-challenge

plaintiffs need only show a "credible threat of prosecution," which exists "when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative." *Babbitt*, 442 U.S. at 298, 302. And where, as here, (1) the government has not disclaimed prosecution and (2) the statute has not fallen into disuse, *see Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013), standing exists.

This case is to be contrasted with a case where the government has disclaimed prosecution, or the statute has fallen into dormancy. In that situation there is no "credible threat of prosecution." *Susan B. Anthony List,* 573 U.S. at 159. *See Graham v. Butterworth,* 5 F.3d 496, 499 (11th Cir. 1993), *cert. denied* 511 U.S. 1128 (1994) (A credible threat of prosecution exists where "at the time the [plaintiffs] filed [the] action . . . they intended to engage in arguably protected conduct, which the statute seemed to proscribe"); *N.H. Right to Life Political Action Comm. v. Gardner,* 99 F.3d 8, 15 (1st Cir.1996) ("courts will assume a credible threat of prosecution in the absence of compelling contrary evidence").

Standing is not defeated where the government fails to disavow prosecution, where the disavowal is equivocal, or where the government merely states its view that the plaintiff's intended conduct is not proscribed by the statute. *See Woodhull Freedom Foundation v. United States,* 948 F.3d 363, 373 (D.C. Cir. 2020) (DOJ did not disavow any intention of invoking criminal penalties against persons who operate web sites like plaintiffs'. "And although the Department has maintained in the instant litigation that plaintiffs' intended conduct is not proscribed by § 2421A, 'there is nothing that prevents the [Department] from changing its mind,' *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000)."). *See also Rhode Island Assoc. of Realtors v. Att'y General*, 199 F.3d 26, 35 (1st Cir. 1999) ("[T]he cautious phrasing of the Attorney General's statements (e.g., 'does not appear') is a far cry from a flat commitment not to prosecute

in this particular instance."); *Wilson v. Stocker*, 819 F.2d at 947 & n.3 (finding a credible threat of prosecution notwithstanding the Attorney General's affidavit which stated that "he did not presently believe the [plaintiff's] proposed conduct . . . was prohibited by the statute").

All Plaintiffs thus demonstrate they have a sufficient "personal stake" in this case for standing. *TransUnion*, 141 S. Ct. at 2203. And in any event, Plaintiffs Christian and Beck have in the past engaged in off body carry as defined by the District and they have been singled out by the MPD which sought to criminally charge them and proposed to revoke their CPLs**.** These two Plaintiffs plainly demonstrate standing even under a strained reading of this Circuit's *Navegar* line of cases. *See Ord v. District of Columbia,* 587 F.3d 1136 (D.C. Cir. 2009).

### V.    DCMR § 24.2344.2 is inconsistent with the Nation's history and tradition of firearms regulation and is thus unconstitutional.

#### A.  Plaintiffs' proposed conduct is encompassed within the Second Amendment's text.

The Second Amendment guarantees "the right of the people to keep and bear Arms." U.S. Const. amend. II. That right encompasses the right to carry a handgun for individual personal protection in the event of confrontation. *Heller,* 554 U.S. at 584. Since the provision at issue is a restriction on Plaintiffs' bearing of arms for personal protection it is a fortiori encompassed within the text of the Second Amendment. The burden is then on D.C. to show that its regulation is consistent with the Nation's historic tradition of firearms regulation. *See Bruen,* 142 S.Ct. at 2126.

In spite of the Constitution's unambiguous text and binding Supreme Court precedent, including *Bruen*, 142 S.Ct. 2111, D.C. unconstitutionally and under pain of criminal sanctions, and revocation of the right to carry in public for self-protection, bans this common methods of firearm carry, including holstered in a purse, sling bag, backpack or in a vehicle glove box or console.

D.C. might argue the Second Amendment right is not a right to carry any arms for any purpose in any manner. *See* ECF 21 at 17.[4] All rights of course have limits. But that is where the historical analysis comes in. We determine limitations on the Bill of Rights by reference to history. *See Bruen,* 142 S.Ct at 2129-30. Thus, under *Bruen,* we first look at the text. Plaintiffs plainly meet that first step analysis since their conduct involves the carrying of arms. So, then the burden under *Bruen* to support DCMR 24.2344.2 falls squarely on D.C. to show that history supports its rule.

And contrary to D.C.'s previous argument, DCMR § 24-2344.2 is not a de minimis burden on Plaintiffs. *See* ECF 21 at 19 & 21. The rule makes it a criminal offense for law-abiding citizens to exercise their fundamental right to keep and bear arms using a purse, sling bag, backpack or other off body device, and subjects violators to revocation of their right to bear arms in public altogether as well as criminal sanctions *which could lead to banning them for the rest of their lives from possessing firearms in the District*. As a weapons offense as defined by District law, a conviction under DCMR § 24.2344.2 operates to strip the offender for life of the right to register a firearm in the District, which is a prerequisite to lawful possession of a firearm within the city. *See* D.C. Code § 7-2502.03(a)(2) and § 7-2501.01(18) (defining "weapons offense).[5] Moreover, as discussed *infra,* the rule places a significant burden on persons carrying a firearm for personal protection, especially women, whose fashions are often not readily compatible with on body carry. In any event, the "de minimis" argument is relevant only in an interest balancing analysis which

---

[4] References to ECF 21 are to the page indications at the top margin of the document.

[5] DC Code § 7-2502.03(a)(2), with exceptions not pertinent hereto, prohibits the registration of a firearm to anyone convicted of a weapons offense as defined by D.C. Code § 7-2501.01(18). Under D.C. law, registration is a prerequisite to legal possession of a firearm in the District with minor exceptions not pertinent hereto. Thus, the effect of a conviction for violating the off body carry ban is a permanent denial of the right to possess a firearm in the District even for home protection.

*Bruen* forbids. *See* 142 S.Ct. at 2129 & 2131. Defendants' enforcement of the District's off-body carry ban thus violates Plaintiffs' fundamental, individual right to bear commonly possessed arms in a serious and severe manner contrary to how the District argued in opposing preliminary relief. *See* ECT 21 at 30 (arguing that "the penalty does not extend to dispossessing a person of arms").

In *Bruen*, the Supreme Court expressly rejected all interest balancing and the D.C. Circuit's prior "two-step" approach in the context of Second Amendment claims.[6] "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S.Ct. at 2127. Indeed, "*Heller* … demands a test rooted in the Second Amendment's text, as informed by history." *Id*.

