## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LYNNE ANNE-BRIGITTE RUSSELL, *et al.*,** | |
| **Plaintiffs,** | |
| **v.** | **No. 1:24-cv-01820-JDB** |
| **DISTRICT OF COLUMBIA, *et al.*,** | |
| **Defendants.** | |

## DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants move for summary judgment under Federal Rule of Civil Procedure 56.

Defendants also oppose Plaintiffs' Motion for Partial Summary Judgment [30]. A memorandum

of points and authorities, statement of undisputed material facts, response to Plaintiffs' statement

of undisputed facts, and proposed order are attached. Because this Motion is dispositive,

Defendants have not sought Plaintiffs' consent. *See* LCvR 7(m).

Date: April 4, 2025.                Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
Special Counsel for Firearm Safety
MATEYA B. KELLEY [888219451]
Assistant Attorney General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LYNNE ANNE-BRIGITTE RUSSELL,** *et al.*, <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **DISTRICT OF COLUMBIA,** *et al.*, <br><br> **Defendants.** | **No. 1:24-cv-01820-JDB** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 1

    I.      The District's Concealed Carry Licensing System ................................................. 1

    II.     Plaintiffs ................................................................................................................ 3

    III.    Procedural History ................................................................................................. 4

LEGAL STANDARD ......................................................................................................... 5

ARGUMENT ...................................................................................................................... 6

    I.      Plaintiffs Lack Standing ........................................................................................ 6

         A.     Russell, de Caro, and Reilly Lack Standing. ............................................ 6

         B.     Christian and Beck Lack Standing. .......................................................... 12

    II.     Plaintiffs' Second Amendment Claims Fail. ....................................................... 15

         A.     The Holster Rule Is Consistent With the Scope of the Second Amendment. ............................................................................................... 15

              1.     The Right to Bear Arms Is Not Infringed by Reasonable Manner-of-Carry Regulations. ....................................................... 15

              2.     The Holster Rule Is a Reasonable Manner-of-Carry Regulation, Especially As Applied Here. ..................................... 20

              3.     Plaintiffs Otherwise Fail to Carry Their Burden. .......................... 26

                    a.     Plaintiffs Cannot Carry Their Burden by Simply Alleging That They Want to Carry Arms. ........................ 26

                    b.     Off-Body Carry Is Neither Constitutionally Protected Nor Common. .................................................. 28

         B.     The Holster Rule Is Consistent With Historical Principles. ..................... 32

               1.     The Historical Record Establishes the Principle That the Government Can Reasonably Regulate Manner of Carry. ........... 32

2.      The Holster Rule Is Relevantly Similar to Historical
        Precursors.................................................................................... 38

CONCLUSION.............................................................................................................. 45

**INTRODUCTION**

This is a case where Plaintiffs mistake their personal preferences for a constitutional right.  Plaintiffs prefer, at times, and for fashion or comfort, to carry guns in purses, bags, or otherwise off their bodies.  But such carry methods kill or maim Americans every year.  So a common-sense District of Columbia (District) rule requires that guns be safely holstered when carried.  Contending that the District cannot make such rules for safe carry methods, Plaintiffs allege that this holster rule, on its face and as applied to them, violates the Second Amendment.

Neither Article III nor the Second Amendment supports Plaintiffs' extreme claims.  At the threshold, Plaintiffs lack standing because, among other reasons, three Plaintiffs have never had the holster rule enforced or threatened to be enforced against them, and the two remaining Plaintiffs never faced any injuries after they were caught allegedly violating the rule.  On the merits, Plaintiffs' Second Amendment challenge fails because reasonable manner-of-carry regulations, like the holster rule, are consistent with both the scope of the Second Amendment and the Nation's tradition of firearm regulation.  Thus, the Court should enter summary judgment for the District and deny Plaintiffs' Motion for Partial Summary Judgment [30].

**BACKGROUND**

I.    **The District's Concealed Carry Licensing System**

District law allows the carrying of a concealed pistol with a license issued by the Metropolitan Police Department (MPD).  *See* D.C. Code §§ 22-4505(a), 22-4506.  In enacting the current licensing system, the elected branches of District government decided that gun carriers should abide by "standards for safe holstering."  *Id.* § 7-2509.11(a)(3).  They also decided that MPD is best equipped to prescribe those standards, so they delegated to MPD the responsibility "[t]o establish the methods by which a pistol may be carried."  *Id.*  Upholding that responsibility more than a decade ago, MPD issued a rule that licensees must keep the pistol "in

a holster on their person in a firmly secure manner that is reasonably designed to prevent loss, theft, or accidental discharge of the pistol." 24 DCMR § 2344.2; *see* Notice of Emergency and Proposed Rulemaking, 61 D.C. Reg. 11,519, 11,530 (Oct. 31, 2014).[1]

Many carrying methods are allowed under the holster rule. Defs.' Statement of Undisputed Material Facts (Defs.' SUMF) ¶ 1. Licensees can wear holsters at various places on the body, including under the shoulder or on the thigh or ankle. *Id.* ¶ 2. In addition, inside-the-waistband holsters and outside-the-waistband holsters can be worn in different locations, including at the strong side of the waist, in a cross-draw position, at the appendix, and at the small of the back. *Id.* ¶ 3. Myriad models and makes for holsters at each of these locations are available on the market. *Id.* ¶ 4. The holster rule does not require that any particular model or make of holster be used. *Id.* ¶ 5.

If a licensee violates the holster rule, MPD may revoke the license. 24 DCMR § 2341.1(2). To do so, MPD must serve a notice explaining the reasons for the proposed revocation. D.C. Code § 7-2509.05(a)(4). A licensee may appeal the revocation to the Office of Administrative Hearings (OAH). *Id.* § 7-2509.08(a)(3). An administrative law judge may hold a hearing in which MPD bears the burdens of production and persuasion. *Id.* § 7-2509.08(d). If OAH affirms, the licensee may petition the D.C. Court of Appeals for review. *Id.* § 2-1831.16(e). That court may set aside a revocation if it was, among other things, contrary to constitutional rights, arbitrary and capricious, or unsupported by substantial evidence. *Id.* § 2-510(3)(A), (B), (E). A revocation does not become effective until appeals are resolved. *Id.* § 7-2509.05(a)(4); 24 DCMR § 2341.3. Usually, however, violations of the holster rule are

---

[1]     When a licensee is traveling in a vehicle, he or she may choose, instead of holstering, to keep the firearm unloaded and out of reach. *See* D.C. Code § 22-4504.02(b)(1), (d).

resolved by an agreement for a temporary suspension of the license and are not criminally

prosecuted.  Defs.' SUMF ¶¶ 7–8.  Besides suspensions and revocations, violations of carrying

regulations are also punishable as a misdemeanor.  D.C. Code § 7-2509.10(a).

## II.    Plaintiffs

Plaintiffs are four concealed carry licensees (Lynne Russell, Charles de Caro, Leanne

Reilly, and Timothy Beck) and one previous licensee (Eric Christian Jr.).  Pls.' Statement of

Undisputed Material Facts (Pls.' SUMF) [30-1] ¶¶ 4, 22, 30, 52, 55.  Plaintiffs say that, in certain

situations, they would prefer to carry their guns in purses, in bags, or off their bodies.  *E.g.*, *id.*

¶¶ 15, 18, 33, 36.  For example, Russell and Reilly do not like carrying guns safely holstered

because holsters clash with their preferred "fashion" choices.  *Id.* ¶¶ 15, 32.  Reilly also says that

"[i]f" she becomes pregnant, "she believes carrying a firearm in a holster secured on a belt

around her waist will be problematic."  *Id.* ¶ 38.

Nonetheless, Russell, de Caro, and Reilly do not live in the District but in Georgia and

Pennsylvania.  *Id.* ¶¶ 1, 19, 27.  Reilly does not allege any intent to visit the District in the future.

*See* Pls.' Attach. C, Decl. of Leanne Reilly (Reilly Decl.) [30-1].  Russell and de Caro state that

they "regularly visit[ ]" the District and "intend[ ] to continue to do so," but they provide no

evidence to support their alleged intent.  Pls.' SUMF ¶¶ 17, 24.

Christian and Beck are District residents who have had run-ins with the law and—

allegedly—the holster rule.  During a traffic stop, officers found a loose, loaded gun under the

seat of Christian's car.  Defs.' SUMF ¶ 10.  But the officers did not arrest Christian.  *Id.* ¶ 12.

Instead, they only issued Christian a notice of proposed revocation for allegedly violating the

holster rule.  *Id.* ¶ 13.

Christian appealed to OAH.  *Id.* ¶ 14.  During his appeal, his license expired.  *Id.* ¶ 15.

So he voluntarily dismissed his appeal, conceding that it was moot.  *Id.* ¶ 16.  He also stated that

he understood that "the incident leading to the revocation notice at issue in th[e OAH] proceeding will not bar him from receiving a newly issued" license. *Id.* ¶ 17.

As to Beck, while driving in the early morning hours, he stopped to talk with a woman who, unbeknownst to him, was an undercover agent. *Id.* ¶ 18. After Beck described the sexual acts he wanted and agreed to a price, MPD officers initiated a vehicle stop. *Id.* ¶ 19. Beck was wearing a sling bag across his chest with a handgun inside it along with other items, including a hairbrush. *Id.* ¶ 20. Beck was arrested for soliciting prostitution and a license violation. *Id.* ¶ 22. But no charges were filed. *Id.* ¶ 23.

Instead, MPD issued a notice of proposed revocation for violating 24 DCMR § 2304.9, which is a repealed regulation and not the holster rule at issue here. *Id.* ¶ 24. Beck appealed to OAH. *Id.* ¶ 25. OAH agreed with Beck that MPD had cited an incorrect regulation, which MPD did not contest. *Id.* ¶ 26. Accordingly, OAH reversed the notice of proposed revocation and ordered that it never took effect. *Id.* ¶ 27.

### III.    **Procedural History**

Plaintiffs sued the District and individual MPD defendants. Compl. [1] ¶¶ 57–62. As relevant here, the original Complaint alleged, among other things, that the holster rule violates the Second Amendment. *Id.* ¶¶ 81–105. After filing their Complaint, Plaintiffs moved for a preliminary injunction. Pls.' Mot. [9]. The District filed an Opposition [21] and subsequently notified the Court of new D.C. Circuit precedent, *Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024) (per curiam), *pet. for cert. docketed*, No. 24-936 (U.S. Feb. 28, 2025), that endorsed many of the District's arguments [24]. Conceding that *Hanson* foreclosed their request for emergency injunctive relief, Plaintiffs withdrew their Motion for a Preliminary Injunction [25].

Plaintiffs later, with the District's consent, filed a Second Amended Complaint [29]. They allege that the holster rule violates the Second Amendment, and they seek declaratory and injunctive relief in Count 1, 2d. Am. Compl. ¶¶ 75–101, and damages in Count 2, *id.* ¶¶ 102–03.[2] The Parties agreed to resolve the "case" on cross-motions for summary judgment. Jt. Mot. to Set a Br. Sched. [27] at 1; *see also* Order [28]. Nonetheless, Plaintiffs moved for *partial* summary judgment, only seeking judgment on their claims for prospective relief, not damages. Pls.' Mot. for Partial Summ. J. [30] at 1.[3]

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive summary judgment, a plaintiff must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks and citation omitted). Summary judgment in

---

[2]    Plaintiffs name as defendants the District and MPD Chief Pamela Smith in her official capacity. 2d Am. Compl. ¶¶ 55–56. The claims against Chief Smith are superfluous, so this brief refers only to the District. *See Johnson v. Fenty*, No. 10-5105, 2010 WL 4340344, at *1 (D.C. Cir. Oct. 1, 2010) (per curiam). Regardless, the same arguments entitle both Defendants to summary judgment.

