# EXHIBIT 13

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LYNNE ANNE-BRIGITTE RUSSELL,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **No. 1:24-cv-01820-JDB** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

### <u>DECLARATION OF NATHAN KOZUSKANICH</u>

Pursuant to 28 U.S.C. § 1746, I, Nathan Kozuskanich, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.  The views I state herein are drawn from my professional experience.

2.      I have been asked by the District of Columbia (District) to render an opinion on the history of firearms regulation and the historical understanding of the right to keep and bear arms during the Founding Era in the United States, especially as it relates to a District law that requires concealed pistol license holders to carry their pistols safely holstered (hereinafter the "holster regulation"), 24 DCMR § 2344.2.

3.      In this declaration, I answer four questions: (1) How did Founding Era governments regulate the carrying of firearms?  (2) Are regulations on manner of carry consistent with early Americans' understanding of the right to keep and bear arms?  (3) Is the challenged law here consistent with the Nation's tradition of firearm regulation in the early

American and Founding period?  (4) If similar laws to the holster regulation were not present at the Founding, what historical reasons explain the lack of such laws?

4.    I have reviewed Plaintiffs' Complaint and Motion for a Preliminary Injunction, as well as the regulation.  I make this declaration on the basis of my training, professional expertise, and research.

5.    For my work on this case, I am being compensated at a rate of $250 per hour.

### BACKGROUND AND QUALIFICATIONS

6.    I hold a PhD (2005) in Early American History from The Ohio State University, an MA (2000) in History from Queen's University, and a BAH in History (1998) from Queen's University.  I am currently a tenured full professor and chair of the Department of History, Anthropology, and Ancient Studies at Nipissing University.  I have been employed at Nipissing University since 2007.  I am also Assistant Editor of the John Dickinson Writings Project (https://www.jdproject.org/), a collaborative project supported by grants from the National Endowment of the Humanities, the State of Delaware, the National Historical Publications and Records Commission, and private donors, and housed at both the University of Delaware and the University of Virginia.  As of the writing of this report, volumes 1, 2, and 3 of *The Complete Writings and Select Correspondence of John Dickinson* have been published by the University of Delaware Press, and volume 4 is in press.  At least six more volumes will follow.

7.    I specialize in early American political and constitutional history, with a specific focus on Pennsylvania.  I also specialize in the right to keep and bear arms in the colonial period and early republic.  My dissertation, *For the Security and Protection of the Community: The Frontier and the Makings of Pennsylvanian Constitutionalism* (2005), explains how community self-defense on the frontier shaped the understanding of the right to keep and bear arms in the 1776 state constitution.  My co-edited collection, *The Second Amendment on Trial* (2013),

published by University of Massachusetts Press, remains the only comprehensive book-length academic treatment of the landmark *Heller* case. I have written articles on originalism and the right to keep and bear arms published in The American Journal of Legal History, Widener Law Journal, Journal of the Early Republic, The Pennsylvania Magazine of History and Biography, University of Pennsylvania Journal of Constitutional Law, and Rutgers Law Journal.

8.      I have provided expert testimony in another Second Amendment challenge, *Dotson v. District of Columbia*, No. 24-cv-01864 (D.D.C.). I also co-wrote the Brief of Historians on Early American Legal, Constitutional and Pennsylvania History as *Amici Curiae* in Support of Respondent City of Chicago, filed in *McDonald v. City of Chicago*, 561 U.S. 742 (2010). The brief was cited in Justice Stevens' dissent.

9.      I am the author of a biography of Benjamin Franklin, *Benjamin Franklin: American Founder, Atlantic Citizen* (2015), published for the Routledge Historical Americans series geared for use in senior high school and undergraduate history classrooms.

10.      I have given numerous conference papers and public lectures and written numerous book reviews and encyclopedia entries based on my research expertise described above.

## OPINIONS

11.      To answer the historical questions posed here, one must first understand the nature of government around the time of the American Revolution. By 1776, all the mainland British colonies had legislative assemblies that served two basic functions: (1) make local law, and (2) check the executive authority of the governor. Assemblies generally met for about one month out of the year to ensure that enough tax revenue was generated to pay for the salaries of

the governor and a handful of permanent officials.[1]  They also passed laws to address particular

local issues as they arose.  Government was small and did not have the funds or bureaucracy to

establish and maintain extensive licensing or registration regimes, nor was there a publicly

funded police service to enforce the law.  Outside of the cities, county sheriffs responded to

citizen complaints about infractions of the law and made arrests as appropriate.  Within the

cities, the mayor usually was responsible for keeping the peace with the help of constables and

marshals who could make arrests and serve warrants.  A volunteer force of nightwatchmen

patrolled the streets at night and reported fires, crimes, and riots to the authorities.  As Lawrence

Friedman explains, "colonial justice was a business of amateurs.  Amateurs ran and dominated

the system."[2]  This meant that "laymen, amateurs, and ordinary judges (some of them without

any training in law) ran the system, together with a few lawyers, and a ragbag of constables,

night watchmen, and haphazard jailers."[3]

       12.     While there were not extensive licensing schemes in early America, legislators

clearly exercised their right to regulate society for the common good.  In the wake of the

Declaration of Independence, the new states secured the right to control their own affairs.