It is patently plain *Bruen* did not create a new test but instead applied the very test the Court established in *Heller*, 554 U.S. 570. "The test that [the Court] set forth in *Heller* and [we] apply today [in *Bruen*] requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. "*Heller's* methodology centered on constitutional text and history. Whether it came to defining the character

---

[6] In adopting DCMR § 24-2344.2, the MPD Chief provided no justification for the regulation. *See Final Rulemaking* published at 62 DCR 9781 (July 17, 2015). Thus, even if an interest balancing analysis were appropriate, and it is not, there is no administrative record to support the regulation. *See DHS v. Regents of the University of California*, 591 U.S. __, 140 S.Ct. 1891, 1907-08 (2020) ("It is a "foundational principle of administrative law" that judicial review of agency action is limited to "the grounds that the agency invoked when it took the action."). Any justification the District offers to support its rule would thus amount to post hoc rationalization. *See End Citizens United PAC v. Fed. Election Comm'n*, 69 F.4th 916, 922 (D.C. Cir. 2023); *AT&T Info. Sys., Inc. v. Gen. Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987) *(*citing *Camp v. Pitts*, 411 U.S. 138, 142-143 (1973); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 1971)); *Action on Smoking and Health v. C.A.B.*, 713 F.2d 795 (D.C. Cir. 1983); *Rodway v. United States Dep't of Agriculture*, 514 F.2d 809, 817 (D.C.Cir.1975) (Courts have repeatedly held that post hoc rationalizations are unacceptable substitutions for a contemporaneous basis and purpose statement.) This serves as an independent basis beyond *Bruen* to invalidate the rule.

of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, *Heller* relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny." *Id*. at 2128-29.

Plaintiffs are among the "People" referred to in the Second Amendment. The plain text of the Second Amendment covers the conduct in which Plaintiffs wish to engage: bearing arms. 142 S.Ct. at 2132. And "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." 142 S.Ct. at 2126. It is irrelevant whether the regulation may have a salutary effect for the public good or would otherwise pass a traditional interest balancing analysis. The Constitution reflects the balance already struck by the people. *See Heller,* 554 U.S. at 634-35.

**B. The Nation's history and tradition of firearms regulation does not support DCMR § 24.2344.2.**

D.C. cannot meet *Bruen's* historical test. To meet its burden to justify a firearms regulation the city must point to a well-established analogue from the founding period, possibly up to the period of the adoption of the 14th amendment,[7] "distinctly similar" to its regulation. As *Bruen* explains:

---

[7] *But see Bruen,* 142 S.Ct. at 2163 (Barrett, J., concurring) ("So today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful to caution 'against giving post enactment history more weight than it can rightly bear.' Ante, at 2136.").

In *United States v. Rahimi*, 144 S.Ct 1889 (2024), Justice Barrett amplified her concern over use of post-enactment history, stating, "Because the Court has taken an originalist approach to the Second Amendment, it is worth pausing to identify the basic premises of originalism. The theory is built on two core principles: that the meaning of constitutional text is fixed at the time of its ratification and that the "discoverable historical meaning ... has legal significance and is authoritative in most circumstances. K. Whittington, Originalism: A Critical Introduction, 82 Ford.

> [W]hen a challenged regulation addresses a general societal problem that
> has persisted since the 18th century, the lack of a distinctly similar historical
> regulation addressing that problem is relevant evidence that the challenged
> regulation is inconsistent with the Second Amendment. Likewise, if earlier
> generations addressed the societal problem, but did so through materially different
> means, that also could be evidence that a modern regulation is unconstitutional.
> And if some jurisdictions actually attempted to enact analogous regulations during
> this timeframe, but those proposals were rejected on constitutional grounds, that
> rejection surely would provide some probative evidence of unconstitutionality.

*Bruen,* 142 S.Ct. at 2131. Although lacking any explanation whatsoever in the rulemaking adopting

DCMR § 24-2344.2, a deficiency which should doom the rule at the outset, we can assume for

argument's sake that the issue it seeks to address is one of firearm safety and the problem of lost

or stolen firearms. *See* Amadeo Declaration, ECF 21-13. That is not a new social concern but is a

general societal issue that has persisted since the founding.[8] Accordingly, the District must show a

---

L. Rev. 375, 378 (2013)." 144 S.Ct. at 1924 (Barrett, J., concurring). "So for an originalist, the
history that matters most is the history surrounding the ratification of the text; that backdrop
illuminates the meaning of the enacted law. History (or tradition) that long postdates ratification
does not serve that function." *Id.* "[G]enerally speaking, the use of postenactment history requires
some justification other than originalism simpliciter." *Id.* "As I have explained elsewhere, evidence
of "tradition" unmoored from original meaning is not binding law. *Vidal [v. Elster]*, 602 U.S. [286]
322-325, 144 S.Ct. [1507] 1531-1532 [(2024)] (BARRETT, J., concurring in part). And scattered
cases or regulations pulled from history may have little bearing on the meaning of the text. *Samia
v. United States*, 599 U.S. 635, 656–657, 143 S.Ct. 2004, 216 L.Ed.2d 597 (2023) (BARRETT, J.,
concurring in part and concurring in judgment)." 144 S.Ct. at 1925 (Barrett, J., concurring).

[8] In its opposition to Plaintiffs' preliminary injunction motion, D.C. argued contra, claiming that
in the founding period few persons possessed handguns and they were kept unloaded. ECF 21 at
33, citing Kozuskanich declaration (ECF 21-14 at ¶ 20). That argument does not hold up for several
reasons.

First, although the founding period is the most important for *Bruen's* historical analysis, *see* note
7, *supra*, *Bruen* also looked at history up to the late 1800s. And that history belies the view
handguns were rare as we discuss in more detail below.

Second even at the founding evidence that handguns were rare is lacking. The Militia Act of 1792,
Section 4, required mounted troops, both officers and men, to be equipped with a pair of pistols so
they were by no means scarce. *See* United States Statutes at Large, Volume I, Chapter 33 (May 8,
1792). Indeed, *Bruen* indicates that pistols had been around since the time of James I. *See* 142
S.Ct. at 2143. *Bruen* also discusses that New Jersey in 1686 enacted a law prohibiting the

concealed carry of pocket pistols. *Id.* And *Bruen* found that pocket pistols were commonly possessed by the time of the founding. *Id.* at 2144 n. 13. It makes little sense to conclude that persons carried pistols in their pockets for protection yet left them unloaded.

Third as we move into the 19th Century various states enacted laws period prohibiting the concealed carry of pistols. *Id.* at 2146. These laws were enacted as discussed herein to prevent surprise attacks. If few persons possessed or carried pistols, it is surprising that states felt the need to regulate their concealed carry. Moreover, it hardly seems likely that these laws were passed because the guns that were being carried concealed were unloaded. Indeed, the very purpose of carrying a gun either concealed or openly was and is today to have the arm ready for immediate use in event of confrontation. So, the suggestion of the District's expert that guns would have been carried unloaded is nonsensical.

Fourth, as we move toward the Civil War period, production figures belie the view that pistols were not commonplace in early America. Samuel Colt's patent for the revolver was issued August 29, 1836. His design was marked by the use of interchangeable parts and assembly line manufacture that greatly reduced the cost of pistols making them affordable to the masses. Colt produced some 340,000 of his Model 1849 Pocket Pistol from 1850 to 1873. *See* https://www.nramuseum.org/guns/the-galleries/a-prospering-new-republic-1780-to-1860/case-10-california-gold-rush/colt-model-1849-pocket-revolver.aspx. About 200,400 of the Colt 1860 Revolver were manufactured from 1860 to 1873. *See* https://www.w.nramuseum.org/guns/the-galleries/a-nation-asunder-1861-to-1865/case-13-confederate-arms/colt-model-1860-army-percussion-revolver.aspx. In addition, the Smith & Wesson No. 1 Revolver, first and second issue, had a combined production run of more than 128,000 though 1868. *See https://www.nramuseum.org/guns/the-galleries/a-prospering-new-republic-1780-to-1860/case-11-firearms-innovations/smith-wesson-no-1-1st-issue-revolver-w-original-gutta-percha-case.aspx.* Various other pistol manufacturers competed in the American firearms market in the time prior to the adoption of the 14th Amendment. Accordingly, the view that pistols were rare in the founding period and up through the ratification of the 14th Amendment is simply untenable.