[3]    Although Plaintiffs move for judgment on their injunctive relief claim, they only address the merits. *See* Mem. of P. & A. in Supp. of Pls.' Mot. for Partial Summ. J. (Pls.' Mot.) [30-3]. Yet, "[a] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (internal quotation marks and citation omitted). Plaintiffs' failure to address all injunctive factors in their opening brief is reason enough to deny their Motion. *Abdullah v. Obama*, 753 F.3d 193, 199 (D.C. Cir. 2014).

the defendant's favor is warranted when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential" to her case. *Id.* at 322.

## ARGUMENT

### I.    Plaintiffs Lack Standing.

To pursue claims in federal court, a plaintiff must have standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). That is, he must "show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Id.* at 431. Analyzing "each" Plaintiff's standing, *id.*, reveals that they all lack standing, although the reasons differ for the out-of-District Plaintiffs (Russell, de Caro, and Reilly) and the District residents (Christian and Beck).[4]

### A.    Russell, de Caro, and Reilly Lack Standing.

Russell, de Caro, and Reilly do not allege that the holster rule has been enforced against them. So they bring a pre-enforcement challenge, which requires them to show that (1) they intend "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and (2) "there exists a credible threat of prosecution thereunder."

---

[4]    Contrary to Plaintiffs' assertion, Pls.' Mot. at 3 n.1, if the Court finds that one Plaintiff has standing, the Court should still analyze the other Plaintiffs' standing. The supposed one-plaintiff "rule" that Plaintiffs invoke does not apply if Plaintiffs seek "individualized relief." *M.M.V. v. Garland*, 1 F.4th 1100, 1110 (D.C. Cir. 2021). Plaintiffs seek damages, which are a form of individualized relief. *Air Transp. Ass'n of Am. v. Reno*, 80 F.3d 477, 483 (D.C. Cir. 1996); Aaron-Andrew P. Bruhl, *One Good Plaintiff Is Not Enough*, 67 Duke L.J. 481, 497 (2017). Further, Plaintiffs bring as-applied challenges, which also require that they each prove standing. *See Wikimedia Found. v. NSA*, 857 F.3d 193, 216 (4th Cir. 2017).

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see also Seegars v. Gonzales*, 396 F.3d 1248, 1251 (D.C. Cir. 2005); *Navegar, Inc. v. United States*, 103 F.3d 994, 1001–02 (D.C. Cir. 1997).

With respect to the first prong, Russell, de Caro, and Reilly have not shown that they intend to engage in the "proscribed" conduct.  The holster rule applies only to concealed carry that occurs in the *District*.  As a matter of common sense and law, to challenge a regulation, the plaintiff must be subject to that regulation—*i.e.*, he or she usually must be present in the jurisdiction that enforces the regulation.  *See Gill v. Whitford*, 585 U.S. 48, 69 (2018) (plaintiffs lacked standing to challenge gerrymandered district when they did not live in the district); *California v. Texas*, 593 U.S. 659, 670 (2021) ("[O]ur cases have consistently spoken of the need to assert an injury that is the result of a statute's actual or threatened *enforcement* . . . ." (emphasis in original)).  But Russell, de Caro, and Reilly do not live in the District.  They are therefore not currently "subjected" to the holster rule.  *United States v. Hays*, 515 U.S. 737, 739 (1995); *see also Frost v. Sioux City*, 920 F.3d 1158, 1161–62 (8th Cir. 2019) (plaintiff who did not live in the city lacked standing to challenge city ordinance banning pitbulls, despite stated intention to adopt a dog "in the near future" and "likely" take it into the city).

Nor have Russell, de Caro, and Reilly shown that they have any concrete plans to visit the District in the future.  Reilly does not even allege that she intends to visit the District.  And Russell and de Caro only vaguely contend that they "regularly visit[ ]" the District and "intend[ ] to continue to do so."  Pls.' SUMF ¶¶ 17, 24.  Such vague assertions of potential future travel to a location where a plaintiff will allegedly face injury are "simply not enough" to confer standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992); *see also id.* at 564 n.2.  Rather, Plaintiffs must provide "description[s] of concrete plans" indicating that "'actual or imminent' injury" will

come to pass. *Id.* at 564; *see also Carney v. Adams*, 592 U.S. 53, 64 (2020) ("[A]n injury in fact requires an intent that is concrete."). This requirement, far from a mere formality, serves the purpose of "ensur[ing] that the alleged injury is not too speculative for Article III purposes." *Lujan*, U.S. at 564 n.2. And it is not satisfied "when, as here, the plaintiff alleges only an injury at some indefinite future time." *Id.* For the same reason, Russell, de Caro, and Reilly also fail to show that they face a credible threat of prosecution. As the holster rule applies only in the District—and Russell, de Caro, and Reilly have not alleged any concrete plans to visit the District—there is no credible threat of the rule being enforced against them.

Moreover, on the second prong, binding D.C. Circuit precedent requires Plaintiffs to show that the threat of prosecution is "credible and immediate, and not merely abstract or speculative," to bring a pre-enforcement challenge outside of the First Amendment context. *Navegar*, 103 F.3d at 998. This requires more than Plaintiffs' stated "intent to commit violative acts and a conventional background expectation that the government will enforce the law." *Seegars*, 396 F.3d at 1253. Rather, Plaintiffs must prove that they "have been singled out or uniquely targeted by the D.C. government for prosecution." *Parker v. District of Columbia*, 478 F.3d 370, 375 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008).

Thus, in *Navegar*, the D.C. Circuit held that firearms manufacturers lacked standing to bring a pre-enforcement challenge to the portion of a statute that "could be enforced against a great number of weapon manufacturers or distributors." 103 F.3d at 1001. "[A]lthough the government has demonstrated its interest in enforcing the Act generally," because there was no evidence of any "special priority" for enforcing the statute against the plaintiffs, the D.C. Circuit could not "say that a genuine threat of enforcement has given rise to the requisite 'injury in

fact.'" *Id.* And in *Seegars* and *Parker*, the D.C. Circuit held that residents' expressed intention to violate the District's firearms laws was not sufficient to demonstrate a threat of imminent prosecution sufficient to confer standing to bring a pre-enforcement challenge. *Seegars*, 396 F.3d at 1255; *Parker*, 478 F.3d at 375 (finding insufficient evidence that plaintiffs had been singled out or uniquely targeted where the District merely "appears to be expressing a sentiment ubiquitous among stable governments the world over, to wit, scofflaws will be punished").

Here, there is no allegation—let alone evidence—that the District is threatening or has threatened to prosecute Russell, de Caro, and Reilly. Instead, these Plaintiffs just allege that they would carry guns unholstered but for the rule. Pls.' SUMF ¶¶ 18, 26, 33. Allegations that a plaintiff would engage in proscribed conduct but for the law are precisely the type of allegations that the D.C. Circuit has held are inadequate. *Seegars*, 396 F.3d at 1254–55 (allegations that plaintiffs would possess pistols but for a pistol ban); *Parker*, 478 F.3d at 375 (same); *see also Angelo v. District of Columbia* (*Angelo I*), 648 F. Supp. 3d 116, 123 (D.D.C. 2022) (allegations that plaintiffs would carry guns on public transportation but for a prohibition on doing so). Such generalized allegations fail to show any "prior threats against [Plaintiffs] or any characteristics indicating an especially high probability of enforcement against them." *Seegars*, 396 F.3d at 1255; *see also Sibley v. Obama*, 819 F. Supp. 2d 45, 49–50 (D.D.C. 2011) (Bates, J.).

Thus, under *Navegar* and related case law, Russell, de Caro, and Reilly lack standing. That they seek damages makes no difference. "The form of relief sought does not alter the fact that this is a preenforcement challenge," and these Plaintiffs have not alleged sufficient injury. *Angelo v. District of Columbia* (*Angelo II*), No. 22-cv-1878, 2024 WL 3741401, at *11 (D.D.C. Aug. 9, 2024), *appeal docketed*, No. 24-7127 (D.C. Cir. Sept. 10, 2024). Indeed, in *Navegar*, manufacturers challenging the former federal assault weapons ban alleged loss of sales and

revenue, but "the fact that they had incurred—and would continue to incur—substantial financial losses had no bearing on" whether they had faced or currently faced a threat of prosecution. *Id.*

Plaintiffs "acknowledge" the *Navegar* line of cases but argue that those cases (1) "have been effectively arrogated [*sic*]" by two Supreme Court decisions, Pls.' Mot. at 9, and (2) are distinguishable, *id.* at 9–15. Plaintiffs' arguments are not enough for a district court to jettison binding precedent plainly applicable here.

First, Plaintiffs are wrong to contend that the *Navegar* cases are no longer binding. "[D]istrict judges . . . are obligated to follow controlling circuit precedent until either [the D.C. Circuit], sitting en banc, or the Supreme Court, overrule[s] it." *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997). In rare circumstances, circuit law "may be 'effectively overruled,' but only if a later Supreme Court decision 'eviscerates' its reasoning." *Brookens v. Acosta*, 297 F. Supp. 3d 40, 47 (D.D.C. 2018) (quoting *Perry v. MSPB*, 829 F.3d 760, 764 (D.C. Cir. 2016), *rev'd on other grounds*, 582 U.S. 420 (2017)), *aff'd sub nom. Brookens v. DOL*, No. 18-5129, 2018 WL 5118489 (D.C. Cir. Sept. 19, 2018). Still, that is a high standard that courts are "ordinarily reluctant" to find that a party has met. *Id.* (internal quotation marks and citation omitted).

Here, neither the Supreme Court nor D.C. Circuit has overruled *Navegar* and its progeny. To the contrary, "the D.C. Circuit itself has reckoned" with these cases but declined to overrule them. *Angelo I*, 648 F. Supp. 3d at 130. In fact, the D.C. Circuit has continued to apply these cases. *E.g.*, *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 291 (D.C. Cir. 2022); *Shah v. Lynch*, No. 14-5280, 2016 WL 3545671, at *1 (D.C. Cir. June 3, 2016) (per curiam). Although Plaintiffs suggest that *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), and *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), abrogate *Navegar*, Plaintiffs do not explain why that is

so.  Pls.' Mot. at 9.  In any event, the *Angelo* court already thoroughly explained why those cases do not meet the high standard for eviscerating *Navegar* and its progeny.  *Angelo I*, 648 F. Supp. 3d at 129–30 (*Susan B. Anthony*); *Angelo II*, 2024 WL 3741401, at *8–9 (*Whole Woman's Health*).  And Plaintiffs point to no flaw in the *Angelo* court's reasoning.

Second, Plaintiffs fail to distinguish *Navegar* or *Seegars*.  As to the former, Plaintiffs argue that *Navegar*'s rule and reasoning only apply to void-for-vagueness challenges.  Pls.' Mot. at 11–12.  But *Navegar* applied its rule and reasoning to a claim that a law exceeded Congress's enumerated powers.  103 F.3d at 1001–02.  *Seegars* then applied *Navegar* in a Second Amendment challenge—like this one.  396 F.3d at 1254–55.  And since *Seegars*, the D.C. Circuit and this Court have applied *Navegar* and *Seegars* to all manner of claims, not just vagueness ones.  *E.g.*, *Hemp*, 36 F.4th at 284; *Sibley*, 819 F. Supp. 2d at 49.  Thus, precedent forecloses Plaintiffs' argument that *Navegar* is good for vagueness claims only.