Pennsylvania, for example, agreed to declare the "united colonies free and independent states"

on the condition that "the forming of the government and the regulation of the internal police of

this colony be always reserved to the people."[4]  This was reaffirmed in the third clause of the

---

[1] Richard Middleton, *Colonial America: A History, 1565–1776*, 3rd edition (Malden: Blackwell Publishing, 2002), 349.

[2] Lawrence M. Friedman, *Crime and Punishment in American History* (Basic Books. Kindle Edition), 27.

[3] Friedman, *Crime and Punishment*, 67.

[4] *Statutes at Large of Pennsylvania*, 18 vols. (Harrisburg: State Printer, 1896–1915), 9:493.

1776 Pennsylvania Constitution's Declaration of Rights: "That the people of the State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[5]

13.     One must also understand that the guiding principle for early American legislators was ensuring the public's safety.  As the fifth clause of Pennsylvania's Declaration of Rights affirmed: "government is, or ought to be, instituted for the common benefit, protection, and security of the people."  And as chief justice of the Pennsylvania Supreme Court, Thomas McKean explained in *Republica v. Sparhawk* (1788): "It is a rule, however, that it is better to suffer a private mischief, than a public inconvenience . . . .  [T]he safety of the people is a law above others."[6]

14.     It is likewise important to appreciate the scale of American society at the time of the Revolution.  Philadelphia was the largest city in the new United States with a population in 1776 of about 34,000.[7]  New York City was the second largest with a population of about 22,000.[8]  In 1689, no settlement in the mainland colonies except Boston (at 7,000 residents) had a population over 3,000 persons.  By 1720, Philadelphia's population had risen to 10,000; Boston had 12,000; and New York 7,000.  Charleston was the biggest city in the South at 4,000.[9]  Still,

---

[5] 1776 Pennsylvania Constitution, Declaration of Rights, clause III.  Other states had similar clauses.  *See, e.g.*, Maryland 1776 Declaration of Rights, clause II; New York 1777 constitution; North Carolina's 1776 Declaration of Rights, clause II; Vermont's 1777 Declaration of Rights, clause IV.

[6] A.J. Dallas, ed., *Reports of Cases Ruled and Adjudged in the Courts of Pennsylvania* 4 vols., 2nd ed. (Philadelphia: P. Byrne, 1806), 1:362–63.

[7] John K. Alexander, "The Philadelphia Numbers Game: An Analysis of Philadelphia's Eighteenth-Century Population," *The Pennsylvania Magazine of History and Biography* 98, no. 3 (July 1974): 324.

[8] Carl Abbott, "The Neighbourhoods of New York," *New York History* 55, no. 1 (January 1974): 40.

[9] *See* Middleton, 381.

even with this growth, only about 6% of the population lived in a city.  As cities began to grow, although not on the scale of the 19th century, legislators tried to address a specific set of problems through various regulations.

15.     Although crime in general was a concern in early American cities, gun-related—and especially handgun-related—homicides were not.  Colonial society was violent, to be sure, but in ways particular to the time period.  As Randy Roth argues, "the homicide rate for adult European colonists in New England before King Philip's War [(1675–76)] was as high as the rate in the United States today, 7–9 per 100,000 adults per year.  Before the Pequot War [(1636)], the rate was higher still: roughly 110 per 100,000 adults per year, or 11–14 times the rate today."[10]  These deaths were largely the function of colonization and the violent wresting of land from indigenous peoples.  But once political stability was achieved "the homicide rate for colonists fell abruptly from a third to a tenth of its previous level."[11]

16.     Within the early American and Founding era context of imperial wars, fear of slave and servant uprisings, and the violent wresting of lands from indigenous peoples, the key to public safety lay in a well-regulated militia.  All the colonies except for Pennsylvania (whose legislature was controlled by pacifist Quakers) had a militia by the Revolution.  All these colonies, therefore, had laws to regulate the militia, as New York's militia law stated, for the "security and Defence" of the colony.[12]  Such laws required men of a specified age range to

---

[10] Randolph Roth, "Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence," *The William and Mary Quarterly* 59, no. 1 (2002): 235.

[11] Randolph Roth, *American Homicide*. Kindle Edition (Cambridge: Belknap Press of Harvard University Press, 2009).

[12] *An Act for Settling and Regulating the Militia in this Province* (New York: William Bradford, 1724), 269.

show up to muster properly armed and accoutered, and levied fines against those who failed to meet the standard.  Legislatures were mindful that militiamen carry their guns safely to and from muster.  For example, Massachusetts lawmakers in 1792 recognized that "the good citizens of this commonwealth are often injured by the discharge of single guns on [militia] muster day," and therefore forbade the unnecessary firing of guns "in any public road, or near any house . . . unless embodied under the command of some officer."[13]  The carrying of arms, then, was regulated by law.