Fifth, the metallic cartridge was invented in 1845 in France. *See* Chuck Hawks, Early Metallic Cartridges, available at https://www.chuckhawks.com/early_metallic_cartridges.htm. The .22 short cartridge was introduced in 1857 for the first Snith and Wesson revolver. *Id.* This was followed by the .22 Long in 1871 and the .22 Long Rifle in 1897, which is the most popular round today. *Id.* Large bore cartridges were developed during the civil war period. *Id.* This included the .50 Remington Navy later known as the 1871 Army. *Id.* Metallic cartridges allowed for increased reliability, allowing pistols to stay loaded, as well as facilitating reloading. By the 1870s several center fire metallic pistol cartridges existed, including the .44 Smith and Wesson American, adopted by both the U.S. and the Russian military. *Id.* The most popular metallic pistol cartridge of the time, however, was the .45 Colt, used in the 1873 Colt revolver. *Id.*

well-established *distinctly similar* historical analogue to support DCMR § 24-2344.2. It will not be possible for the District to justify its regulation under *Brien*, for no distinctly similar well-established analogue exists. For that matter, no relevantly similar historical analogue exists either.

In analyzing historical analogues *Bruen* emphasizes two metrics: how and why. 142 S.Ct. at 2133. *See also Rahimi,* 144 S.Ct. at 1898. How did the proffered historical analogue burden the right to keep and bear arms; and why did it burden that conduct. *Bruen,* 142 S.Ct. at 2133. The Supreme Court's decision in *Rahimi* is instructive in this regard. Rahimi addressed the facial constitutionality of 18 U.S.C. § 922(g)(8)'s prohibition of firearm possession for persons under a domestic abuse restraining order. *See* 144 S.Ct. at 1896. The Court found two sets of laws that were widely in force in the period immediately following the ratification of the amendment. *Id.* at 1899. These were the surety laws and the going armed to the terror of the people laws. *Id.* at 1899-1902. Each allowed a temporary disarmament of an individual based on a judicial finding they represented a threat to innocent persons.[9] While not *identical* in how they effected a temporary disarmament, they were sufficiently similar to meet the how component of *Bruen,* and they were plainly synonymous as to the why component. *See Id.* at 1903. From this the Court derived the narrow principle that a person may be temporarily disarmed upon a judicial finding they represent a threat to an innocent person(s). *Id.* at 1901 & 1903.

The narrowness of the Court's holding in *Rahimi* is illustrative of a concern that courts not analogize at too high a level in evaluating the "how" and "why." *See Bruen,* 142 S.Ct. at 2132. The

---

[9] The surety laws required a person found to be a threat to another to post bound to keep the peace for a period of time on pain of a period of incarceration; while under bond he could be disarmed. *Id* at 1900. In the case of the going armed to the terror of the people laws, the temporary disarmament occurred from the potential term of incarceration upon conviction. *Id.* at 1901-02.

D.C. Circuit's opinion in *Hanson v. Smith*, 120 F.4th 223 (D.C. Cir. 2024), Case No. 23-7061, slip op. (Oct. 29, 2024) is instructive here. There the Court explained:

> At the pinnacle of abstraction, an historical analogue could be representative of "an unbroken tradition of regulating weapons to [protect communities]." *Bevis [v. City of Naperville],* 85 F.4th [1175,] 1200 [7th Cir. 2023)]. Conversely, one could read the history to find "no American tradition of limiting ammunition capacity." *Duncan v. Bonta,* 695 F. Supp. 3d 1206, 1214 (S.D. Cal. 2023). We think these levels of generality and specificity exemplify, respectively, just the "regulatory blank check" and the "regulatory straightjacket" against which *Bruen* warns. 597 U.S. at 30; *see id.* (at a high enough level of generality, "everything is similar in infinite ways to everything else" (cleaned up)).

*Slip op.* at 13-14.

Throughout this Nation's history there have existed only two well-established regulations respecting the manner of carrying firearms: (1) restrictions on carrying dangerous and usual weapons to the terror of the people as exemplified by the Statute of Northampton and state analogues such as the "going armed" laws *Rahimi* cites; and (2) restrictions on carrying concealed handguns and other deadly concealable weapons. *See Heller,* 554 U.S. at 612-13 & 626; *Bruen,* 142 S.Ct. at 2143-44 & 2146-47; *Rahimi,* 144 S.Ct. at 1900-02.[10]  Neither of these laws are either distinctly similar or relevantly similar to DCMR § 24.2344.2. Both of these sets of laws were directed at preventing armed criminal assaults. No regulations in the relevant period – whether that be the founding era or the period up to and around the adoption of the 14th Amendment mandated that handguns must be carried in a holster on the body or otherwise on the body or similarly sought

---

[10] *See, e.g.,  State* v. *Chandler*, 5 La. Ann. 489, 490 (1850); *Nunn* v. *State*, 1 Ga. 243, 251 (1846); *Aymette* v. *State*, 21 Tenn. 154 (1840) (relating to laws prohibiting concealed weapons). To be sure regulations existed with respect to other aspects of carrying directed at dangerous behavior with guns such as prohibiting celebratory gunfire, public discharge unrelated to self defense, the setting of spring guns, and the carrying of firearms under the influence of alcohol. Regulation of these acts which are inherently dangerous is well established in our historical tradition. Yet they are far afield from D.C.'s off body carry ban. *See Hanson, slip op.* at 15-17.

to regulate exactly how arms were carried. In various cases throughout the country, government defendants have pointed to a host of law seeking to justify modern firearms regulations. *See, e.g., Duncan v. Bonta,* Case No. 17-cv-01017 BEN-JLB (S.D. Cal.), Doc. 139-1 (Jan. 11, 2023). No statute distinctly or relevantly similar to DCMR § 24-2344.2 has been identified. Our independent research likewise failed to identify any distinctly similar statute, much less a well-established historical analogue. And our research shows such regulations currently are nonexistent.[11]

Further, as noted, the rationale behind the two historical analogues discussed above differs markedly from that evidently behind D.C.'s ban on off body carry. The self-evident rationale behind the going armed to the terror of the people analogues which were prevalent at the founding, *see Rahimi*, 144 S.Ct. at 1900-01 – was to prevent the public from being menaced by persons carrying unusual and dangerous weapons in a threatening offensive manner. *See, e.g., State v. Huntley,* 25 N.C. 418, 423 (1843) ("For any lawful purpose—either of business or amusement— the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result, which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people."). So, the why behind those laws was materially different than D.C.'s off body carry ban.