Next, Plaintiffs argue that *Seegars* is distinguishable because the plaintiffs there had an alternative avenue for relief (they could have applied to register a pistol and challenged any denial), yet Plaintiffs have no way to challenge the holster rule besides in a criminal prosecution.  Pls.' Mot. at 13–14.  Plaintiffs reason that this alleged predicament requires loosening the standing requirements.  *Id.*  But *Seegars* expressly rejected the argument that "the lack of an administrative remedy" allows a plaintiff to skirt the requirements of *Navegar*.  396 F.3d at 1256; *see also Angelo I*, 648 F. Supp. 3d at 130.  Regardless, Plaintiffs *do* have administrative remedies available to challenge the holster rule because the rule is enforced through administrative proceedings in which constitutional challenges can be raised, as one Plaintiff did.  Defs.' Ex. 5, Eric Christian Appeal Docs. at 3–16.  In all, Plaintiffs give no good reason to disregard binding case law.

But even if the *Navegar* line was somehow abrogated, Plaintiffs still fail to demonstrate any credible threat of prosecution under a "less onerous" standard. *Angelo I*, 648 F. Supp. 3d at 131. Plaintiffs do not provide any facts or evidence fleshing out why they face a credible prosecution. *See, e.g.*, Pls.' SUMF ¶ 26, 33. Bare assertions that Plaintiffs face a credible threat of prosecution are not enough to confer standing, even in the First Amendment context. *Angelo I*, 648 F. Supp. 3d at 131–32; *see Susan B. Anthony*, 573 U.S. at 164–66 (identifying several facts that, taken together, showed a credible threat of enforcement).

### B. **Christian and Beck Lack Standing.**

Christian and Beck, too, lack standing. As to their claims for prospective relief, Christian and Beck are not currently subject to any enforcement proceedings for alleged violations of the holster rule. As a result, they are in a pre-enforcement position just like Russell, de Caro, and Reilly. Like those Plaintiffs, Christian and Beck only allege that they would carry guns unholstered but for the rule, yet they do not prove that they currently face a threat of prosecution. Pls.' SUMF ¶¶ 53, 67. For the same reasons that Russell, de Caro, and Reilly lack standing, Christian and Beck lack standing to seek prospective relief. And Christian lacks standing for the additional reason that, at the time of the operative pleading, his license had expired, so he was not even subject to the holster rule, which only applies to licensees. 2d Am. Compl. ¶¶ 44, 46; *see Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 32 (2025) (jurisdiction is determined by an amended complaint).

Nonetheless, Christian and Beck argue in passing that they have standing to seek prospective relief because they previously received notices of proposed revocation. Pls.' Mot. at 16. That bare fact does not give them standing to seek prospective relief because "past injuries alone are insufficient to establish standing." *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1227 (D.C. Cir. 2024) (internal quotation marks and citation omitted). Indeed, in *Navegar*,

"case agents of the Bureau of Alcohol, Tobacco and Firearms had visited the plaintiff gun manufacturers, alerted them to the prohibitions in question, and conducted inventories of their firearms stocks, including those of the weapons about to be barred." *Seegars*, 396 F.3d at 1255 (citing *Navegar*, 103 F.3d at 997, 1001). But those past enforcement efforts were not enough to provide standing to seek prospective relief. *Id.*

Although Plaintiffs obliquely cite *Ord v. District of Columbia*, 587 F.3d 1136 (D.C. Cir. 2009), it does not help them. Pls.' Mot. at 16. In *Ord*, the D.C. Circuit held, at the pleading stage, that a plaintiff plausibly alleged a credible threat of prosecution when (1) the government had issued an arrest warrant but only withdrew it in bad faith to avoid judicial review, (2) the government conceded that the plaintiff had standing, thus signaling that it intended to prosecute him, and (3) the plaintiff's fellow employees had been arrested for the same conduct for which he feared arrest. 587 F.3d at 1142. Taken together, these facts supported a plausible inference that the government "expect[ed] to prosecute [the plaintiff] in the future" for the same, ongoing conduct. *Id.* Here, however, the fact that the District previously issued notices of proposed revocation to Christian and Beck for a completed, past violation does not indicate that it expects to prosecute them in the future for some hypothetical violation. Rather than help Christian and Beck, *Ord* shows just what they lack.

As to retrospective relief—wholly apart from standing to pursue a pre-enforcement challenge—Christian's and Beck's theory of injury fails. Fundamentally, their licenses were never revoked. They maintained their licenses while they pursued administrative appeals of notices of *proposed* revocation. And the appeals did not result in revocation: Christian voluntarily dismissed his appeal, and Beck succeeded in his appeal. As a result, their ability to carry concealed in the District—and their Second Amendment rights—were never impaired.

While Christian and Beck seem to assume that simply receiving notices of proposed revocation confers standing to seek retrospective relief, that position lacks any legal basis. In *Ord*, the D.C. Circuit held that the plaintiff had standing to seek damages under a Fourth Amendment claim because he articulated a theory for how prior issuance of an arrest warrant caused him injury (namely, it required him to abandon lucrative contracts). *Id.* at 1144. Here, in contrast, Christian and Beck have not explained—let alone proved with evidence—how receiving notices of *proposed* revocation caused them any injury redressable by a successful Second Amendment claim.

Nor have they articulated any other injury as a result of the holster rule. Although Beck was arrested, there was probable cause for sex solicitation (as he does not dispute), so any injury from arrest and detention was "independently cause[d]" by that separate offense. *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1297 (D.C. Cir. 2015) (per curiam). And Christian was never arrested at all. At bottom, it is Plaintiffs' job—not this Court's or the District's—to articulate theories of standing in their opening brief if they knew standing would be at issue, as here. *Sierra Club v. EPA*, 292 F.3d 895, 899–901 (D.C. Cir. 2002); *Nguyen v. DHS*, 460 F. Supp. 3d 27, 33 (D.D.C. 2020). Christian and Beck have not done so, and thus the Court should find that they failed to carry their burden.[5]

---

[5]    If the Court disagrees, then still no Plaintiff has standing to seek *prospective* relief. That has important consequences: (1) because Plaintiffs only move for summary judgment on their prospective relief claims, their Motion should be denied on standing alone; (2) no Plaintiff can pursue a facial challenge; *see Daskalea v. Wash. Humane Soc'y*, 710 F. Supp. 2d 32, 42–43 (D.D.C. 2010) (monetary damages are not available for a facial challenge); *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011) (same); and (3) the merits should be limited to addressing whether "enforcement" of the rule against Christian and Beck was constitutional.

II.    <u>**Plaintiffs' Second Amendment Claims Fail.**</u>

If Plaintiffs overcome their jurisdictional defects, then their Second Amendment

challenge nonetheless fails on the merits.  Such a challenge proceeds in two steps.  At the first

step, Plaintiffs bear the burden to show that the holster rule infringes on activity protected by

"the Second Amendment's plain text," as originally understood and interpreted by precedent.

*Hanson*, 120 F.4th at 231–32 (internal quotation marks omitted) (quoting *N.Y. State Rifle &*

*Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022)).  If the rule infringes upon textually protected

conduct, the Court proceeds to the second step, and the rule nonetheless must be upheld if it "is

consistent with the principles that underpin our regulatory tradition."  *United States v. Rahimi*,

602 U.S. 680, 692 (2024).

In addition, to succeed on a *facial* Second Amendment challenge, Plaintiffs must

"establish that no set of circumstances exists under which the [holster rule] would be valid."  *Id.*

at 693 (internal quotation marks omitted) (quoting *United States v. Salerno*, 481 U.S. 739, 745

(1987)).  "That means that to prevail, the [District] need only demonstrate that [the rule] is

constitutional in some of its applications."  *Id.*  With Plaintiffs' burden properly understood, it

becomes apparent that they cannot meet it.

A.    <u>**The Holster Rule Is Consistent With the Scope of the Second Amendment.**</u>

Plaintiffs' challenge fails at *Bruen*'s first step because neither the plain text of the Second

Amendment nor its understanding preclude reasonable manner-of-carry regulations, and the

holster rule is one.  Plaintiffs' arguments to the contrary fail to sustain their burden.

1.    <u>**The Right to Bear Arms Is Not Infringed by Reasonable Manner-of-**</u>
<u>**Carry Regulations.**</u>

Although Plaintiffs give short shrift to the text of the Second Amendment, *Bruen* requires

courts to start with the text and its interpretation.  *Hanson*, 120 F.4th at 231–34.  The text of the

15

Amendment's operative clause provides that "the right of the people to keep and bear Arms[ ] shall not be infringed."  U.S. Const. amend II.  Two textual elements are relevant here: "bear Arms" and "infringed."[6]

Start with "bear Arms."  "At the time of the founding, as now, to 'bear' meant to 'carry.' When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—confrontation."  *Heller*, 554 U.S. at 584 (internal citations omitted).  In describing carrying, *Bruen* gave an example: "wear[ing] a holstered pistol at [the] hip."  597 U.S. at 32.

Next is "infringed."  Early American dictionaries defined the term "infringe" as to "destroy," "violate," "break," "transgress," or "hinder" (meaning, in turn, to "obstruct," "stop," or "prevent").  Samuel Johnson, *A Dictionary of the English Language* (1st ed. 1755), https://tinyurl.com/2s4ra9d3; Noah Webster, *American Dictionary of the English Language* (1st ed. 1828), https://tinyurl.com/4t5jcae9.  The Supreme Court has relied on these dictionaries when defining terms in the Second Amendment.  *Heller*, 554 U.S. at 581, 584; *see also Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 114 (10th Cir. 2024) (explaining that 18th-century dictionaries are properly considered at *Bruen* step one).

Putting these textual elements together, the right to "bear Arms" is "infringed" when a person is prevented from carrying or possessing a gun for self-defense.  Supreme Court precedent bears that interpretation out.  The Court has only ever found a Second Amendment violation when a challenged law prevented carrying or possession of guns commonly used for self-defense by ordinary citizens.  *Heller*, 554 U.S. at 628 (handgun ban); *id.* at 630 ("requirement . . . that firearms in the home be rendered and kept inoperable at all times,"

---

[6]    The holster rule does not affect the right to "keep" (*i.e.*, possess) arms.  Plaintiffs provide no explanation or evidence to the contrary.

"mak[ing] it impossible for citizens to use them for the core lawful purpose of self-defense");
*McDonald v. Chicago*, 561 U.S. 742, 750 (2010) (plurality) (handgun ban); *Caetano v.
Massachusetts*, 577 U.S. 411, 411 (2016) (per curiam) (stun gun ban); *Bruen*, 597 U.S. at 60
(licensing law that "operated to *prevent* law-abiding citizens with ordinary self-defense needs
from carrying arms in public for that purpose" (emphasis added)); *see id.* at 38 n.9 (suggesting
that a licensing scheme put to "abusive ends" could be susceptible to challenge if it operated to
"*deny* ordinary citizens their right to public carry" (emphasis added)).  At the same time, the
Court has held that "the right secured by the Second Amendment is not unlimited" and is "not a
right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever
purpose."  *Heller*, 554 U.S. at 626.  That holding is so important that the Court has repeatedly
reaffirmed it, *McDonald*, 561 U.S. at 786 (plurality); *Bruen*, 597 U.S. at 21, including in its most
recent Second Amendment decision, *Rahimi*, 602 U.S. at 691.  So, while the Second Amendment
may call into question "severe" "ban[s]" on possession or carrying, *Heller*, 554 U.S. at 629, it
"does not imperil every law regulating firearms," *McDonald*, 561 U.S. at 786 (plurality).