17.    The first mention of holsters in American law can be found in militia regulations. For example, in 1775, a Virginia committee on which Thomas Jefferson sat, tasked with updating the 1738 militia law, recommended that "every horseman be provided with . . . pistols and Holsters."[14]  George Washington considered the holster to be essential for an effective cavalry, and wrote to Philip Schuyler in 1777 that there was no point in Congress spending the money on horses unless the cavalry could also be "properly equipped with . . . Holsters [and] Pistols."[15] When Congress passed its own laws "for the order and discipline of the troops" called into federal service in 1794, it mandated that commissioned officers commanding Troops of Horse furnish themselves "at their own expense" with "a Sword and Pair of Pistols, the Holsters of which shall be covered with Bear-Skin caps."[16]  These regulations were a carbon copy of

---

[13] *Laws for the Government of the Militia of the Commonwealth* (Salem: Joshua Cushing, 1801), 41.

[14] "Report of Committee to Prepare a Plan for a Militia, March 25, 1775," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-01-02-0098.

[15] George Washington to Major General Philip Schuyler, 9 February 1777," *Founders Online,* National Archives, https://founders.archives.gov/documents/Washington/03-08-02-0311.

[16] *Regulations for the Order and Discipline of the Troops of the United States. Part* I (Philadelphia: Charles Cist, 1794), 14.

those Pennsylvania had passed a year earlier.[17]   The point of these laws was to ensure that those

who were liable under the law to carry arms for the state were properly and safely armed.

18.     Outside of the militia, the colonies had a long tradition of regulating the carrying

of arms, particularly to prevent affrays, riots, and disturbances of the peace.  William

Blackstone's *Commentaries on the Laws of England*, published in England between 1765 and

1769, and then in the colonies in 1771, provided the authoritative opinion: "going armed with

unusual attendance, to the terror of the people" broke "the security of the peace."[18]  In

Massachusetts, a 1692 law empowered justices of the peace to arrest those "who shall ride or go

armed offensively" and "Seiz and Take away [their] Armour or Weapons."[19]  The legislature

repealed the law in 1795 to remove reference to the king's officials while retaining the power of

justices of the peace to arrest all who "shall ride or go armed offensively, to the terror of the

good citizens of this Commonwealth."[20]  In 1809, in the midst of the uproar over the Embargo

Act of 1807, the inhabitants of Wiscasset, Massachusetts (now Maine), resolved to form a

committee of safety "to cause the law against such as shall 'go armed offensively to the fear and

terror of the good citizens of this commonwealth,' to be duly enforced."[21]  When the state of

Maine was created as part of the Compromise of 1820, the legislature passed a law that forbade

"going armed offensively, to the fear and terror of the good citizens of this State," and requiring

---

[17] "An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania," April 11, 1793, *Statutes at Large Pennsylvania*, 18 vols. (Harrisburg: State Printer, 1996–1915), 14:454.

[18] William Blackstone, *Commentaries on the Laws of England*, book 4 (Philadelphia: Robert Bell, 1771), 254.

[19] *Acts and Laws, Passed by the Great and General Court or Assembly of Their Majesties Province of the Massachusetts-Bay* (Boston: Benjamin Harris, 1692), 18.

[20] 1795 Mass. Acts 436, ch. 2.

[21] "Wiscasset Resolutions," *Columbian Centinel* (Boston, Massachusetts), February 1, 1809, 1. Quoting the 1795 law.

"sureties for the good behaviour of dangerous and disorderly persons."[22]  In 1770, Pennsylvania

passed an act to punish "wicked and evil-disposed persons from going armed in disguise."[23]  In

the South, a 1736 procedural manual for justices of the peace in Virginia agreed that justices

could "lay Hands upon the Offenders, take away their Weapons, and commit them" to jail.[24]  In

1786, the Virginia legislature passed an act that forbade people riding armed "in terror of the

country" lest they "forfeit [their] armour [i.e. weapons] to the Commonwealth."[25]  In Tennessee,

the legislature passed a law in 1801 requiring sureties from those who "shall publicly ride or go

armed to the terror of the people, or privately carry any . . . pistol or any other dangerous

weapon, to the fear or terror of any person."[26]

19.    Other laws pertaining to the carrying of firearms regulated where arms could be

carried.  These laws were broad in scope in that they forbade anyone from carrying arms and

hunting on lands they did not own without permission.  In Pennsylvania, for example, no person

could "carry a gun, or hunt, on the Land of another, without Licence from the Owners."[27]

Maryland forbade any person "that have been convicted of . . . Crimes, or that shall be of evil

Fame, or a Vagrant, or a dissolute Liver" from "carry[ing] a Gun on any Person's Land."[28]

---

[22] *Laws of the State of Maine* (Hallowell: Calvin Spaulding, 1822), 285.

[23] See *Statutes at Large Pennsylvania*, 18 vols. (Harrisburg: State Printer, 1996–1915), 7:350.

[24] *The Office and Authority of a Justice of Peace* (Williamsburg: William Parks, 1736), 5.