Likewise, the rationale behind 19th century laws that banned the concealed carry of deadly weapons differs markedly from the why of D.C.'s off body carry ban. Those laws were directed to ensure that someone encountering a person armed with a deadly weapon would be alerted to the potential danger such a person presented. Unlike today, concealed weapons were considered

---

[11] New Jersey Criminal Justice Code § 2C:58-4.4 (5)(a)(3) requires that a handgun must be carried in a holster. Without regard to whether that statute comports with the Nation's historical tradition of firearms regulation, we find that requirement unobjectionable as it does not prohibit off body carry in a purse, slingbag, fanny pack or backpack as does the regulation at issue here.

predominately the tools of the robber and assassin. This is readily apparent from the discussions

of courts which considered the constitutionality of these concealed carry restrictions. For example,

in *State v. Chandler,* 5 La. Ann. at 489-90, the court explained,

> This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. It interfered with no man's right to carry arms (to use its words) "in full open view," which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.

*State v. Reid,* 1 Ala. 612 (1840) similarly considered a restriction on the concealed carry of

deadly weapons. The title of the act in question set forth the "why" succinctly being "An Act to

Suppress the Evil Practice of Carrying Weapons Secretly." 1839 Ala. Act 67.  The court explained

that "a law which is intended merely to promote personal security, and to put down lawless

aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner

as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making

him less regardful of the personal security of others, does not come in collision with the

constitution."

The view that the purpose of the laws against carrying arms concealed was to prevent

surprise attacks and assassinations, runs throughout the 19th century state court decisions. *See, e.g.,*

*Aymette v. State,* 21 Tenn. 154: "To hold that the legislature could pass no law upon this subject,

by which to preserve the public peace, and protect our citizens from the terror, which a wanton and

unusual exhibition of arms might produce, or their lives from being endangered by desperadoes

with concealed arms, would be to pervert a great political right to the worst of purposes, and to

make it a social evil, of infinitely a greater extent to society, than would result from abandoning

the right itself." "The citizens may bear them for the *common defence*; but it does not follow, that

24

they may be borne by an individual, merely to terrify the people, or for purposes of private assassination."[12] *Id. See also Nunn v. State*, 1 Ga. at 251 (1846) ("So far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid…."); *Stockdale v. State*, 32 Ga. 225 (1861) (describing the state's protection of open-carry as a way "to compel persons who carried those weapons to so wear them . . . that others . . . might see that they were armed, and dangerous persons, who were to be avoided in consequence").

It is certainly true the prohibition on concealed firearms extended to firearms carried in a purse or bag. That of course makes perfect sense as otherwise someone could defeat the prohibition on concealing a deadly weapon by just carrying it in a bag or other container. The laws in question, however, were directed not to the carry in a bag or container, but to the concealed nature of the carriage. The "why" then was also materially different than the "why" of DCMR § 24-2344.2.

Of added significance here–to the extent such post enactment history is relevant under *Bruen, see* note 7, *supra*–is the complete lack of regulation how one might carry in the discretionary licensing schemes enacted in the late 19th and early 20th centuries. D.C.'s expert, Ms. Rivas references such licensing laws but fails to cite any adopting carry restrictions similar (whether relevantly or distinctly) to D.C.'s off body carry ban. *See* ECF 21-15. No such laws we have found banned off body carry or otherwise regulated the exact manner how one carried firearms.

Beyond the going armed  and the concealed carry laws, laws at the founding and through the end of the 19th century – assuming we can even look to that later period – simply did not

---

[12] Note that the *Aymette* court viewed the right as limited to the "common defense" suggesting it did not extend to protect an individual's private right to use arms for self-defense. Justice Stevens cited this case to support his dissent in *Heller,* 554 U.S. 570 that the Second Amendment did not protect an individual right to keep and carry arms. *See Id.* at 648 n.10. Thus, *Aymette* is a weaker case for gauging the Second Amendment's scope than some of the other 19th century cases discussing concealed weapon statutes since that court's view of the scope of the Second Amendment is inconsistent with the Supreme Court's view in *Heller, Bruen* and *Rahimi.*

regulate how one carried arms. One outlier state, Tennessee in the late 1800s did severely limit the carrying of handguns, providing they must be carried only in the hand, a regulation unthinkable today that would result at the very least in public alarm if not innocent deaths. *See* 1879 Tenn. Pub. Acts 231, ch. 186, § 1 (An Act to Amend the Criminal Laws of this State upon the Subject of Carrying Concealed Weapons). That statute read in pertinent part, "[I]t shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol used in warfare, which shall be carried openly in hand…." That statute obviously evinced an enmity to firearm carry and in light of *Bruen* was plainly in violation of the Second Amendment.[13] One outlier state statute – completely inconsistent with *Bruen* – does not constitute a well-established historical analogue. *See Bruen,* 142 S.Ct. at 2147 & 2153 (discussing Tennessee's statutes). *See also Id.* (discussing Texas's late 18th century restrictions on pistol carry as an outlier).

Another outlier state statute, this one in Georgia, banned sale, possession and carry of a number of arms including most pistols, except for horse pistols; these were large pistols generally

---

[13] Given the statute was enacted shortly after reconstitution in a southern state, one must wonder if it was ever enforced against white citizens. Consider the words of a Florida Supreme Court Justice in a 1941 concurring opinion that analyzed a Reconstruction Era handgun licensing law:

> The same condition existed when the Act was amended in 1901 and the Act was passed for the purpose of disarming the negro laborers…. The statute was never intended to be applied to the white population and in practice has never been so applied. We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in rural sections of Florida have violated this statute…[but there has] never been, within my knowledge, any effort to enforce the provisions of this statute as to white people.

*Watson v. Stone*, 148 Fla. 516, 524 (Fla. 1941) (Buford, J., Concurring). Care should thus be taken in considering laws from the Jim Crow era enacted by former Confederate states given their historical efforts to disarm freedmen. *See McDonald v. City of Chicago,* 561 U.S. 742, 745 (2010).

not carried by individuals, sold as a pair, and carried in pouches draped over a horse. *See* Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837, pp. 90-91 (Milledgeville: P. L. Robinson, 1838) (Dec. 25, 1837). Thus, that statute sanctioned a form of off body carry while drastically restricting both open and concealed pistol carry. The Georgia Supreme Court, however, found this statute unconstitutional in all its applications except as to its prohibition on concealed carry of pistols and other weapons as we discussed above. *See Nunn v. State,* 1 Ga. 243. *Heller* extols *Nunn* because the "opinion perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause. *See* 554 U.S. at 612; *Bruen,* 142 S.Ct. at 2147.