Indeed, the Supreme Court has identified several regulations that are "presumptively
lawful," *Heller*, 554 U.S. at 627 n.26, and these regulations share something in common: they do
not prevent ordinary citizens from possessing or carrying common arms.  These include
"prohibitions on carrying concealed weapons," *id.* at 626, "laws forbidding the carrying of
firearms in sensitive places such as schools and government buildings," *id.*, "laws regulating the
storage of firearms to prevent accidents," *id.* at 632, and licensing schemes that "require
applicants to undergo a background check" or "pass a firearms safety course," *Bruen*, 597 U.S. at
38 n.9.  These regulations are "presumed not to burden conduct within the scope of the Second
Amendment."  *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1253 (D.C. Cir. 2011).

As such, courts—including the majority of courts of appeals—reject challenges at *Bruen*'s first step when the challenged law mirrors the Supreme Court's presumptively lawful measures or does not effectively prevent carrying or possession.[7]

Among these regulations that do not infringe the Second Amendment are "restrictions governing . . . the manner of carry." *Bruen*, 597 U.S. at 38. In fact, the *Bruen* Court stated no fewer than three times that restrictions on the "manner" of carrying arms are consistent with the scope of the right. *Id.* at 38, 59, 70. The concurring Justices also made this point. As Justice Alito explained, "all" *Bruen* "decide[d]" was that a law that "effectively prevents . . . law-abiding residents from carrying a gun" was unconstitutional. *Bruen*, 597 U.S. at 72 (Alito, J., concurring). But the Court did not "disturb[ ] anything" in *Heller* "about restrictions that may be imposed on the . . . carrying of guns." *Id.* And as Justice Kavanaugh and the Chief Justice similarly affirmed, "the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun." *Id.* at 79 (Kavanaugh, J., concurring). In all, "*Bruen* is replete with references, both in the majority opinion and in concurrences, to the lawfulness of restrictions on the right to carry weapons in public, particularly with respect to concealed weapons." *City of Portland v. Sottile*, 336 Or. App. 741, 748 (2024).

That manner-of-carry restrictions do not infringe the Second Amendment is likewise established in historical precedent. *See Heller*, 554 U.S. at 610–14 (relying on 19th-century case

---

[7]    *E.g.*, *United States v. Rush*, 130 F.4th 633, 640 (7th Cir. 2025); *Rocky Mountain*, 121 F.4th at 119–20; *McRorey v. Garland*, 99 F.4th 831, 836–37 (5th Cir. 2024); *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222–23 (4th Cir. 2024) (en banc), *cert. denied*, No. 24-373, 2025 WL 76446 (U.S. Jan. 13, 2025); *United States v. Manney*, 114 F.4th 1048, 1053 (9th Cir. 2024), *cert. denied*, No. 24-6197, 2025 WL 299574 (U.S. Jan. 27, 2025); *Oakland Tactical Supply, LLC v. Howell Township*, 103 F.4th 1186, 1196 (6th Cir. 2024), *cert. denied*, 145 S. Ct. 603 (2024); *Gazzola v. Hochul*, 88 F.4th 186, 196–97 (2d Cir. 2023) (per curiam), *cert. denied*, 144 S. Ct. 2659 (2024).

law from state supreme courts); *Rocky Mountain*, 121 F.4th at 114 (explaining that *Bruen* step

one may look to "early American court cases").  As the Supreme Court of Alabama explained,

the right "has neither expressly nor by implication, denied to the Legislature, the right to enact

laws in regard to the manner in which arms shall be borne."  *State v. Reid*, 1 Ala. 612, 616

(1840); *see also Hanson*, 120 F.4th at 239 (relying on *Reid*); *Heller*, 554 U.S. at 629 (same).  So,

as the Supreme Court of Louisiana held, a law does not infringe the right when "[i]t is a measure

of police, prohibiting only *a particular mode* of bearing arms which is found dangerous to the

peace of society."  *State v. Jumel*, 13 La. Ann. 399, 399–400 (1858) (emphasis in original).

Thus, summarizing nearly a century of case law, the Supreme Judicial Court of Massachusetts

declared that "it has been almost universally held that the legislature may regulate and limit the

mode of carrying arms."  *Commonwealth v. Murphy*, 44 N.E. 138, 138 (Mass. 1896); *see also id.*

(collecting cases).  Recognizing as much, the Supreme Court of the United States held that this

precedent "demonstrate[s] that *the manner* of public carry was subject to reasonable regulation."

*Bruen*, 597 U.S. at 59 (emphasis in original); *see also, e.g.*, *Sinnissippi Rod & Gun Club, Inc. v.

Raoul*, --- N.E.3d ----, ----, No. 3-21-0073, 2024 WL 886651, at *9–10 (Ill. App. Ct. Mar. 1,

2024) (Albrecht, J., concurring); *United States v. Serrano*, 651 F. Supp. 3d 1192, 1210 (S.D. Cal.

2023); *State v. Robinson*, 48 N.E.3d 1030, 1037 (Ohio Ct. App. 2015); *State v. Reininger*, 65

A.3d 865, 878 (N.J. App. Div. 2013).

    Plaintiffs, however, ignore all this precedent and argue that any "limitations" on Second

Amendment rights are determined solely by "reference to history" at *Bruen* step two.  Pls.' Mot.

at 16.  But the Supreme Court approved various carry restrictions identified above without

analyzing whether they were historically supported.  The Court's treatment of those restrictions

shows that their constitutionality was not determined by history but by the scope of the Second

Amendment. *E.g.*, *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 223–24 (4th Cir. 2024) (en banc), *cert. denied*, No. 24-373, 2025 WL 76446 (U.S. Jan. 13, 2025); *Mills v. New York City*, No. 23-cv-7460, 2024 WL 4979387, at *8 (S.D.N.Y. Dec. 4, 2024), *appeal docketed*, No. 24-3308 (2d Cir. Dec. 20, 2024). Plus, Plaintiffs' history-only approach collapses *Bruen*'s "two-step test" into one. *Hanson*, 120 F.4th at 231. Yet, "*Bruen* does not say that any regulation that affects firearms must satisfy the historical-regulation test." *Oakland Tactical Supply, LLC v. Howell Township*, 103 F.4th 1186, 1195 (6th Cir. 2024), *cert. denied*, 145 S. Ct. 603 (2024).

### 2.    The Holster Rule Is a Reasonable Manner-of-Carry Regulation, Especially As Applied Here.

Applying the correct understanding of the Second Amendment, Plaintiffs' challenge to the holster rule fails. The rule does not prevent them from carrying guns. It only affects the "manner of carry." *Bruen*, 597 U.S. at 38. Even then, the rule permits a variety of carry methods. The plain text of the rule is flexible, requiring only that the pistol be (1) holstered, (2) on the person, (3) "in a firmly secure manner that is reasonably designed to prevent loss, theft, or accidental discharge." 24 DCMR § 2344.2. Many types of holsters exist. Defs.' SUMF ¶¶ 4–5. And those holsters can be worn on various parts of the body. *Id.* ¶¶ 2–3. Unsurprisingly, then, Plaintiffs produce zero evidence of any instance in which the holster rule has prevented anyone from carrying in its ten-year history. For its part, the District is aware of only one challenge to the holster rule. It failed. Order at 6, *District of Columbia v. Williams*, No. 2023 CDC 007061 (D.C. Super. Ct. Sept. 17, 2024).

This challenge should also fail. If the Court concludes that the holster rule was "applied" to Christian and Beck, then those applications involved carrying methods that frustrated, rather than facilitated, self-defense—not to mention were dangerous. Christian was driving around with a gun thrown under the driver's seat. Defs.' SUMF ¶ 10. A gun tossed beneath a car seat

cannot be drawn or even easily accessed.  And it certainly is not safe.  *Id.* ¶ 11.  Christian does

not try to argue that this "off-body" carry was necessary for him to defend himself.  Quite the

opposite, he admits that he carried his gun in this way not for self-defense reasons—but for

"temporar[y]" "comfort."  Decl. of Eric Christian [9-5] ¶ 4.

   Same goes for Beck.  He had his gun loosely stowed in a zippered sling bag.  Defs.'

SUMF ¶ 20.  In the off chance he had been attacked, he would have had to unzip the bag and

draw the gun from it, which would require some fiddling because he had other items in the bag,

including a hairbrush.  *Id.*  Not only is such carrying ineffective for self-defense, but it is also

"dangerous"—as the Fourth Circuit held in a case in which a defendant similarly carried a gun in

a messenger bag in his car.  *United States v. Masciandaro*, 638 F.3d 458, 460, 473 (4th Cir.

2011); *see also* Defs.' SUMF ¶ 21.  Like Christian, Beck does not try to argue that his carrying

was justified by self-defense needs.

   As to the remaining three Plaintiffs, they present no evidence that the holster rule

impedes their ability to defend themselves.  Russell avers that she "often" carries a gun in a purse

or bag "[d]ue to limitations of women's fashion."  Pls.' Attach. A, Decl. of Lynne Anne-Brigitte

Russell [30-1] ¶ 16.  Similarly, Reilly alleges that holstering is not the way she "prefer[s]" to

carry because it "does not comport with the way [she] normally dress[es] for business or social

occasions."  Reilly Decl. ¶ 3.  De Caro states that when outside the District he does not carry in a

holster on the body, but he does not explain why that is his preference.  Pls.' Attach. B, Decl. of

Charles John de Caro [30-1] ¶ 11.

   None of these vague statements show that the holster rule "*prevent[s]*" Plaintiffs "from

carrying arms in public for" "ordinary self-defense needs."  *Bruen*, 597 U.S. at 60 (emphasis

added).  At most, this evidence shows that sometimes safely holstered carrying does not comport

with Plaintiffs' personal preferences.  Yet, they cite no precedent—and the District is aware of

none—holding that a manner-of-carry regulation is unconstitutional if three individuals cannot

carry a gun however they want in all situations.

That "poses a problem" for Plaintiffs.  *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468,

475 (2022).  That Plaintiffs cannot even come up with a student note supporting their extreme

vision of the right to bear arms means that there is "little reason to think the [Second]

Amendment was designed or commonly understood" to protect Plaintiffs' preferences.  *Id.*  To

the contrary, the Second Amendment does *not* confer a right to carry "in any manner

whatsoever" or "upon all occasions."  *Heller*, 554 U.S. at 626; *Reid*, 1 Ala. at 616; *see Baird v.

Bonta*, 709 F. Supp. 3d 1091, 1140 (E.D. Cal. 2023) (rejecting argument that requiring guns be

carried concealed prevented plaintiffs from effectively defending themselves if they want to wear

tight clothing), *appeal docketed*, No. 24-565 (9th Cir. Feb. 1, 2024).