[25] William Waller Hening, ed., *The Statutes at Large; Being a Collection of all the Laws of Virginia* 13 vols. (Richmond: George Cochran, 1819–1823), 12:334.  The *Oxford English Dictionary* defines the historical meaning of armour as "The whole apparatus of war collectively; military equipment, both offensive and defensive; arms, weaponry."

[26] 1801 Tennessee Public Acts, chapter 22 § 6.

[27] *Anno Regni Georgii II. Regis, Magnae Britanniae, Franciae & Hiberniae, vigesimo secundo. At a General Assembly of the province of Pennsylvania* (Philadelphia: B. Franklin, 1749), 88.

[28] A Compleat Collection of the Laws of Maryland (Annapolis: William Parks, 1727), 126.

20.    Still, gun-related crime and concealed carry was not the issue that it is today because of the patterns of American gun ownership and the gun technology available at the Founding.  American colonists resisted purchasing heavier and expensive muskets that were the standard for military service (like the 10-pound Brown Bess), preferring instead "lighter, smaller-caliber [long] guns because these firearms were more useful as weapons for hunting and controlling vermin."[29]  Few outside the wealthy class owned pistols.  For example, while 46% of probate inventories in New England from 1783 to 1786 listed firearms, only 2.5% listed pistols.[30]  Similarly, 56.4% of probate inventories in the Chesapeake from the same period listed firearms with only 2.3% listing pistols.[31]  Wealthier colonists were more likely to own firearms than their poorer neighbors.[32]  The majority of these guns were muzzle-loading flintlock weapons that took time and skill to load effectively and were therefore not particularly well suited for self-defense or committing crimes.  What distinguishes violent crimes then from today's similar ones "is mostly the availability of handguns and automatic weapons.  In the eighteenth century, demented murderers rarely had more than one victim."[33]  A flintlock pistol, for example, required the user put a primer charge in the pan, a main powder charge in the barrel of the gun, followed by the bullet.  Improper ignition of the primer charge (from which we get the phrase "a flash in the pan") was already an issue, so it made little sense to risk losing the primer or main charge into

---

[29] Kevin M. Sweeney, "Firearm Ownership and Militias in Seventeenth- and Eighteenth-Century England and America," in *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment*, eds. Jennifer Tucker et. al (Washington D.C: Smithsonian Scholarly Press, 2019), 62.

[30] Sweeney, 61 (Table 3.5).

[31] Sweeney, 61 (Table 3.5).

[32] Sweeney, 62 (Table 3.6).

[33] Jack Marietta and G. S. Rowe, *Troubled Experiment: Crime and Justice in Pennsylvania, 1682–1800* (Philadelphia: University of Pennsylvania Press, 2006), 112.

one's pockets by carrying an already loaded or charged pistol.  Also, the corrosive nature of black gun powder meant that Americans preferred to store their guns unloaded.  Local laws also prohibited keeping firearms with gun powder in the barrel within the city limits.  For example, in Boston under a 1783 law, any firearms found in any houses that were "charged with, or having in them any gun-powder" were "liable to be seized."[34]

21.    Lastly, we must understand that the drafting of the Second Amendment did not invalidate or undermine the gun regulations legislatures had passed up until 1790.  Most relevant here, I have not located in my research any Founding Era discussions indicating that Americans at that time understood the right to keep and bear arms to preclude reasonable manner of carry regulations.  To the contrary, because many of these regulations sought to arm and train the militia, they in fact worked to serve Congress's purposes.  When James Madison brought a list of amendments before the House on June 8, 1789, he proposed inserting the following into Article 1, section 9: "The right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: but no person religiously scrupulous of bearing arms, shall be compelled to render military service in person."[35]  Indeed, the first Congress's only concern when it came to firearms was establishing a functional federal militia now that the Constitution gave them the power to do so.  The suggestion that some men should be exempt from service was contentious.  James Jackson of Georgia argued that "every citizen was not only entitled to carry arms, but also duty bound to perfect himself in the use of them, and thus become capable of defending his country."[36]  Roger Sherman of Connecticut

---

[34] *Private and Special Statutes of the Commonwealth of Massachusetts* 3 vols. (Boston: Manning and Loring, 1805), 1:43.

[35] *Daily Advertiser* (New York), June 12, 1789, p. 2.

[36] *Pennsylvania Packet*, December 21, 1790, p. 2.

questioned if Congress could give an exemption to pacifists since the "state governments had [not] given out of their hands the command of the militia, or the right of declaring who should bear arms."[37]  As he argued, "every power still remained in the people and the state governments except what had been given up the United States by the new constitution."  Antifederalists agreed that arms regulation should remain with the states.  The influential "Dissent of the Minority" issued during the ratification debates in Pennsylvania argued that "the power of organizing, arming, and disciplining the militia . . . remain with the individual states," and that no one be disarmed "unless for crimes committed, or real danger of public injury from individuals."[38]

22.      Nor did colonial gun regulations run afoul of the long-standing English common law tradition of self-defense.  That Americans since the establishment of the first colonies in the early 1600s had a right to arms for self-defense was not controversial.  That legislators could regulate that right was equally uncontroversial.  William Blackstone's *Commentaries on the Laws of England* provided the authoritative opinion: "the fifth and last auxiliary right of the subject . . . is that of having arms for their defense, suitable to their condition and degree, and such as are allowed by law."[39]  Englishmen, then, had the right "of having and using arms for self-preservation and defense" which they could enjoy "unless where the laws of our country have laid them under necessary restraints."[40]  What this meant is that Americans could enjoy the right to arms for self-defense in whatever ways were not restricted by law.  Once a new law was

---

[37] *Pennsylvania Packet*, December 21, 1790, p. 2.