D.C.'s proffered expert, Ms. Rivas indicates that two "excellent examples" of compendia of historic carry laws are the Appendix of Patrick Charles's amicus brief in *Bruen*. *See* Brief of Amicus Curiae Patrick J. Charles, Appendix 1 at 8-30, *New York State Rifle and Pistol Ass'n. v. Bruen*, and the Duke Repository of Historical Gun Laws. *See* Doc. 21-15 at 20-21 n. 43. Second Amendment scholar Mr. Charles's amicus brief contains a 104 page Appendix of the texts of "Mid-to-Late Nineteenth Century and Early Twentieth Century Laws Governing the Carrying of Concealed and Dangerous Weapons," predominately licensing laws. The document is available on the Supreme Court's web site at https://www.supremecourt.gov/DocketPDF/20/20-843/184310/20210719174313263_40977%20pdf%20Charles%20app.pdf. A text search of that document revealed no mention of the words "holster," "holsters," "holstering" or "holstered."

A text search of the Duke Repository of Historic Gun Laws for the word "holster," prior to 1901, including related terms, revealed only two laws in which the word appears. The first is credited to Samuel Kimball, Charter, Other Powers, and Ordinances of the City of Lawrence Page 149, Image 157 (1866) available at The Making of Modern Law: Primary Sources. It provides:

27

Nuisances, § 10. Any person who shall in this city have or carry concealed or partially concealed, upon his person, any pistol, bowie knife or other deadly weapon, shall, on conviction, be fined not less than one nor more than ten dollars; Provided, This section shall not apply to peace officers of the city or state. The carrying of a weapon in a holster, exposed to full view, shall not be deemed a concealed or partially concealed weapon under this section.

The second law is An Act to Organize and Discipline the Militia, § 29, 1836 Ohio Laws 18, 30–31 (S. R. Dolbee 1837). It provides:

Sec. 29. That in each regiment, squadron or battalion, the field officers shall each arm himself with a good and sufficient sword and pair of pistols, and furnish himself with a good and sufficient horse, with saddle, bridle, martingale, and holsters; and in each company of cavalry or troop of horse, the commissioned officers shall each be armed with a good and sufficient sword and pair of pistols, and shall each furnish himself with an active horse, not less than fifteen hands high, with saddle, bridle, martingale, holster and valise; and each non-commissioned officer, musician and private, shall, in like manner, furnish himself with a good horse, not less than fifteen hands high, with a good and sufficient saddle, bridle, martingale, valise and holsters; and, in like manner, shall arm himself with a good and sufficient sword and pair of pistols, and a cartridge box to contain twelve cartridges, suitable to the bore of his pistols ….

Expanding the search to 1950 added one more law, 1925 Or. Laws 468, 469-471. That law reads:

Section 5. Except as otherwise provided in this act, it shall be unlawful for any person within this state to carry concealed upon his person or within any vehicle which is under his control or direction any pistol, revolver or other firearm capable of being concealed upon the person without having a license to carry such firearm, as hereinafter provided in section 8 hereof. Any person who violates the provisions of this section shall be guilty of a misdemeanor, and if he has been convicted previously of any felony, or of any crime made punishable by this act, he is guilty of a felony. This section shall not be construed to prohibit any citizen of the United States, over the age of eighteen years, who resides or is temporarily sojourning within this state, and who is not within the excepted classes prescribed by section 2 hereof, from owning, possessing or keeping within his place of residence or place of business any pistol, revolver or other firearm capable of being concealed upon the person, and no permit or license to purchase, own, possess or keep any such firearm at his place of residence or place of business shall be required of any such citizen. Firearms carried openly in belt holsters shall not be deemed to be concealed within the meaning of this section.

Plaintiffs could find no distinctly similar historical law to the off body carry ban, nor even a law relevantly similar to the District's, despite that under *Bruen* relevantly similar analogues are only pertinent when a "nuanced analysis" is appropriate, and here it is not. *See Bruen,* 142 S.Ct. at 2132.[14] In response to Plaintiffs' withdrawn motion for preliminary injunction, D.C.'s experts could point to no similar laws to the DCMR § 24.2344.2. *See* Doc. 21-14 and 21-15. Rather, both experts spent considerable space attempting to justify why there were *no such laws. See* Doc. 21-14 at 3 & 14; Doc. 21-15 at 6. Moreover, D.C.'s expert, Ms. Rivas, concedes it was *commonplace for Americans to carry firearms in saddlebags and purses,* thereby demonstrating a history and tradition of no regulation of off body carry. *See* Doc. 21-15 at 7 n.4. Because D.C. cannot justify its regulation by showing either distinctly similar–or even the inapposite relevantly similar– historical analogues *Bruen* requires*,* Plaintiffs may not be prohibited from exercising their right to bear arms through off body carry. Thus, under the Supreme Court's precedents, the constitutionally relevant history, and the proper analysis, Plaintiffs must prevail here.

In our view, the off body carry ban is facially unconstitutional and the Court should so declare. It requires concealed firearms to be borne two ways: 1. In a holster and 2. On the body. This is conjunctive, not disjunctive. So, in all its applications, the law is unconstitutional since there is no historical analogue to support a prohibition of off body carry. As we stated above, however, we would not object to a regulation that requires that handguns simply be carried in a holster that fully covers the trigger guard. The consensus within the firearms training community, as we discuss below, is that for safety purposes firearms carried on body or off body should be

---

[14] Even if consideration of "relevantly similar" historical analogues were appropriate–and they are not here–they must be evaluated at the proper level of generality. *See Hanson*, slip. op. at 13-14.

holstered to prevent a potential unintentional activation of the firearm's trigger were an object to enter the trigger guard of the gun. So, were the court to conclude DCMR § 24.2344.2 is constitutional in some application, i.e., in requiring that carried guns be holstered, then Plaintiffs request the Court to find the rule unconstitutional as applied to holstered firearms carried off body in a device designed for firearm carry such as a concealed carry purse, slingbag or fanny pack.

### C. Off Body Carry is a common means of handgun carry and is thus consistent with *Heller's* common use principle.

In *Rahimi,* the Supreme Court, applying *Bruen,* discussed principles underlying the Second Amendment. 144 S.Ct. at 1898. *Heller* and *Breun repeatedly* point to one such very clear principle: that the choice of the American people is entitled to judicial deference. *See, e.g., Bruen,* 142 S.Ct. at 2131. Thus, *Heller* found that the weapons protected by the Second Amendment were those in common use. 554 U.S. at 627. *See Bruen,* 142 S.Ct. 2143. As we will show below, off body carry is commonly used for firearm carry. Indeed, the District appears to concede this point. *See* ECF 21-2 at 15 ("Modified purses, tablet cases, briefcases and other bags are common ways to carry concealed firearms. Though they present their own challenges, they are an exceptional way to carry concealed…. Depending on your needs, they can fill a very important role"). As such, the principle that deference is owed to the choice of the American people reinforces the conclusion that off body carry is protected under the Second Amendment.

The literature aptly shows off body carry is a common means of carrying a handgun. *See, e.g.,* Elizabeth Bienas, "The Pros and Cons of Off-body Carry," *Guns.com* (March 7, 2023) available at https://www.guns.com/news/off-body-concealed-carry-pros-cons-CCW (Exhibit 1, hereto); Travis Pike, "The Art of Off-Body Carry – How To and Why," *Crossbreed Holsters.com* (undated), available at https://www.crossbreedholsters.com/blog/the-art-of-off-body-carry-how-to-and-why/ (Exhibit 2, hereto); "Opening Up To Off-Body Carry," *American Rifleman* (Nov. 25,

2013), available at https://www.americanrifleman.org/content/opening-up-to-off-body-carry-1/ (Exhibit 3, hereto).