Reilly fares no better with a two-sentence allegation that if—someday—she becomes

pregnant, carrying a gun on "a belt around [her] waist will be problematic" and "impede" her

from protecting herself.  Reilly Decl. ¶ 4.  Assuming she has standing to raise this argument even

though she is not pregnant, there are many holstering options available on the market that allow

pregnant women to carry and do not utilize a holster at the belt.  Defs.' SUMF ¶ 6.  Reilly does

not allege that she has even tried any of these.

As to a facial challenge, Plaintiffs fail to show that the rule prevents or even just

compromises carrying for self-defense in *all* applications.  *Rahimi*, 602 U.S. at 693.  Such an

argument would defy common sense because a person can effectively carry a gun for self-

defense if it is safely holstered.  In fact, Christian avers that he "regularly" carries his gun in

compliance with the holster rule.  Pls.' SUMF ¶ 42.  Clearly the rule is not preventing him from

carrying.  And as explained above, the holster rule "is constitutional as applied to the facts of [Christian's and Beck's] own case[s]"—which is enough to defeat a facial challenge.  *Rahimi*, 602 U.S. at 693.

Nonetheless, as a fallback, Plaintiffs argue that the holster rule infringes the Second Amendment because its burden is more than de minimis.  Pls.' Mot. at 16.[8]  But they are clearly mistaken.  As explained, the holster rule at most affects some people's fashion choices in some situations; it does not operate to effectively prevent anyone's carrying.  Indeed, the supposed burdens of the holster rule fall well short of the burdens imposed by laws that courts have upheld against Second Amendment challenges, like a ban on the sale or purchase of guns by individuals under 21, *Rocky Mountain*, 121 F.4th at 104–05, or requirements that individuals submit to a background check, pass training requirements, satisfy various objective criteria, pay a fee, and wait before obtaining a license necessary to purchase a gun, *Md. Shall Issue*, 116 F.4th at 216–17.  These courts asked whether the challenged law prevented or "effectively" prevented carrying.  *Id.* at 223; *see also, e.g.*, *McRorey v. Garland*, 99 F.4th 831, 836–37, 840 (5th Cir. 2024) (holding that only "prohibitions on 'keep[ing] and bear[ing]' or a "*de facto* prohibition" infringe the Second Amendment).  The alleged burden here does not rise to that standard and is thus de minimis.

In sum, no Plaintiff has shown that the holster rule infringes his or her right to carry.  So Plaintiffs must make this case about something else.  They spend much of their brief extolling

---

[8]    Plaintiffs are apparently unsure of this argument because they argue that a "'de minimis' argument is relevant only in an interest balancing analysis which *Bruen* forbids."  Pls.' Mot. at 16–17.  Evaluating whether a regulation burdens Second Amendment rights is not "interest balancing."  *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms After Bruen*, 98 N.Y.U. L. Rev. 1950, 1955–61 (2023) (explaining that while *Bruen* abandoned interest balancing, "inquiry into the magnitude of a given burden is indeed part of the Second Amendment test").

various types of off-body carry and complaining that holstered carry may be harder than off-body carry in particular situations, such as when riding a bike, doing yoga, and sitting by a pool. Pls.' Mot. at 16–17, 30–40.  But these arguments—which sound in policy, not constitutional law—are unavailing for three reasons.

First, none of these activities are material to *Plaintiffs'* challenges.  As to their as-applied claims, no Plaintiff avers that he/she wants to engage in any of these activities.  For example, so far as the record reveals, no Plaintiff is a bicyclist.  But "constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court."  *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984).  So a plaintiff ordinarily cannot raise complaints on behalf of someone else or a class to which he does not belong.  *Metro. Wash. Chapter, Associated Builders & Contractors, Inc. v. District of Columbia*, 62 F.4th 567, 573 (D.C. Cir. 2023).  Moreover, the holster rule has never been *enforced* against Plaintiffs to prevent them from engaging in any of these activities.  Such activities cannot be the basis for an as-applied claim.  *See McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014) ("[A] plaintiff generally cannot prevail on an as-applied challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally applied to him.").  As to Plaintiffs' facial challenge, even if the holster rule prevents self-defense in the situations identified by Plaintiffs, those situations do not amount to *all* situations in which the holster rule may be applied.

Second, even if the Court were to consider these arguments, they are not supported by admissible evidence.  Defs.' Mot. to Strike (filed concurrently).[9]  Yet, summary judgment

---

[9]    There is one exception: the training manual for the Los Angeles Police Department (Pls.' Ex. 5 [30-8]).  *See United States v. Bailey*, No. 19-cr-156, 2022 WL 4379059, at *6 (D.D.C.

requires evidence capable of being admitted at trial.  *Greer v. Paulson*, 505 F.3d 1306, 1315

(D.C. Cir. 2007); Fed. R. Civ. P. 56(c)(1)(B), (2).  Likewise, *Bruen* step one requires a factual

showing.  *See Hanson*, 120 F.4th at 233.  But Plaintiffs' evidence should be excluded, and as a

result, they cannot sustain their burden to show that the holster rule infringes on their Second

Amendment right to carry a weapon for self-defense.  Summary judgment in the District's favor

is therefore warranted.  *Celotex*, 477 U.S. at 322.

Third, even if the Court reaches the merits of Plaintiffs' arguments that holstered carry

may be harder than off-body carry in particular situations, these arguments fail for similar

reasons as Plaintiffs' as-applied challenges.  There simply is no support for Plaintiffs' notion that

the Second Amendment is a right to carry deadly weapons on every occasion, during any

activity, or while wearing every outfit.  Moreover, many of Plaintiffs' complaints are misguided.

For one, many of Plaintiffs' complaints are about *concealing* a gun, not carrying it holstered, and

the concealing requirement is not challenged here.  *E.g.*, Pls.' Mot. at 36 ("Try to imagine how

one would conceal a firearm on one's person heading to a yoga class or sitting by the

neighborhood pool" (internal quotation marks and citation omitted)).  For another, many of

Plaintiffs' complaints rely on stereotypes or gross generalities.  Plaintiffs complain that the

holster rule burdens women because women, according to Plaintiffs, wear tight clothing or

dresses.  *E.g.*, *id.* at 16.  But the law is not supposed to be based on "overbroad generalizations

about the different . . . preferences of males and females."  *United States v. Virginia*, 518 U.S.

515, 533 (1996).  In addition, these complaints sound like something out of equal protection, but

---

Sept. 22, 2022).  Nonetheless, it is immaterial.  Police officers are not similarly situated to the
typical citizen because they have extensive firearms training.  So the fact that one police
department allows off-body carry according to careful rules hardly shows that off-body carry is
"common" or that the holster rule burdens *Plaintiffs*.  Pls.' Mot. at 30.

the Supreme Court has cautioned against finding "faults" in a gun regulation that "appear to sound in" another constitutional right. *Rahimi*, 602 U.S. at 701 n.2; *see also NRA v. Bondi*, --- F.4th ----, ----, No. 21-12314, 2025 WL 815734, at *12 (11th Cir. Mar. 14, 2025) (en banc) ("Judge Brasher's dissent erroneously reviews the Florida law under an equal-protection standard masquerading as an analysis under the Second Amendment.").

### 3.    Plaintiffs Otherwise Fail to Carry Their Burden.

Besides complaining about the burdens of holstered carry, Plaintiffs offer two other arguments to meet their burden at *Bruen* step one: (1) the Second Amendment protects their proposed conduct because "their conduct involves the carrying of arms," Pls.' Mot. at 16, and (2) off-body is constitutionally protected because it is common, *id.* at 30–40.  Neither suffices.

#### a.    Plaintiffs Cannot Carry Their Burden by Simply Alleging That They Want to Carry Arms.

For four reasons, Plaintiffs are wrong to argue that they satisfy *Bruen* step one just because they want to carry guns.  *See* Pls.' Mot. at 16.

First, Plaintiffs' argument cannot be squared with precedent.  Start with *Bruen*.  The Supreme Court instructed no fewer than three times that restrictions on the "manner" of carrying arms were consistent with the scope of the right.  *Bruen*, 597 U.S. at 38, 59, 70.  So it cannot be that all "restrictions on . . . bearing of arms" are "encompassed within the text of the Second Amendment," Pls.' Mot. at 15, when, to the contrary, "the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing . . . the manner of carry," *Bruen*, 597 U.S. at 38.  Plaintiffs remarkably do not address this holding of *Bruen* at all.

More broadly, Plaintiffs' argument contradicts all the Supreme Court's assurances about measures that do not "burden conduct within the scope of the Second Amendment."  *Heller II*, 670 F.3d at 1253 (citing *McDonald*, 561 U.S. at 786 (plurality)).  Many of the presumptively

lawful measures identified by the Court are "restrictions" on "bearing" arms.  Pls.' Mot. at 16; *see Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 38 n.9.  It cannot be true, then, that any restriction on bearing arms per se infringes the Second Amendment.

Second, Plaintiffs define the conduct at issue at too high a level of abstraction.  Defining a plaintiff's proposed course of conduct at *Bruen* step one requires specificity.  *E.g.*, *United States v. Manney*, 114 F.4th 1048, 1052 (9th Cir. 2024), *cert. denied*, No. 24-6197, 2025 WL 299574 (U.S. Jan. 27, 2025); *Oakland*, 103 F.4th at 1196.  "[I]n defining a plaintiff's proposed conduct, courts should look to the intersection of what the law at issue proscribes and what the plaintiff seeks to do."  *Oakland*, 103 F.4th at 1196; *see also Manney*, 114 F.4th at 1052.  That is what *Bruen* did.  *Bruen* defined the proposed course of conduct as "carrying handguns publicly for self-defense" because that it is what the New York law prohibited the plaintiffs from doing, as it required license applicants to show a special need for a license.  597 U.S. at 32; *see also Oakland*, 103 F.4th at 1195.

In contrast, here, the holster rule does not prohibit Plaintiffs from carrying guns generally, so the proposed course of conduct cannot be "the carrying of arms."  Pls.' Mot. at 16; *see Mills*, 2024 WL 4979387, at *8 (rejecting challenge to licensing requirements and plaintiffs' argument that they satisfied step one because the proposed conduct is carrying guns).  The holster rule just provides, in short, that a gun must be carried "in a holster on their person in a firmly secure manner that is reasonably designed to prevent loss, theft, or accidental discharge of the pistol."  24 DCMR § 2344.2.  Plaintiffs' proposed course of conduct, then, is carrying guns unholstered and off their bodies in an unsecure manner that is not designed to prevent loss, theft, or accidental discharge.  Plaintiffs provide no argument that *that* conduct is protected by the Second Amendment.

Third, Plaintiffs' approach reads "infringed" out of the Second Amendment.  But "real effect should be given to all the words [the Constitution] uses." *Myers v. United States*, 272 U.S. 52, 151 (1926); *see also Marbury v. Madison*, 1 Cranch 137, 174 (1803) ("It cannot be presumed that any clause in the constitution is intended to be without effect.").  The original meaning of "infringe," discussed above, does not indicate that just any regulation on bearing arms would implicate the text of the Second Amendment, regardless of whether it would substantially burden an individual's ability to carry arms in public for self-defense.  Rather, the Second Amendment's deliberate use of the term "infringed" means that that "any number of regulations [that] may incidentally, minimally, or not substantially burden the exercise of [the] right" are not implicated by the Amendment.  *United States v. Libertad*, 681 F. Supp. 3d 102, 109 (S.D.N.Y. 2023).