[38] *The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania* (Philadelphia: E. Oswald, 1787), 1.

[39] William Blackstone, *Commentaries on the Laws of England*, 4 vols. (Oxford: Clarendon Press, 1765-69), 1:139.

[40] Blackstone, *Commentaries*, 1:140.

passed, it had to be followed.  As justice Isaac Parker reminded a jury in *Commonwealth v. Selfridge* (1807), "it is sometimes necessary to resort to the books of the common law, the principles of which, by the constitution of our government, are made the law of our land, until they shall be changed or repealed, by our own legislature."[41]

## CONCLUSION

23.     From this context we can draw the following conclusions:

24.     Even though early American governments were ill-equipped to establish and enforce extensive licensing laws and regulations, governments still had the power to regulate the manner of carrying of firearms for the common good and safety.  Early legislators enacted and enforced a variety of carrying laws.

25.     The relative lack of holster laws during the Founding is a function of the kinds of guns Americans owned (i.e. mostly long guns) and the fact that violence associated with loaded and concealed firearms did not pose a pressing problem for legislators to solve.

26.     Laws regulating the manner of carrying of firearms are consistent with early Americans' understanding of the right to keep and bear arms.  The right of self-defense was not understood to be unlimited, nor was the keeping and carrying of arms immune from regulation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

September 24, 2024
Date

NATHAN KOZUSKANICH

---

[41] *Trial of Thomas O. Selfridge, attorney at law, before the Hon. Isaac Parker,* Esquire (Boston: Russell and Cutler, Belcher and Armstrong, and Oliver and Monroe, 1807), 158.

# Curriculum Vitae
# Nathan Ross Kozuskanich

### Professional Address
Nipissing University
100 College Drive, Box 5002
North Bay, ON, Canada P1B 8L7
Telephone: 705-474-3450 x. 4189
Email: nathank@nipissingu.ca

### Current Position
Chair, Department of History, Anthropology, and Ancient Studies
Professor, Department of History, Nipissing University
Assistant Editor, The John Dickinson Writings Project

### Education
| | |
|---|---|
| 2005 | Doctor of Philosophy, The Ohio State University |
| 2000 | Master of Arts, Queen's University |
| 1998 | Bachelor of Arts (Honours), Queen's University |

### Professional Experience
| | |
|---|---|
| 2011 | Associate Professor, Nipissing University |
| 2007 | Assistant Professor, Nipissing University |
| 2006 | Visiting Assistant Professor, The Ohio State University, Mansfield |

### Related Professional Experience
| | |
|---|---|
| 2017 | Completed the ADE's Institute for the Editing of Historical Documents (Buffalo, NY) |
| 2004-05 | Research Associate, Second Amendment Research Center John Glenn Institute for Public Service and Public Policy |

### Awards and Honours
| | |
|---|---|
| 2004 | Clio Award for Excellence in Teaching (OSU) |

### External Research Funding
| | | | |
|---|---|---|---|
| 2011 | SSHRC | C | $54,904 |
| 2004 | Andrew W. Mellon Foundation | F | $1,750 |
| 2004 | David Library of the American Revolution | F | $1,500 |
| 1999 | Donald S. Rickard Fellowship | F | $800 |

### Internal Research Funding
| Date | Type | Institution | Amount |
|---|---|---|---|
| 2010 | Internal Research Grant | Nipissing University | $2,354 |
| 2008 | Start Up Research Grant | Nipissing University | $5,000 |
| 2005 | Presidential Fellowship | The Ohio State University | $27,102 |
| 2004 | College of Humanities | The Ohio State University | $4,140 |
| 2004 | College of Humanities | The Ohio State University | $500 |
| 2003 | Graduate School | The Ohio State University | $4,020 |

**_Publication Summary (Lifetime total)_**

| | |
|---|---|
| Books Authored | 1 |
| Books Edited | 4 |
| Articles in Refereed Journals & Refereed Book chapters | 8 |
| Book Chapters | 1 |
| Online Publications | 3 |
| Legal Briefs | 1 |
| Non-refereed articles | 1 |
| Dictionary and Reference Articles | 4 |
| Book Reviews | 11 |
| Conference Papers | 14 |
| Keynotes, Invited Papers, & public lectures | 3 |
| Panel Chair, Moderator, Commentator, and Roundtable Participant | 1 |
| Works in Progress | 2 |