Police officers often utilize off body carry off duty. A study of off duty use of lethal force by Los Angeles Police Department officers found numerous instances in which off body carry was utilized; LAPD determined these instances were within policy. *See* Declaration of Claude Werner, Exhibit 4, hereto. Indeed, an LAPD firearms training module for off duty carry explains "The holstered firearm shall be securely attached to the officer or may be carried concealed in a container under the officer's immediate control. Such a container may include, but is not limited to, purses and briefcases." Los Angeles Police Department Stand Alone 7 – LD 35 Firearms Session No. 41 and 42- Back-up/Off-Duty Handguns & Department Qualifications, (I)(D)(4), available at https://lapdonlinestrgeacc.blob.core.usgovcloudapi.net/lapdonlinemedia/2021/09/SA07_S41_42_ LD35_SA_07S_41_and_42_TEST_back_up_gun.pdf#:~:text=The%20LAPD%20does%20not% 20require%20an%20officer%20to,off-duty%20for%20protection%20against%20an%20unexpected%20deadly%20threat. (Exhibit 5, hereto.)

Firearm instructor Melody Lauer explains that "Some mothers choose to carry off-body in a bag or purse similar to the tactical diaper bag." *See* Armed and Pregnant, The guide to carrying a firearm while pregnant, available at https://armedpregnancy.blogspot.com/.[15] (Exhibit 6,

---

[15] Ms. Lauer explains that a "tactical diaper bag is more than what is carried in the bag but here are some things you might find if you were to search such a bag:

- gun
- knife
- multi-tool
- spare magazine/speedloader
- pepper spray
- tactical pen

hereto), "A tactical bag takes the carrying of the defensive tools to a whole new level of security and accessibility. There are bags out there that are specifically designed to be 'tactical' and they make it very easy to put together in a configuration that works for you both as a kick-ass mother and as a warrior woman." *Id.*

Instructor Vicki Farnum is a veteran civilian and law enforcement firearms trainer. She specializes in teaching male instructors to teach woman gun owners. She is the author of two books on the subject, "Teaching Women to Shoot: A Law Enforcement Instructor's Guide," and "Women Learning to Shoot: A Guide for Law Enforcement Officers." With the special needs of women shooters in mind, she developed in 2019 a system of off body carry she calls "FlexCCarry" and began teaching a course to certify off body concealed carry instructors. *See* Vicki Farnum, FlexCCarry Solutions, A Positive Guide for Off-Body Carry at ix (2024) (Exhibit 7, hereto). Ms. Farnum offers this course nationwide. *Id.* Ms. Farnum writes that "'FlexCCarry Solutions' is a

---

- medical supplies (beyond just a few bandaids and neosporin)
- flashlight
- Taser
- Stun gun
- Personal Alarm."

*Id.* She further explains,

> The greatest thing about these types of bags is that they assume you will be carrying defensive tools and/or weaponry of some sorts and they make provisions for such tools.

> The back pocket of the bag is designed to hold a gun if you wish. There is a holster accessory you can purchase separately that you attach to the inside of the pocket to secure your firearm. The shoulder strap (which is designed to be carried cross-body) has a quick-release snap but also small loops and hooks for anything you might want to attach to the strap like a pen or pepper spray or even your car keys. In addition to that there are many more pockets and pouches that allow for reasonable placement of items by level of importance.

*Id.*

more accurate description of handbags, sling bags, tote bags, waist packs, and briefcases with dedicated pockets to hold your handgun than the term 'off-body carry.'" *Id.* at xi. She explains, "Wardrobe styles, work requirements and environments, physical challenges, and medical issues are just a few reasons someone may choose or be compelled to choose something other than a waistband belt holster." *Id.*

Ms. Farnum explains that FlexCCarrry offers advantages not available with traditional on body carry. *Id.* at 2. She says,

> Women have resisted the requests of men in their lives to carry a handgun because they didn't want to change their wardrobe. The FlexCCarry Solution allows her the freedom to dress in her own style. She does not have to adjust her wardrobe to accommodate a handgun attached to a particular place on her body. Think of the carry bag as a "Daily Go Bag" (DGB)….

> No matter what you are wearing – a dress,, a lightweight vest, or your wool sweater, down vest and heaviest down jacket – your DGB maintains consistent position and accessibility to your defensive handgun on top of the outermost layer of your clothing.

*Id.* at 2-3.

> She goes on to explain that

> Physical, medical and mobility challenges (e.g., wheelchairs) can leave a person vulnerable to threats from violent people and prevent traditional methods of carry. These challenges may also reduce someone's ability to avoid or respond to violence. Using a DGB provides a possible solution and the capability to defend themselves.

> Women who have carried traditionally detest using the bathroom. A DGB solves this problem as the bag stays on your body.

*Id.* at 3.

Other women firearm trainers agree with Ms. Farnum. Jerah Hutchins has been a firearms instructor for 17 years. *See* Declaration Under Penalty of Perjury of Jerah Dawn Hutchins, at 1 (Exhibit 8, hereto).  She is also a competitive shooter and has had to use her firearm in self-defense.

*Id.* She formerly owned a security company that trained security professionals in Texas. *Id.* Women make up some 70 percent of the students in her classes. *Id.* As such, her classes are geared toward female safety and cover both on and off body carry. *Id.* Based on her training and experience she says, "off body carry is a common method of carrying a concealed firearm for personal protection." *Id.* She herself employs off body carry daily in a backpack that stays on her person when she is out and about. *Id.* at 1-2.

In Ms. Hutchins' professional opinion as a firearms instructor DCMR § 24.2344.2 "significantly impedes the ability of women to protect themselves with no significant countervailing increase in public safety." *Id.* at 2. She states,

> I understand security of the firearm has been raised as an objection to off body carry. This is a training issue more than anything else. If the carrier is properly trained, she will maintain constant control over the device in which the gun is carried. I will also note that police officers and security guards have in the past had their guns taken by criminals from belt holsters.

*Id.* She further states "there are multitudes of accounts nationwide of people defending themselves successfully with a firearm carried off body. These people could have suffered serious injury or death if they would have refrained from carrying due to a regulation like DCMR 24.2344.2." *Id.*

Ms. Hutchins explains that DCMR § 24.2344.2

> limits women in particular due to our much more complicated attire in comparison to men. There are handbags/backpacks/belt-bags for women that are specifically designed for carrying a firearm and they come equipped with a built-in holster or will hold a holster that is sold separately for trigger protection, effectively negating the argument that off body carry will lead to a negligent discharge. Negligent discharges unfortunately happen when people fail to follow safe gun handling rules that can and does occur with on body carry. Again this is predominately a training issue.