Fourth, Plaintiffs' approach would open the floodgates to Second Amendment claims.  As the Ninth Circuit explained, if plaintiffs could satisfy step one by "describing the conduct in question at such a high level of generality," then "every requirement making it slightly more difficult to possess [or carry] a firearm" would require a court to engage in "a full historical inquiry into its origin." *Manney*, 114 F.4th at 1052.  Generally applicable laws that implicate the right to bear arms "[o]nly in the most indirect way" would be subject to challenge. *United States v. Scheidt*, 103 F.4th 1281, 1284 (7th Cir. 2024).  That is not how constitutional rights work.  Instead, "a plaintiff bears certain burdens to demonstrate an *infringement* of his rights." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (emphasis added).  Nothing in *Bruen* casts doubt on this basic proposition.

### b.   Off-Body Carry Is Neither Constitutionally Protected Nor Common.

Plaintiffs' last argument—that off-body carry is constitutionally protected because it is common—also fails.  Pls.' Mot. at 30.  Plaintiffs reason that because *Heller* held that the Second

Amendment protects guns in common use for self-defense, the Second Amendment also protects "commonly used" methods for carrying. *Id.*  But Plaintiffs point to no court that has so held. And the Supreme Court has certainly not held that commonness—whatever that means—is the "very clear principle" that decides all Second Amendment challenges. *Id.*  *Heller* only spoke of commonness when describing what types of firearms are protected by the Second Amendment. 554 U.S. at 627.  The Court did not indicate that commonness had any other relevance to determining the scope of the Amendment.  In any event, even in the context of deciding what arms are protected under the Second Amendment, the D.C. Circuit rejected the argument, raised in *Hanson* and echoed here by the same counsel, that "the choice of the American people," Pls.' Mot. at 30, dictates the scope of the Second Amendment, *Hanson*, 120 F.4th at 232–33.

Even if commonness were legally relevant, Plaintiffs fail to show that off-body carry—especially involving all the specific devices they tout—is a common, safe method of carrying.[10] For starters, none of the evidence they offer in support of their commonness argument is admissible.  *See* Defs.' Mot. to Strike.  And the admissible evidence shows that off-body carry presents myriad risks—some life-threatening.  Defs.' Ex. 12, Decl. of Stephen Amodeo ¶¶ 16–20.

Further, Plaintiffs' evidence, if admitted, contradicts their argument.  One of Plaintiffs' authorities, a supposed proponent of off-body carry, says that she "carr[ies] on-body 99.9 percent of the time," and off-body carry is a "last-resort."  Pls.' Ex. 1 [30-4] at 1, 8; *accord United States v. Olson*, 41 F.4th 792, 801 (7th Cir. 2022) (finding that "most" permit holders in Wisconsin,

---

[10]    Plaintiffs say that the District "concedes" that off-body carry is common, citing one sentence plucked from a guide that the District submitted as an exhibit at the preliminary injunction stage.  Pls.' Mot. at 30 (citing Defs.' Ex. 1 [21-2] at 14).  But the guide is not authored by the District and does not represent its views, so it cannot be a concession.

which does not have a holster rule, still "typically holster their guns"). Another of Plaintiffs' sources attests that "[o]ff-body carry isn't for everyone and to [him] isn't a primary means of carrying." Pls.' Ex. 2 [30-5] at 5. He underscores that "[o]ff-body carry is a very controversial topic in the firearms community." *Id.* at 2.

Plaintiffs' sources also explain—correctly—that off-body carry is "usually less safe than on-body carry." Pls.' Ex. 10 [30-13] at 8. "Bags and backpacks are a purse-snatchers dream because it's a low-risk crime." Pls.' Ex. 1 at 5. "[N]ow the gun you are carrying to save your life could be (unknown to the attacker) taken in that attack and unavailable to you." Pls.' Ex. 3 [30-6] at 2. Even if the bag is kept on the person, carrying a pistol in a bag "leaves a pistol vulnerable to accidental discharge." Pls.' Ex. 10 at 6; *accord Warden v. Nickels*, 697 F. Supp. 2d 1221, 1230 (W.D. Wash. 2010). And when a person opens the bag, for example, to get her wallet and pay a cashier, she might accidentally brandish her weapon, which could terrorize anyone in sight and "could be considered illegal." Pls.' Ex. 1 at 6.

All these risks have little reward. Plaintiffs' sources agree that off-body carry is not an ideal carrying method for self-defense because, among many other reasons, "[d]rawing your firearm from a bag is often slower and more complicated than drawing from on-body." *Id.* at 4. And Plaintiffs themselves conceded that "there are disadvantages to off-body carry." Mem. of P. & A. in Supp. of Pls.' Mot. for Prelim. Inj. [9-1] at 14. Given the controversy surrounding off-body carry, it should not be constitutionalized. Policy judgments about the safest and most effective manner of carry are best left to the political branches. *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013). If Plaintiffs think there are reasons that "one would desire to employ off-body carry," Pls.' Mot. at 37, they are free to submit those reasons to the Council or MPD. Thus far, they have not.

Related to their commonness point, Plaintiffs argue that the holster rule is invalid because it is an outlier. Pls.' Mot. at 41. But a basic constitutional principle is that "a single courageous state may, if its citizens choose, serve as a laboratory" and enact laws that no other has. *Whalen v. Roe*, 429 U.S. 589, 597 n.20 (1977) (internal quotation marks omitted) (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)). Similarly, "States have broad latitude" to legislate according "to problems of vital local concern." *Id.* at 597. There is no constitutional rule that a law is invalid because it is an outlier.

Regardless, the District's law is no outlier. States require holstering in various situations or at least do not allow all the off-body carry methods identified by Plaintiffs.[11] States prohibit concealed carry unless the gun is holstered or carried in a similar device.[12] And states require training in holstering before an individual can obtain a license.[13] Rather than some affront to the Constitution, holstering is a regular part of firearms law and firearm owners' responsibilities.

---

[11]    *See, e.g.*, N.J. Stat. Ann. § 2C:58-4.4(a)(3) (licensees must holster); Tex. Penal Code § 46.02(a-1)(1) (person cannot carry in a motor vehicle unless, among other things, the gun is holstered); Ga. Code Ann. § 16-11-126 (2010) ("the pistol, revolver, or firearm may only be carried in a shoulder holster, waist belt holster, any other holster, hipgrip, or any other similar device"); Mont. Code Ann. § 45-8-358(2)(d) (authorizing universities to prohibit "the carrying of a firearm outside of a domicile on campus unless the firearm is within a case or holster"); Mont. Dep't of Admin., *Permitted Conceal Carry Firearm Policy* § IV(B) (June 4, 2021), https://tinyurl.com/4535mfa8 (public employees must holster).

[12]    *See, e.g.*, Tex. Penal Code § 46.035(a); 21 Okla Stat. Ann. §§ 1290.4, 1290.2(3); Or. Rev. Stat. §§ 166.250(1)(a), 166.250(3); Cal. Penal Code §§ 25400(a), 166.250(3); N.D. Cent. Code Ann. §§ 62.1-04-01(1), 62.1-04-02(1); Miss. Stat. § 97-37-1(4).

[13]    S.C. Code § 23-31-210(4)(a)(v); Md. State Police, *Maryland State Police Wear and Carry Training Course* 41 (2023), https://tinyurl.com/ypmhxzea; N.Y. State Div. of Crim. Just. Servs. & Div. of State Police, *Minimum Standards for New York State Concealed Carry Firearm Safety Training* 1, 3, 4 (2022), https://tinyurl.com/yc3s9rc9; Att'y Gen. Matthew J. Platkin & Col. Patrick J. Callahan, *Civilian Carry Assessment and Range Evaluation (CCARE) Protocol* 1 (2023), https://tinyurl.com/3uysjpf3.

## B.    The Holster Rule Is Consistent With Historical Principles.

Because Plaintiffs have not carried their burden at *Bruen*'s step one, their challenge fails. Nonetheless, their challenge independently fails at *Bruen*'s step two.  The step-two "analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."  *Rahimi*, 602 U.S. at 692.  The Court gleans principles and traditions from the historical record and asks whether the holster rule fits within them.  *Id.* at 691–92; *see also id.* at 739 (Barrett, J., concurring) ("founding-era gun regulations yield concrete principles").  The rule will so fit if it burdens the right for similar reasons and to a similar extent as historical precursors.  *Id.* at 692 (majority).

Performing this analogical reasoning "demands a wider lens" than asking whether "the government produce[d] a founding-era relative of the challenged regulation."  *Id.* at 739 (Barrett, J., concurring).  The Second Amendment is not a "regulatory straightjacket," *Bruen*, 597 U.S. at 30, that confines courts to upholding only "a law trapped in amber," *Rahimi*, 602 U.S. at 691. The test only requires a "historical *analogue*, not a historical *twin*."  *Bruen*, 597 U.S. at 30.  The challenged law need not "precisely match its historical precursors" or be a "'dead ringer'" for historical laws.  *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30).  Rather, the focus is on whether the law "comport[s] with the principles underlying the Second Amendment."  *Id.*  Here, the holster rule comports with the historical principle—already recognized in *Bruen*—that governments may reasonably regulate the "manner of carry[ing]" arms commonly used in self-defense, so long as the regulation does not "broadly prohibit[ ]" carrying.  597 U.S. at 38.

### 1.    The Historical Record Establishes the Principle That the Government Can Reasonably Regulate Manner of Carry.

Since the earliest days of the right to bear arms through its exercise today, governments have enjoyed the power to regulate manner of carry.  The English Bill of Rights—the first

codification of the right to bear arms and the Second Amendment's predecessor, *Heller*, 554 U.S. at 599—provided that Protestants "may have arms for their defence suitable to their conditions and as allowed by law," An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown, 1 W. & M., Sess. 2, c. 2, § 7 (1689). "[A]s the document itself memorialized," English law recognized "the principle that arms-bearing was constrained 'by Law.'" *Rahimi*, 602 U.S. at 694. This "ensured that Parliament could define which persons could be armed—'suitable to their Condition'—and under what circumstances those arms could be borne—'as allowed by Law.'" Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 61 (2018).

This power crossed the Atlantic. As an expert historian on the Founding Era explains, the colonies had a robust tradition of regulating the carrying of arms, particularly to prevent affrays, riots, and disturbances of the peace. Defs.' Ex. 13, Decl. of Nathan Kozuskanich (Kozuskanich Decl.) ¶ 18. As the Supreme Court similarly explained, the early states enacted "laws [that] prohibited 'riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land.'" *Rahimi*, 602 U.S. at 697 (quoting 4 W. Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787)). "[T]he law punished these acts with 'forfeiture of the arms . . . and imprisonment.'" *Id.* (quoting Blackstone, *supra*, at 149); *see also* 1 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 52–53 (1869) (providing that a justice could "seize and take away [an affrayer's] armour or weapons"). Thus, affray laws punished a form of carrying ("to terrify the people").

Militia laws likewise regulated manner of carry—and even required holstering. Kozuskanich Decl. ¶ 17. Militia laws can be informative because most rights-holding men in the Founding Era were required to serve in the militia. *E.g.*, Act of Apr. 3, 1778, ch. 33, 1778 N.Y.

Laws 62 ("every able bodied male person[,] Indians and slaves excepted[,] residing within this

state from sixteen years of age to fifty"); 1795 N.H. Laws 525 (similar).  So restrictions on

militia-members' use of arms affected a large swath of the citizenry.  Saul Cornell & Nathan

DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L.