**_Publications_**

**Books Authored**

2015          *Benjamin Franklin: American Founder, Atlantic Citizen* (Routledge)

**Books Edited**

2024          (Assistant Editor) *The Complete Writings and Selected Correspondence of John Dickinson, Volume 3, 17519–1763* (University of Delaware Press)

2021          (Assistant Editor) *The Complete Writings and Selected Correspondence of John Dickinson, Volume 2, 17519–1763* (University of Delaware Press)

2020          (Assistant Editor) *The Complete Writings and Selected Correspondence of John Dickinson, Volume 1, 1751–1758* (University of Delaware Press)

2013          and Saul Cornell, eds., *The Second Amendment on Trial: Critical Essays on* District of Columbia *v.* Heller (University of Massachusetts Press)

**_Articles in Refereed Journals & Refereed Book Chapters_**

2016          "Rethinking Originalism: Bearing Arms and Armed Resistance in Pennsylvania," *American Journal of Legal History* 56 (2016): 398–411.

2010          "'Falling Under the Domination Totally of Presbyterians:' The Paxton Riots and the Coming of the Revolution in Pennsylvania" in William Pencak, ed., *Pennsylvania's Revolution* (The Pennsylvania State University Press, 2010), 7-35.

2010          "History or Ideology? A Response to David B. Kopel and Clayton E. Cramer," *Widener Law Journal* 19 (2010): 321-342.

2009          "Originalism in a Digital Age," *Journal of the Early Republic* 29 (Winter 2009): 585-606.

2009          "Pennsylvania, the Militia, and the Second Amendment," *The Pennsylvania Magazine of History and Biography* 133 (2009): 119-147.

2008          "Originalism, History, and the Second Amendment: What Did Bearing Arms Really Mean
              to the Founders*?" University of Pennsylvania Journal of Constitutional Law* 10 (2008):
              413-446.

2008          "Defending Themselves: The Original Understanding of the Right to Bear Arms" *Rutgers
              Law Journal* 39 (2008): 1041-1070.

2004          "Who Ever Proclaimed War With Part of a Nation, and Not With the Whole?:" The Paxton
              Riots and Perceptions of Civil Society in Pennsylvania" in 2 *The Journal of Scotch-Irish
              Studies* (Fall 2004): 45-63.

### Online Publications

2015          "Good Guys and Bad Guys with Guns: Gun Control in Canada and the U.S.," *Origins* 8:4
              (2015).   http://origins.osu.edu/article/good-guys-and-bad-guys-guns-gun-control-canada-
              and-us

2008          "Historians and Heller: The Second Amendment Comes Back From Court," *Origins* 1:5
              (November 2008).
              http://origins.osu.edu/article/second-amendment-goes-court?nopaging=1

2008          "Originalism in a Digital Age: An Inquiry Into the Right to Bear Arms," *The Readex Report*
              3 (November 2008).   https://www.readex.com/readex-report/issues/volume-3-issue-
              4/originalism-digital-age-inquiry-right-bear-arms

### Legal Briefs

2010          "Brief of Historians on Early American Legal, Constitutional and Pennsylvania History as
              *Amici Curiae* in Support of Respondent City of Chicago," *McDonald* v. *City of Chicago*
              (No. 08-1521).

### Non-refereed Articles

2012          "William Smith and the Impact of the West on American History" (introductory remarks
              to Karen Ramsburg, "Saving the Birthplace of the American Revolution") *Pennsylvania
              History* 79 (Winter 2012), 56-58.

### Dictionary and Reference Articles

2016          "Second Amendment" in Stephen L. Schechter, ed., *American Governance* (Farmington
              Hills: Gale, Cengage Learning, 2016), 36-40.

2012          "Militia Bill of 1792" and "Saul Cornell" in Gregg Lee Carter, ed., *Guns in American
              Society: An Encyclopedia of History, Politics, Culture, and the Law*, second edition (Santa
              Barbara: ABC-CLIO, 2012), 572-3, 206-7.

2012          "Guns" in Lynn Dumenil, eds., *The Oxford Encyclopedia of American Social History*
              (Oxford: Oxford University Press, 2012), 473-75.

2002          "Five Civilized Tribes," in Stanley I. Kutler et al, eds. *Dictionary of American History*. 3rd
              ed., vol. 3 (New York: Charles Scribner's Sons, 2002).

## *Book Reviews*

2021        Featured Review of Jennifer Tucker, Barton C. Hacker, and Margaret Vining, editors, *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* and Allan J. Lichtman, *Repeal the Second Amendment: The Case for a Safer America* in *American Historical Review* 126 (June 2021): 743–745 (invited).

2019        Review of Kenneth Owen, *Political Community in Revolutionary Pennsylvania, 1774-1800* in *Journal of Early American History* 9 (2019): 241-242.

2017        Review of George Goodwin, *Benjamin Franklin in London: The British Life of America's Founding Father* in *The New England Quarterly* 90 (September 2017): 478-480.

2017        Review of Carla J. Mulford, *Benjamin Franklin and the Ends of Empire* in *American Historical Review* 122 (February 2017): 170-171.