*Id.*

Ms. Hutchins also explains that

34

> DCMR 24.2344.2 also limits the ability of people to have sufficient preparedness bags or "go bags" as a primary item found in go bags are weapons, including guns. The idea of a go bag is to have supplies and equipment immediately available in case it is necessary to evacuate ones residence. Yet, in DC's case, a person would immediately be breaking the law if she steps out of her house with her firearm in her go bag.

*Id.* Finally, Ms. Hutchins states that many people take their gun off when driving for comfort and accessibility and place their holstered gun in the car's console. *Id.* She explains, "It is very difficult to draw a concealed firearm while sitting in a vehicle wearing a seat belt." *Id.* Ms. Hutchins thus demonstrates that DCMR § 24.2344.2 is a significant impediment to armed self defense, especially for women.

Kerrie Ann Auclair. is chairman of the Massachusetts chapters of Women for Gun Rights and Armed Women of America, and advocacy director for Gun Owners' Action League, a Massachusetts firearms rights advocacy organization. Declaration of Karrie Ann Auclair, at 1 (Exhibit 9, hereto). She is also a handgun instructor certified by the National Rifle Association and by the United States Concealed Carry Association. *Id.* She has additional certifications as a range safety officer, and as an instructor for Refuse to Be a Victim and for self defense spray. *Id.* Her classes are predominately directed toward women, and women comprise the bulk of her students. She states discussion of carry options is a substantial portion of her classes, including off body carry. Ms. Auclair explains that

> Standard of dress for women is materially different than for men. Men basically wear pants with a belt and a shirt. They may wear a jacket or coat as well either for dressier occasions or for weather conditions. Whether formal or informal, the basic dress for a man generally remains the same. There are of course exceptions such as workout clothes, including gym shorts, sweatpants, or beach wear which make attachment of a firearm to the body problematic.

> Generally, however, men's fashions easily allow for on body carry of a holstered gun. The most popular means of carry for men is either outside the waistband in a holster attached to the belt, or using a holster that also clips onto the belt but is tucked inside the waistband of the pants. This latter method enhances concealment

but requires more care in drawing and holstering to avoid pointing a gun at oneself. In either outside the waistband or inside the waistband carry a shirt or jacket is used to conceal the firearm.

. . .

For women, concealing a handgun for personal protection is much more complicated. First, women's clothing is more form fitting and women's bodies tend to be more rounder and shapely compared to most men. For a woman a concealed handgun is more likely to print under tight clothing than the more looser clothing options that men wear. Generally women's clothes do not employ belts since our waists tend to be smaller than our hips. And women's pants do not have pockets of a sufficient size to accommodate a pocket pistol putting aside the printing issue. Nonetheless, there are some casual wear options such a jeans or cargo pants that would allow a woman to wear a gun like a man, inside or outside the waistband, either covering the gun with a jacket or a shirttail. However, that is not a viable option in an office or professional situation and most woman's shirts and jackets are not long enough to cover a handgun carried at the waistline.

Most dressier occasions severely limit a woman's carry options. Wearing a long dress for example pretty much limits a woman to a thigh holster under the dress. While that might seem sexy to some, presenting a firearm in that situation requires hiking the dress up past the gun and drawing the gun without getting tangled in the fabric. Being able to do that quickly and covertly to address an imminent threat is questionable. And that cannot be done while one is running away from a mugger or rapist or intertwined in a physical fight with one's attacker.

*Id.* at 1-2.

Ms. Auclair further highlights the issue of carrying a handgun in athletic wear. "Try to imagine how one would conceal a firearm on one's person heading to a yoga class or sitting by the neighborhood pool," she states. *Id.* at 3. Echoing Ms. Hutchins, she discusses issues of driving with a concealed handgun, pointing out that "Road rage has become a significant issue where I live. Accessing a firearm on body seated in a vehicle is problematic due to vehicle restraining systems no matter what one wears. Ankle carry admittedly is an option in that situation, but it is otherwise not a viable option for women in most other situations. So what does the woman do when she gets to her destination?" *Id.*

Because of these limitations of women's fashion, students in her classes "express considerable interest in off body options." *Id.* Ms. Auclair as well employs off body carry "when

I am in more dressier attire … in a purse specifically designed to carry a firearm. I do so because it is comfortable and practicable.  It allows me to have the gun readily accessible should I or a loved one suffer a life threatening attack." *Id.* In sum, Ms. Auclair considers "a prohibition on off body carry imposes a significant burden on a woman's ability to use a firearm for personal self-protection." *Id.*

The literature is replete with the many reasons why one would desire to employ off body carry. One author explains, "There are times, places, user groups, and activities where modern and functional discreet packs offer the only effective means for carrying or transporting a firearm." Andrew Jordan, "Off-Body Carry Pros and Cons," *ConcealedCarryAndrew.com* (undated), available at https://concealedcarryandrew.com/off-body-carry-pros-and-cons/. (Exhibit 10, hereto) An example would be bicycling. "[T]he great number of casual or average-attired street riders peddling around America these days would be better-served by a conveniently sized, well-positioned, stable and readily accessible waist pack. One that is comfortable and as unobtrusive as possible will still allow the gun to be drawn with relative ease." *Id.* The author suggests the same thing is true for motorcyclists. "A modern, non-contrasting pack or pouch might not only work [with casual clothes] but might also ease mounting and dismounting the bike. While carrying a gun and other valuables, such a bag might also attract less attention when momentarily stepping away from the bike to eat, stretch out or go to the restroom." *Id.*

The author likewise thinks waist packs also have an advantage for certain vacationers.

Consider the activities you might find yourself doing when the family heads off for a week of car-based sightseeing. How many times might you (sometimes in a single day) be in and out of the car or changing clothes to suit the climate and activity. Also in the course of that single day, you're likely to be sitting as much as standing: perhaps confined behind the wheel of a car or by a booth in a diner.

*Id.*

Off body carry offers an easy way to conceal a firearm without the potential of inadvertent disclosure. This is especially a factor as mentioned by Ms. Auclair and Ms. Hutchins for ladies who tend to wear more form fitting clothing. *See, e.g.,* USA Carry, "Off-Body Carry: The Pros and Cons" (Oct. 7, 2024), available at  https://www.usacarry.com/off-body-carry-the-pros-and-cons/ (Exhibit 11, hereto) ("Off-body carry is a viable option for women wearing dresses, anyone who is not wearing a belt, people in workout clothes, and people in light or form-fitting summer clothes. It can also be useful if you are very active and there is a danger of your gun no longer being adequately concealed.")

Comfort is often a reason for off body carry as well. However, off body carry can have tactical advantages. "A fanny pack is perhaps the most surprising place to keep a pistol. It's the most un-stylish bag there is. Fanny packs are all practical and seeming un-tactical. It is also a place a mugger is going to expect money and for his victim to reach into." *Id.* As the author explains further, "An attacker is likely going to expect men to carry a pistol around the waist. He won't expect a gun to be in his face after he hears 'here take my wallet.'" *Id.*

The author further explains that:

> A pistol in a bag can reduce the advantage an attacker has. A violent criminal is always going to attack first and surprise his victim. With a bag, somebody walking through a seedy area can hold a pistol and keep it concealed. This can even be done while pointing it in the direction an attacker might present his thugself. A very close attacker can be shot at through a bag for a surprise counter attack. An on-body carried pistol cannot be gripped without brandishing it. Just walking around with a gripped and visible pistol is usually very illegal.