Rev. 487, 508–10 (2004); *see also* Brian DeLay, *The Myth of Continuity in American Gun

Culture* 113 Cal. L. Rev. 101, 131 (forthcoming), https://tinyurl.com/ymcnaxcu ("The most

consequential firearms regulations concerned militias . . . ."); *Antonyuk v. James*, 120 F.4th 941,

969 (2d Cir. 2024) (a "military decree" is "no doubt relevant" in the *Bruen* analysis when

consistent with historical principles), *pet. for cert. docketed*, No. 24-795 (U.S. Jan. 27, 2025).

These laws specifically addressed holstering.  Kozuskanich Decl. ¶ 17.  Most notably, an early

Congress required that officers purchase and use holsters.  *Id.*  Such actions "provide[ ]

contemporaneous and weighty evidence of the Constitution's meaning."  *Seila L. LLC v. CFPB*,

591 U.S. 197, 214 (2020) (internal quotation marks omitted) (quoting *Bowsher v. Synar*, 478

U.S. 714, 723 (1986)).

As the Nation moved into the 19th century, social, political, and technological realities

changed dramatically.  As an expert historian on carry regulations in the 19th century explains,

over that century, a few things grew: population, cities, and crime; while one thing shrank: the

size of firearms.  Defs.' Ex. 14, Decl. of Brennan Rivas (Rivas Decl.) ¶¶ 12–14.  And those

firearms became easier to load and shoot.  *Id.*  The result was that the carriage of easily fired and

concealed firearms in public presented a greater risk to Americans' safety as the 19th century

wore on, thus prompting lawmakers to turn to new firearms regulations.  *Id.*

"[S]tates and localities responded by regulating the manner of carry . . . ."  *Bianchi v.

Brown*, 111 F.4th 438, 471 (4th Cir. 2024) (en banc), *pet. for cert. docketed sub nom. Snope v.*

*Brown*, No. 24-203 (U.S. Aug. 23, 2024); *see also* Rivas Decl. ¶¶ 12–14.  From 1791 through the

19th century, states and localities banned or severely restricted forms of carry, like concealed

carry.  Rivas Decl. ¶¶ 15–19; *Bianchi*, 111 F.4th at 466 & n.4; *Sinnissippi*, 2024 WL 886651, at

*6 n.3.  To boot, several states amended their state constitutions to make plain that the right to

bear arms did not prevent the government from passing restrictions on carrying or other

regulations.  Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev.

L. & Pol. 192, 210–14 (2006) (collecting amendments); *see Heller*, 554 U.S. at 600–03 (relying

on state analogues to construe the Second Amendment).

Courts held that these "prohibitions on carrying concealed weapons were lawful under

the Second Amendment or state analogues."  *Heller*, 554 U.S. at 626; *see also, e.g.*, *State v.

Mitchell*, 3 Blackf. 229 (Ind. 1833); *State v. Buzzard*, 2 Ark. 18 (1842).  In doing so, courts

recognized the historical principle that governments can reasonably regulate the manner of carry.

Argument § II.A.1, *supra*.  Their articulations of that principle are instructive.

Consider *Andrews v. State*, 50 Tenn. 165 (1871), which the Supreme Court and D.C.

Circuit have relied on to construe the Second Amendment.  *Heller*, 554 U.S. at 629; *Bruen*, 597

U.S. at 54; *Hanson*, 120 F.4th at 239.  In *Andrews*, the Supreme Court of Tennessee affirmed

that the government has the power to "regulate the carrying" of arms.  50 Tenn. at 187.  The

court explained that, when a citizen carries his arms in public and "others are to be affected by

his conduct, then he brings himself within the pale of public regulation, and must submit to such

restriction on the mode of using or carrying his property as the people through their Legislature,

shall see fit to impose for the general good."  *Id.* at 186.  That principle comported with the

historical understanding of constitutional rights.  *Id.* at 185.  For example, while the Constitution

preserves a "right to hold property," the Constitution does not enshrine a right to use that

property in any manner or "to violate the rights of others, or of the community." *Id.* Thus, the right to keep and bear arms "is no more above regulation for the general good than any other right." *Id.*

But the court drew a distinction between regulating the right to bear arms and prohibiting its exercise, which would be unconstitutional. *Id.* at 181, 187–88. To regulate the right, the court explained, "mean[s] some check upon, or direction given to that conduct or course of action" and "subject[ing] [the right] to certain limitations or restraints, either as to manner of doing it, or time, or circumstances under which it is or may be done." *Id.* at 181. The right to bear arms is not a right to "carry [arms] at all times and under all circumstances." *Id.* And "every good citizen is bound to yield his preference as to the means to be used" to exercise the right "to the demands of the public good." *Id.* at 188. Nonetheless, a law that "amounts to a prohibition to keep and use [protected] weapon[s] for any and all purposes" would violate the right to keep and bear arms. *Id.* at 187.

Other historical precedents similarly expressed the principle that the government may regulate the carrying of arms, as long as the government did not prohibit the carrying of arms. The Supreme Court of North Carolina asked rhetorically, "can it be doubted that the legislature might by law *regulate* this right to bear arms—as they do all other rights whether inherent or otherwise—and require it to be exercised in a manner conducive to the peace and safety of the public?" *State v. Speller*, 86 N.C. 697, 700 (1882) (emphasis in original). Applying that principle, the court upheld a carry regulation by reasoning that it did not prohibit "wearing such arms" but only prescribed *how* the individual "must wear them." *Id.* Similarly, the Supreme Court of Arkansas explained that "a constitutional right to bear arms . . . does not prohibit the legislature from making such police regulations as may be necessary for the good of society, as

36

to the manner in which such arms shall be borne." *Carroll v. State*, 28 Ark. 99, 101 (1872). What manner-of-carry regulations were permissible, the court continued, "must be left to the wisdom of the legislature, so long as their discretion is kept within reasonable bounds." *Id.* Relying on this principle, legislatures enacted, and courts upheld, various types of carry regulations—not just bans on concealed carry. *E.g.*, *Murphy*, 44 N.E. at 138 ("[I]t is within the police powers of the legislature to regulate the bearing of arms, so as to forbid such unauthorized drills and parades.").

Historical treatises relied upon by the contemporary Supreme Court were in accord. One treatise stated that laws that "forbid the carrying of arms in a particular manner" were not unconstitutional. *The American Students' Blackstone* 84 n.11 (G. Chase ed., 3d ed. 1894), https://tinyurl.com/42ycxkzb. Another explained that the Second Amendment does not protect, among other things, "carrying [pistols] carelessly in the pocket." B. Abbott, *Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land* 333 (1880), https://tinyurl.com/2ee3pnh7. This treatise also explained that legislatures and courts had long rejected the notion, reminiscent of Plaintiffs' position, that "because a man has a right to own a pistol he might carry it in any manner he pleased." *Id.* at 337. The Supreme Court relied on these exact treatises to recognize a principle applicable here: the Second Amendment is not a license to carry a gun in any manner. *Heller*, 554 U.S. at 626.

Over time, states turned from complete bans on concealed carry to licensing systems for concealed carry. Rivas Decl. ¶¶ 23–27. This evolution reflected the notion that licensing officials were best suited to determine conditions of carry. *Id.* ¶¶ 23, 26–27. And this evolution continued the government's power to regulate manner of carry. *Id.* What is more, the licensing laws vested a high level of discretion in licensing officials to issue licenses and revoke them. *Id.*

¶¶ 26–27. The historical record of administration of these laws indicates that officials could impose their own conditions on manner of carry. *Id.* ¶ 27.

Nonetheless, licensing schemes evolved to provide more rules, standards, and constraints, instead of leaving everything to officials. *Antonyuk*, 120 F.4th at 987–91. That evolution culminated in the holster rule today, which is part of the District's licensing scheme and provides a clear, objective condition of carrying. In so doing, it is just one of many examples throughout Anglo-American history of governments exercising their well-established power to determine appropriate rules for carrying that prevent harm while leaving other means of carrying available.

### 2.    The Holster Rule Is Relevantly Similar to Historical Precursors.

The holster rule "comport[s]" with the historical "principle" that the government can reasonably regulate manner of carry. *Rahimi*, 602 U.S. at 692. The rule does not ban the carrying of guns but merely sets flexible standards for *how* guns can be carried concealed. As such, the rule is a "reasonable regulation" of "*the manner* of public carry." *Bruen*, 597 U.S. at 59. Indeed, the rule is "'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). Two "metrics" for similarity are "why" and "how" "the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. Exact similarity is not required because guns and carry methods have changed over the Nation's 200 years-plus history, so this case "implicat[es] unprecedented societal concerns [and] dramatic technological changes." *Hanson*, 120 F.4th at 241 (internal quotation marks omitted) (quoting *Bruen*, 597 U.S. at 27).

To start, the holster rule shares the same "why" with historical laws because those laws and the rule both aim to prevent harms posed by particular forms of carry. As the holster rule states, it requires safe holstering "to prevent loss, theft, or accidental discharge of the pistol." 24

DCMR § 2344.2.[14]  In other words, it seeks to prevent a form of carrying that is likely to "injure the property or endanger the life of [an individual's] fellow citizen."  *Carroll*, 28 Ark. at 101; *see also* Amodeo Decl. ¶¶ 16–20.  Throughout American history, governments have similarly regulated or proscribed modes of carry based on reasonable evaluations that certain modes threatened harm.  Kozuskanich Decl. ¶¶ 24, 26; Rivas Decl. ¶ 28.  For example, Founding-Era governments across the early United States enacted statutes that criminalized carrying arms in ways that terrified the people.  Similarly, courts upheld carry regulations by explaining that legislatures had exercised their "authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."  *Reid*, 1 Ala. at 616; *see also, e.g.*, *Aymette v. State*, 21 Tenn. 154, 159 (1840); *Jumel*, 13 La. Ann. at 399–400.  Likewise, today, courts have upheld carry regulations by holding that they, like historical precursors, target forms of carrying that have been found to risk harm.  *Baird*, 709 F. Supp. 3d at 1139; *Sinnissippi*, 2024 WL 886651, at *7.

Plaintiffs nonetheless argue that the holster rule does not share the same "why" as historical laws because (1) the purpose of affray laws was "to prevent the public from being menaced by persons carrying unusual and dangerous weapons in a threatening offensive manner," Pls.' Mot. at 23, and (2) the purpose of concealed carry restrictions was to prevent carrying weapons secretly, *id.* at 24.  Plaintiffs err by framing the purpose of historical laws narrowly as preventing only the specific conduct that the statutes outlawed.  Precedent rejects that tactic.  In *Hanson*, when reviewing a challenge to the District's regulation of large capacity

---

[14]    Plaintiffs argue in a footnote that the holster rule is invalid because an explanation of the rule's rationale was not provided when it was promulgated.  Pls.' Mot. at 17 n.6.  But, as support, Plaintiffs only cite federal administrative-law cases.  *Id.*  This is not such a case, and federal administrative-law does not apply to *District* agencies.  In any event, the purpose of the rule is apparent on its face and further explained in testimony that Plaintiffs ignore.

magazines (LCMs), the D.C. Circuit held that it would be error to require the District to show a tradition of laws aimed at "limiting ammunition capacity." 120 F.4th at 234 (internal quotation marks omitted) (quoting *Duncan v. Bonta*, 695 F. Supp. 3d 1206, 1214 (S.D. Cal. 2023), *rev'd*, --- F.4th ----, No. 23-55805, 2025 WL 867583 (9th Cir. Mar. 20, 2025) (en banc)).[15]  Instead, the D.C. Circuit held that historical laws banning Bowie knives shared a relevantly similar justification to the LCM regulation in that both sought to more broadly restrict "weapons particularly capable of unprecedented lethality." 120 F.4th at 237.  Similarly, in *Rahimi*, the majority did not adopt the dissent's narrow framing of the purpose of affray laws—similar to Plaintiffs' here—as to "regulate[ ] only certain public conduct that injured the entire community." 602 U.S. at 768 (Thomas, J., dissenting).  Instead, the Court explained that the purpose of affray laws was more broadly to "restrict gun use to mitigate demonstrated threats of physical violence." *Id.* at 698 (majority).