2014        Review of William Murchison, *The Cost of Liberty: The Life of John Dickinson* in *Pennsylvania Magazine of History and Biography* 138 (July 2014): 340-342.

2009        Review of Jeffery M. Dorwart, *Invasion and Insurrection: Security, Defense, and War in the Delaware Valley, 1621–1815* in *Pennsylvania Magazine of History and Biography* 133 (July 2009): 285-286.

2004        Review of Theda Perdue*, "Mixed Blood" Indians: Racial Construction in the Early South* in *Southern* Historian XXV (Spring 2004): 106-107.

2003        Review of Thomas Goebel, *A Government by the People: Direct Democracy in America, 1890-1940* in *Southern Historian* XXIV (Spring 2003): 107-108.

2001        Review of Edward J. Cashin, *William Bartram and the American Revolution on the Southern Frontier* in *Southern Historian* XXII (Spring 2001), 87-88.

2000        Review of Mary Kemp Davis, *Nat Turner Before the Bar of Judgment: Fictional Treatments of the Southampton Slave Insurrection* in *Southern Historian* XXI (Spring 2000): 71-72.

1999        Review of Wilma A. Dunaway, *The First American Frontier: Transition to Capitalism in Southern Appalachia, 1700-1860* in *Southern Historian* XX (Spring 1999): 63-65.

## *Conference Papers*

2024        "The Challenge of Moderation at the Time of the First Continental Congress," presented at SHEAR Annual Meeting, Philadelphia, PA, July 2024.

2023        "Community and the Local: The War of 1812 in Baltimore," presented at Local Stories, National Narratives: A Conference in Honor of John L. Brooke, Columbus, OH, June 2023.

2022        "'A Certain Coldness in my Presbyterian Friends': Dickinson and the Pennsylvania Radicals," presented at the John Dickinson Symposium: New Perspectives on the American Founding, Philadelphia, PA, October 2022.

2014    "To Bear or Not to Bear: The Question of Arms in the Early Republic," presented at the British Group of Early American Historians Annual Meeting, Edinburgh, UK, September 2014.

2014    "Portrait of the Lawyer as a Young Man: The Diary of Richard Cranch Norton and the War of 1812," presented at the OIEAHC Annual Meeting, Halifax, NS, June 2014.

2012    "'His Connexions Are Highly Respectable:' Manhood and the Militia in the War of 1812," presented at SHEAR Annual Meeting, Baltimore, MD, July 2012.

2008    "Rhetoric and Reality of a Well-Regulated Militia in Pennsylvania," presented at SHEAR Annual Meeting, Philadelphia, PA, July 2008.

2006    "'Falling Under the Domination Totally of Presbyterians:' The Frontier, the Constitution, and Pennsylvania's Road to the American Revolution" presented at the McNeil Center, December 2006.

2006    "'Defending Themselves:' Understanding the Context of the Right to Bear Arms in Revolutionary Pennsylvania" presented at AHA Annual Meeting, Philadelphia, January 2006.

2004    "'For the Security and Protection of the Community:' Safety, Civil Society, and the Making of the Pennsylvania Constitution" presented at Ireland and Scotland: Conjoined Histories in the Long 18th Century, Trinity College, Dublin, Ireland, June 2004.

2004    "The Paxton Riots, 1764" presented at the XV Annual Ulster-American Heritage Symposium, Omagh, County Tyrone, Northern Ireland, June 2004.

2003    "'Who Ever Proclaimed War With Part of a Nation, and Not With the Whole?:' The Paxton Riots and Perceptions of Civil Society in Pennsylvania" presented at the Ohio Valley History Conference, Eastern Kentucky University, Richmond, KY, October 2003.

2003    "'The Uncertainty of Depending on the Indians:" Negotiation, Violence and Accommodation in Pennsylvania During the French and Indian War" presented at the 4th Annual CIC-AIS Graduate Student Conference, The Newberry Library, Chicago, IL, April 2003.

1999    "Imperialism and Regionalism: Nova Scotia Yankees and the American Revolution" presented at New Frontiers in Graduate History, York University, Canada, 1999.

### Keynotes, Invited Papers, & Public Lectures

2018    *John Dickinson and (not) Bearing Arms in the Early Republic*, presented at George Fox University, October 2018. (invited)

2017    *Between Right and Responsibility: What Happens When No One Wants to Bear Arms?*, presented at the University of Kentucky, April 2017. (invited)

2013    "The Second Amendment on Trial: An Historian's Perspective," presented to the UGA American Constitution Society, UGA Law School, Athens, GA, November 2013. (invited)

***Panel Chair, Moderator, Commentator, and Roundtable Participant***

2008          Commentator for *Narratives in Development: Memory and Politics in Early America* presented at the AHA Annual Meeting, Washington D.C., January 2008.