*Id.*

A variety of products specifically designed for off body carry exist. These include purses, fanny packs, sling bags, and backpacks. *See* Bob Boyd, "5 CCW Products Built for Off-Body Carry," *NRAShootingIllustrated.com* (May 8, 2018) (Exhibit 12, hereto); Annette Evans & David Lane, "Best CCW Fanny Packs: Off-Body Carry The Right Way," *Recoil* (undated), available at

https://www.recoilweb.com/best-ccw-fanny-pack-172879.html (Exhibit 13, hereto). Firearm instructor Ms. Lauer speaks highly of the Maxpedition Versipack Jumbo Bag for the new mother who carries a firearm to protect herself and her children. *See* "Armed and Pregnant." (Exhibit 6). Ms. Farnum in her book also discusses options and suppliers. Exhibit 7, at ix-x, 13-14 & 66.

To be sure there are precautions required for off body carry. *See* "Off-body Carry: the Pros and Cons." (Exhibit 11 at 3-4.) The firearm must be in a holster in a separate compartment of the off body device and the holster must – like all holsters – fully cover the trigger guard. *See* Farnum, Exhibit 7 at 7. Moreover, when in public or when children are present the carrier must maintain positive control of the device containing the firearm. Exhibit 11 at 4. However, under *Bruen,* a court is forbidden to engage in an interest balancing analysis. *Bruen,* 142 S.Ct. at 2129 & 2131. Rather, it must find a firearms regulation unconstitutional if it is not consistent with the Nation's historical tradition of firearms regulation. *Id.* at 2126-28, 2130, 2135 & 2138. As discussed above, DCMR § 24-2344.2 is not consistent with the Nation's historical tradition of firearms regulation and it is therefore unconstitutional.

The District might point to anecdotal examples of persons employing off body carry in violation of the safety precautions discussed above, and thereby question the safety of off body carry generally. Unfortunately, irresponsible firearm handling can occur no matter how people carry a firearm. The Internet is replete with stories of police officers and citizens utilizing traditional on body carry managing to shoot themselves or others unintentionally while drawing their guns or holstering them.[16] No one would seriously suggest we should outlaw on body carry

---

[16] *See* Claude Werner, *Serious Mistakes Gunowners Make and the Decisions That Led Up to Them,* "Unintentional Discharges" (Exhibit 14, hereto); *Elkhart Co. court security officer hospitalized after gun discharges* (Mar. 1, 2023) (Exhibit 15, hereto); *Lansing man recovering after shooting himself while holstering gun* (Mar. 19, 2023) (Exhibit 16, hereto); AP, *IndiStar,* "Indiana police officer accidently shoots himself (Aug. 1, 2018) (Exhibit 17, hereto); Luke McCoy, *USACarry,*

for safety sake despite these incidents where officers and civilians mishandled their firearms and caused injury. The answer, as instructors Hutchins (Exhibit 8) and Farnum (Exhibit 7 at 25-59) explain, is proper training. In any event, this is an interest balancing argument which *Bruen* places off limits. *See* 142 S.Ct. at 2029, 2031 & n.7 & 2060.

## VI.    The Court should grant summary judgment in Plaintiffs' favor.

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller,* at 634–35. "The very enumeration of the right [to keep and bear arms] takes out of the hands of government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id*. at 634 (emphasis in original). To justify a law that limits Plaintiffs' Second Amendment rights, the government bears the affirmative burden of proving the regulation is consistent with our Nation's history and tradition. *Bruen*, 142 S.Ct. at 2126. As a matter of law, any statute or regulation infringing on the right to carry a firearm for personal protection is unconstitutional unless it comports with the Nation's historical tradition of firearms regulation. *Id.* DCMR § 24-2344.2 does not comport with the Nation's historical tradition of firearms regulation because traditionally the government has not dictated how citizens physically carry personal protection firearms with the sole exception of prohibitions on the carrying of firearms and other deadly weapons concealed. Here the District does not prohibit the carrying of concealed firearms. Indeed, the District mandates that handguns

---

"Instructor Shoots Himself in the Leg While Holstering (Nov. 5, 2019) (Exhibit 18, hereto); AP, *Police 1,* "NYC officer stable  after shooting self" (Aug. 19, 2013) (Exhibit 19, hereto).

carried in public must be fully concealed. *See* D.C. Code § 7-2509.07(e); DCMR § 24-2344.1.[17] So, the tradition of prohibiting the concealed carry of handguns is inapplicable to this case.

D.C. cannot point to a well-established comparable historical analogue to justify its off body carry prohibition. Indeed, even today D.C.'s off body carry ban is an outlier. Off body carry is a common method of exercising Second Amendment rights and no state prohibits it. Defendants' off body carry ban is thus a contemporary outlier as well as an historical outlier. The conclusion it is unconstitutional both facially and as applied to off body carry of a holstered firearm is patent.

Defendants, acting under color of state law at all relevant times, have deprived the fundamental constitutional rights of Plaintiffs and other persons holding District CPLs through enforcement of the District's regulation banning off body carry of constitutionally protected arms. The District's ban of off body carry inflicts irreparable harm on Plaintiffs by prohibiting conduct protected under the Second Amendment individual right to keep and bear arms. Plaintiffs lack an adequate remedy at law for this burden on their Second Amendment rights so injunctive and declaratory relief are appropriate to protect against the irreparable harm of the ongoing deprivation of Plaintiffs' Second Amendment rights. Summary judgment should therefore be granted in Plaintiffs' favor. Plaintiffs therefore respectfully request this Court to enter summary judgment in their favor and against Defendants, and award them:

A declaratory judgment that DCMR § 24-2344.2 on its face and as applied to holstered off body carry infringes their fundamental right to keep and bear arms, as guaranteed under the Second Amendment to the United States Constitution, and is therefore unconstitutional. A permanent

---

[17] D.C. thus prohibits open carry of handguns by private citizens as well as all carry of long guns in public. There is substantial likelihood these prohibitions violate the Second Amendment as no historical tradition exists of prohibiting open carry or long gun carry. *See* cases cited *supra* & at note 10. Indeed, the court in *State v. Chandler*, 5 La. Ann. at 490, stated open carry "is the right guaranteed by the Constitution of the United States…." Those are questions for another day.

injunction prohibiting Defendants, and Defendants' respective employees, officers, agents, representatives, and all those acting in concert or participation with them, from enforcing DCMR § 24-2344.2.

Respectfully submitted,

**LYNNE ANN BRIGITTE RUSSELL**

**CHARLES JOHN DE CARO**

**LEANNE CHRISTINE REILLY**

**ERIC N. CHRISTIAN, JR.**

**TIMOTHY R. BECK**

By: /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

Dated:   February 20, 2025          *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 20th day of February, 2025, a true copy of the foregoing document was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to all counsel of record.

/s/George L. Lyon, Jr.
George L. Lyon, Jr., DC Bar No. 388678