Here, the holster rule is relevantly similar to historical carry restrictions because, while it may not restrict the exact same type of carrying as those laws, it still aims to restrict bearing arms in a way that the elected branches have reasonably determined risks harm.  "[E]xpectations about what types of gun-carrying is dangerous or frightening have changed drastically" since these historical carry restrictions were in place. *Baird*, 709 F. Supp. 3d at 1137.  Indeed, the holster rule helps prevent dangerous forms of carrying not present at the Founding, like stuffing guns in compression shorts.  Amodeo Decl. ¶ 14; *see Olson*, 41 F.4th at 801.  As a result, it would be error to hold, as Plaintiffs suggest, that modern governments can only seek to prevent the specific types of carrying that past governments judged were dangerous.  That would be just

---

[15]    Notably, the case that the D.C. Circuit singled out for error, *Duncan*, is one of the few cases that Plaintiffs rely on.  Pls.' Mot. at 23.  And this trial-court decision has since been reversed by the en banc Ninth Circuit. *Duncan*, 2025 WL 867583, at *3.

the "regulatory straightjacket" that *Bruen* does *not* impose. *Bruen*, 597 U.S. at 30. Instead, history has recognized a more common-sense, flexible principle: The state may enact regulations aimed at preventing carry methods that the policymaking branches have reasonably determined pose a danger. The holster rule comports with that principle.

Next, the holster rule shares the same "how" as historical precursors. As *Bruen* explained, states historically regulated or banned forms of carry without banning carry altogether. *Id.* at 52–55. The holster rule operates similarly. The rule sets a flexible standard for one form of carry but does "not altogether prohibit the public carry of 'arms' protected by the Second Amendment." *Id.* at 55.

In some ways, the holster rule is *less* burdensome than historical analogues. For one, the rule is not a complete ban on concealed carry and instead leaves licensees plenty of options for carrying how they please. For another, "the penalty," "another relevant aspect of the burden," is less severe than historical manner of carry regulations. *Rahimi*, 602 U.S. at 699. Affray laws could result in forfeiture of a person's arms. *Id.* But a holster rule violation is not usually criminally prosecuted and instead results in a temporary suspension of a *carry* license, so that penalty does not extend to dispossessing a person of arms. Amodeo Decl. ¶¶ 6–7; 24 DCMR § 2341.1(2). Even then, nothing in the statutory scheme prevents a person from reapplying for a license if his or her license has been revoked. In the rare case that a violation is prosecuted as a misdemeanor, jail time cannot exceed six months. D.C. Code § 7-2509.10(a). That is a lesser or equivalent penalty to those imposed for violations of many historical concealed carry bans. *E.g.*, *Aymette*, 21 Tenn. at 155 ("not less than three months and not more than six months"); Act of Jan. 5, 1847, ch. 75, § 3, 1846 Fla. Laws 20 ("not exceeding six months and not less than ten

days"); Acts of the General Assembly of Virginia, Passed at the Session of 1838, ch. 101, at 76,

§ 1 ("not less than one month nor more than six months").

Plaintiffs nonetheless offer two arguments why the holster rule does not share the same

"how" as historical laws. Neither works.

First, Plaintiffs argue that no historical law required holstering. Pls.' Mot. at 25–29.

Plaintiffs demand a "historical *twin*," *Bruen*, 597 U.S. at 30, when the District need only show

that the holster rule "comport[s] with the principles underlying the Second Amendment,"

*Rahimi*, 602 U.S. at 692. Here, as explained above and affirmed by the Supreme Court,

historical regulations reveal that the government can reasonably regulate manner of carry, so

long as it does not entirely prevent citizens from carrying for self-defense. The holster rule

adheres to that principle. By arguing that the government must produce historical laws that

"mandated that handguns must be carried in a holster on the body," Pls.' Mot. at 22, Plaintiffs

insist that the holster rule must be "identical to . . . founding era regimes, but it does not need to

be," *Rahimi*, 602 U.S. at 698. Courts have rejected similar arguments that states "cannot

constitutionally require [plaintiffs] to carry handguns in a specific way" "for the simple reason

that American governments have imposed restrictions on how people carry guns since the

founding era." *Baird*, 709 F. Supp. 3d at 1139; *see also Sinnissippi*, 2024 WL 886651, at *6–9.

Indeed, Plaintiffs' approach cannot be squared with *Rahimi* or *Hanson*. Plaintiffs reason

that they performed a "text search" of one database of historical laws for the term "holster" and

found few laws, so the holster rule must be unconstitutional. Pls.' Mot. at 27–29. But under that

logic, *Rahimi* and *Hanson* are wrongly decided. A text search for "domestic violence" or

"restraining order" would have produced no historical laws because domestic violence

protections are a modern legal development. *See Rahimi*, 602 U.S. at 705–06 (Sotomayor, J.,

42

concurring); *United States v. Gailes*, 118 F.4th 822, 827–29 (6th Cir. 2024). Similarly, a search for "large capacity magazine" would turn up few, if any, pre-20th century results. *See Hanson*, 120 F.4th at 240. Yet, *Rahimi* and *Hanson* upheld a statute prohibiting gun possession by individuals subject to domestic violence restraining orders and an LCM regulation, respectively. So Plaintiffs cannot be right that the lack of a "precise[ ] match"—whether in key words or substance—carries the day. *Rahimi*, 602 U.S. at 692.

Not to mention, the "lack of . . . a tradition" of holstering rules at the Founding "is to be expected" due to differing technological and social conditions. *Hanson*, 120 F.4th at 240. Guns commonly owned at the Founding were difficult to load, needed to be reloaded after each shot, and were not easily carried—especially loaded. Kozuskanich Decl. ¶ 20; *Bianchi*, 111 F.4th at 464. Think of muskets. It is unsurprising that governments did not set standards for safe holstering when the most commonly owned gun was not fit for holstering. "States adopt laws to address problems that confront them." *McCullen*, 573 U.S. at 481–82.

In response to this reality, Plaintiffs spend a footnote—really, more than a page of single-spaced text, *but see* LCvR 5.1(d)—arguing that "handguns" existed at the Founding and in the 19th century. Pls.' Mot. at 19–20 n.8. Plaintiffs attack a strawman. The District's point at the preliminary injunction stage and now is that the *features* of commonly owned guns at the Founding did not pose the same risks when it comes to unholstered carry as more modern guns. For example, those guns were not usually kept loaded. Plaintiffs do not address those features. And Plaintiffs do not marshal evidence or expert testimony showing that "handguns" were *common* at the Founding, not just in existence.

Even if Plaintiffs were right that guns capable of holstering were widespread long ago, that would not mean that a holster rule is constitutionally off-limits now. Plaintiffs reason that

Americans have long been carrying guns unholstered or in bags, but governments have not widely enacted holster rules, so holster rules must be unconstitutional. *Id.* at 19–20 n.8, 29. *But see* Rivas Decl. ¶ 19 (identifying historical law interpreted to prohibit carrying in bags). Such reasoning "has serious problems" because "it assumes that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority. Such assumptions are flawed, and originalism does not require them." *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring); *see also Hanson*, 120 F.4th at 240–41.

Second, Plaintiffs argue that the penalty for violating the holster rule is a ban on possessing arms because a separate statute—unchallenged here—bars individuals *convicted* of a "weapons offense" from registering a firearm in the District. Pls.' Mot. at 16 (citing D.C. Code § 7-2502.03(a)(2)). Plaintiffs ignore unrefuted evidence that the District usually resolves violations of the holster rule with a notice of proposed revocation and temporary suspension. Defs.' SUMF ¶¶ 7–8. Indeed, no Plaintiff was criminally prosecuted. So no Plaintiff even has standing to raise this argument. Nor could this argument support a facial claim because violations of the holster rule do not result in a weapons offense conviction in all applications.

In any event, the weapons offense bar is not considered part of the "penalty" because it is a separate statute imposing collateral consequences. *Rahimi* and *Hanson* show why. In *Rahimi*, the "penalty" that the Supreme Court considered was the penalty imposed by the challenged law itself. 602 U.S. at 699. Notably, the majority did not adopt the dissent's view that part of the penalty was that a violation "triggers a permanent, life-long prohibition on possessing firearms and ammunition" under 18 U.S.C. § 922(g)(1). *Id.* at 748 (Thomas, J., dissenting). In *Hanson*, the D.C. Circuit was unmoved by the possibility that a conviction of possessing LCMs could have consequences under either 18 U.S.C. § 922(g)(1) or D.C. Code § 7-2502.03(a)(2). *See*

*Hanson*, 120 F.4th at 237–40.  The upshot of these cases is that collateral consequences of a conviction imposed by another, unchallenged law are not part of the analysis of the "penalty." Were it otherwise, every Second Amendment challenge to a firearms felony would turn into a challenge to the federal felon-in-possession law.[16]

But even if the Court agrees with Plaintiffs that the weapons offense bar is part of the penalty, Plaintiffs overlook that violations of carry restrictions historically *did* result in forfeiture of arms.  *Rahimi*, 602 U.S. at 697, 699.  So in the rare—and purely speculative—case that a holster violation results in a weapons offense, the penalty would not be dissimilar from historical precursors.  In all events, the penalty is just *one* "*aspect* of the burden."  *Rahimi*, 602 U.S. at 699 (emphasis added); *see also NRA*, 2025 WL 815734, at *15.  It should not be the tail that wags the dog.  *See Md. Shall Issue*, 116 F.4th at 235 (Rushing, J., concurring in the judgment) ("The enforcement mechanisms of those historical laws [discussed in *Rahimi*] were materially different from that of Section 922(g)(8), yet the [Supreme] Court concluded that provision is relevantly similar to those founding era regimes . . . ." (internal quotation marks and citation omitted)); *Antonyuk*, 120 F.4th at 997–98 (similar).

## CONCLUSION

The Court should grant summary judgment in favor of the District and deny partial summary judgment to Plaintiffs.

Date: April 4, 2025.                                    Respectfully submitted,

                                                        BRIAN L. SCHWALB
                                                        Attorney General for the District of Columbia

---

[16]    Because the constitutionality of the weapons offense bar is a separate issue, Plaintiffs' counsel is challenging it separately—and thus far unsuccessfully—in a different case.  *Dotson v. District of Columbia*, No. 24-cv-1864, 2024 WL 5046282, at *1 (D.D.C. Dec. 9, 2024) (denying preliminary injunction).

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
Special Counsel for Firearm Safety
MATEYA B. KELLEY [888219451]
Assistant Attorney General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

*Counsel for Defendants*