***Works in Progress***

Assistant Editor, *The Complete Writings and Selected Correspondence of John Dickinson*, 10 vols. (under contract with University Delaware Press)

*Arms and the Men: Masculinity and the Militia in the Early Republic* (manuscript in progress)

***Graduate and Post-Doctoral Supervisions***

2024          Sydney Ventress, "'Young Ladies Don't Do Things Like That'": Voices and Stories From the Women of the Student Non-Violent Coordinating Committee" (MRP, primary supervisor)

2020          Rebecca Dubeau, "Rioting and Reporting: Representations of Race in the *Chicago Tribune* and the *Chicago Defender* During the 1919 Chicago Race Riot" (MRP, primary supervisor)

2019          An Nguyen, "If There's Still Việt Cộng, Then I Will Never Return:" Understanding the Vietnamese Diaspora Through Memories of Food, Work, and Nation**"** (MRP, primary supervisor)

2018          Carolyne Ticky, "Just Afflictions: Representations of Identity, Illness and Pain in Four Seventeenth-Century English Diaries" (MRP, second reader)

2017          Rachel Loewen, "'No Officer . . . Will Forget That the Soldier is Like Himself a Man:' American Citizen-Soldiers in a Democratizing Nation, 1812-1815" (MRP, primary supervisor)

2016          Lauren Edwards, "A Union Through Chains: Slavery and Meanings of the United States Constitution" (MRP, primary supervisor)

2016          Lesley, Kimewon, "Kina Dnwendagnag Miigsaabiigan Miinwaa Niizhswasebboon Gii Miigaading=Wampum belts: All my Relations and the Seven Years' War" (MRP, primary supervisor)

2014          Peter Brath, "'A Luxurious, Lazy, Idle, and Effeminate People:' Manhood, Property, and Race in Trustee Georgia, 1731-1752" (MRP, primary supervisor)

2013          John Picard, "Between Two Masters: National Liberation Front Defectors in Dinh Tuong Province" (MRP, second reader)

***Graduate Teaching***

| Date | Course |
|---|---|
| FA 2015, 19, 22 | HIST 5406: Topics in Gender History |
| WI 2013 | HIST 5007: Methods in Historical Research |
| WI 2013 | HIST 5506: Directed Studies |
| FA 2012 | HIST 5506: Directed Studies |
| FA 2010 | HIST 5316: The Atlantic World |

### *Undergraduate Courses Offered*

| | |
|---|---|
| HIST 1106 | Sex, Violence, and Power in Early America |
| HIST 2515 | The History of the United States |
| HIST 2516 | An Introduction to American History |
| HIST 2517 | Race and Racism in America |
| HIST 2336 | The Vietnam War |
| HIST 3387 | Teaching Hard History |
| HIST 3517 | American Music |
| HIST 3576 | Colonial America |
| HIST 3577 | The American Revolution and New Nation |
| HIST 4335 | Topics: American Slavery |
| HIST 4335 | Topics: American Bodies |
| HIST 4335 | Topics: Black History, Black Voices |

### *Service*
### *University Level*

| | | |
|---|---|---|
| 2022 – present | IRG Committee | Member |
| 2022 – present | AQAPC | Member |
| 2021 – 2023 | NUFA Executive | Past President |
| 2020 | President's Search Committee | Member |
| 2019 – 2021 | NUFA Executive | President |
| 2018 – 2020 | Collective Bargaining Committee | Member |
| 2018–19 | NUFA Executive | Vice President |
| 2017 | PVPAR Search Committee | Member |
| 2016–17 | NUFA GED Committee | Member |
| 2017–2020 | UGRC Committee | Chair |
| 2017–18 | NUFA | Grievance Officer |
| 2016–17 | UGRC Committee | Member |
| 2016–18 | Special Joint Committee, Librarians | Member |
| 2016 | Board of Governors | Member (resigned) |
| 2015–16 | Collective Bargaining Committee | Member |
| 2011–13 | Graduate Coordinator | MA in History |
| 2009–11 | ARCC | Member |
| 2007–17, 19–21 | Academic Senate | ArtSci Senator |
| 2007–09 | Native Studies Steering Committee | Member |

### *Department Level*

| | | |
|---|---|---|
| 2022–present | Department of History | Chair |
| 2017 | Ontario Universities Fair | Delegate |
| 2012–present | Fall Open House/March Up Close | Participant |
| 2011 | Search Committee, English Studies | External Member |
| 2010–19 | Departmental Social Media manager | |
| 2010–11 | Departmental Policy Committee | Member |
| 2010–11 | Hiring Committee, LTA 1 | Member |
| 2010–11 | Hiring Committee, LTA 2 | Member |
| 2009–11 | Graduate Admissions Committee | Member |

### *Provincial, National, and International Service*

| | |
|---|---|
| 2019–21 | Member, CAUT Council |
| 2018–19 | Board Director, OCUFA |
| 2017–18 | Reviewer, *Journal of the Early Republic* |

| | |
|---|---|
| 2017–18 | Reviewer, University of Massachusetts Press |
| 2016–18 | Reviewer, *William and Mary Quarterly* |
| 2012–13 | Reviewer, *Pennsylvania History* |

***Community Service***

| | | |
|---|---|---|
| 2013–21 | North Bay Regional Heritage Fair | Chair |