# EXHIBIT 14

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LYNNE ANNE-BRIGITTE RUSSELL,** *et al.***,** <br><br>      **Plaintiffs,** <br><br>      **v.** <br><br> **DISTRICT OF COLUMBIA,** *et al.***,** <br><br>      **Defendants.** | **No. 1:24-cv-01820-JDB** |

## <u>DECLARATION OF BRENNAN RIVAS</u>

Pursuant to 28 U.S.C. § 1746, I, Brennan Rivas, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information. The views I state herein are drawn from my professional experience.

2.      I have been asked by the District of Columbia (District) to render an opinion about the history of firearms restrictions enacted in the nineteenth century, especially as they relate to restrictions on the manner of carrying weapons. I have also been asked to provide additional contextual information about the history of deadly weapons and societal attitudes about them. Finally, I have been asked to opine whether a District law that requires concealed pistol license holders to carry their pistols safely holstered (hereinafter the "holster regulation"), 24 DCMR § 2344.2, is consistent with American firearms regulation in the nineteenth century.

3.      I have reviewed Plaintiffs' Complaint and Motion for a Preliminary Injunction as well as the regulation at issue, 24 DCMR § 2344.2. I make this Declaration on the basis of my training, professional expertise, and research.

4.      For my work on this case, I am being compensated at a rate of $225 per hour.

## BACKGROUND AND QUALIFICATIONS

5.      I am a historian and currently work as a Senior Postdoctoral Researcher at the Center for the Study of Guns and Society at Wesleyan University in Middletown, Connecticut. During the 2021–2022 academic year, I was the Lloyd Lewis Fellow in American History at The Newberry Library.  From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University.  From 2019 to 2020, I was a Lecturer in American History at Texas Christian University (TCU).  My educational background includes a Ph.D. in History from TCU, where my dissertation was on the development, evolution, and enforcement of gun and weapon policy in Texas from the 1820s to the 1930s.

6.      My expertise includes historical weapon regulations in the United States.  I have authored multiple publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; in 2022, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study" (June 2022), was published in the *UC Davis Law Review*.  I am currently completing a book manuscript based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period.  This manuscript has undergone the first round of peer-review and is currently under contract with an academic press.

7.      I have provided expert witness testimony in the following cases, all involving Second Amendment challenges to firearm regulations: *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*, No. 1:22-cv-03093 (E.D. Wash.); *Christian v. Nigrelli*,

No. 22-cv-00695 (W.D.N.Y.); *Frey v. Nigrelli*, No. 21-cv-5334 (S.D.N.Y.); *Sullivan v. Ferguson*, No. 22-cv-05403 (W.D. Wash.); *Siegel v. Platkin*, No. 22-cv-7463 (D.N.J.); *NAGR v. Campbell*, No. 22-cv-11431 (D. Mass.); *Or. Firearms Fed'n, Inc. v. Kotek*, No. 22-cv-01815 (D. Or.); *NSSF v. Jennings*, No. 22-cv-01499 (D. Del.); *Chavez v. Bonta*, No. 19-cv-01226 (S.D. Cal.) (f/k/a *Jones v. Bonta*); *Nguyen v. Bonta*, No. 20-cv-02470 (S.D. Cal.); *Baird v. Bonta*, No. 19-cv-00617 (E.D. Cal.); *Nichols v. Bonta*, No. 11-cv-09916 (C.D. Cal.); *Wiese v. Bonta*, No. 17-cv-00903 (E.D. Cal.); *Wolford v. Lopez*, No. 23-cv-00265 (D. Haw.); *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077 (D. Col.); *Kipke v. Moore*, No. 1:23-cv-01293 (D. Md.); *Ohio v. City of Columbus*, No. 22-cv-00657 (Com. Pleas, Fairfield Cnty., Ohio); *Schoenthal v. Raoul*, No. 22-cv-50326 (N.D. Ill.); *May v. Bonta*, No. 23-cv-01696 and No. 23-cv-01798 (C.D. Cal.); *State of Washington v. Gator's Custom Guns, Inc.*, No. 23-2-00897-08 (Sup. Ct., Cowlitz Cty., Wash.); *California Rifle & Pistol Assoc. v. Bonta*, No. 23-cv-10169 (C.D. Cal.); *Knife Rights, Inc. v. Bonta*, No. 23-cv-00474 (S.D. Cal.); *Hartford v. Ferguson*, No. 23-cv-5364 (W.D. Wash.); *Birney v. Delaware Department of Safety and Homeland Security*, C.A. No. K23C-07-019 RLG (Sup. Ct., Del. St.); *Lane v. James*, No. 22 Civ. 10989 (S.D.N.Y.); *City of Columbus v. State of Ohio*, No. 23-cv-3555 (Com. Pleas, Franklin County, OH); *O'Neil v. Neronha*, No. 23-cv-00070 (D.R.I); *Granata v. Campbell*, No. 21-cv-10960 (D. Mass.); and *Dotson v. District of Columbia*, No. 24-cv-01864 (D.D.C.).  I am currently working on potential expert witness reports and declarations that may be provided in other jurisdictions.  I have been deposed and testified at trial in one matter, *Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815 (D. Or.).  I have been deposed in *Knife Rights, Inc. v. Bonta*, No. 3:23-cv-00474 (S.D. Cal.), and *O'Neil v. Neronha*, No. 1:23-cv-00070 (D.R.I.).

## METHODOLOGY

8.      This Declaration is a work of historical scholarship, informed by analysis of primary and secondary sources.  Having studied the subject of historical gun regulations for several years now, I have drawn upon knowledge gained from reading numerous peer-reviewed, scholarly books and articles, in addition to law review articles and media such as blogs and news articles.  I have supplemented that with additional research into the development of firearms, cartridge, and magazine technologies during the nineteenth and early twentieth centuries.  I have read or consulted many books about the development of firearms and other weapons from the early modern period to the mid-twentieth century.  In addition to online repositories like Westlaw, Hein Online, Hathi Trust, Chronicling America, and the Duke Repository of Historical Gun Laws, I have made use of digital collections housing government documents and rare newspapers.

## SUMMARY OF OPINIONS

9.      In American history, governments at the state and local levels have regulated the manner in which individuals could carry deadly weapons.  These regulations built upon older traditions inherited from English common law but evolved in the face of new conditions in the United States.  The nineteenth century was not only a time of rising violence, but also one of increased weapon-carrying as well as tremendous advancement in the field of weapons technology.  These forces acted together to increase the number of weapons carried in public, and the number of homicides and assaults committed with those weapons, which in turn led to regulations designed to combat these problems.  The fundamental regulatory policy was what scholars today call "public carry laws," which restricted the carrying of weapons in public spaces.  These public carry laws took several different forms, some of which embraced both

open- and concealed-carry of firearms and other deadly weapons.  The first two parts of this

declaration address this important history.

10.    The American tradition of regulating weapon-carrying is in fact more complex

than Plaintiffs' filed documents (Complaint and Motion for Preliminary Injunction) suggest.  The

third part of this declaration provides much needed context that recasts some of the arguments

presented by Plaintiffs.  In their discussion of historical analogues from Tennessee and Georgia,

Plaintiffs omit crucially important contextual information that questions the supposed "outlier"

status of Tennessee's "open-in-hand" requirement as well as the assertion that Georgia's 1837

law endorses "off-body" carry.  The third part also disputes the accuracy of Plaintiffs' statement

that the only tradition in the United States relating to manner-of-carry is that concealed carry

could be prohibited so long as open carry remained unrestricted.  I refer to this as the "manner-

of-carry exchange" argument and show that it is not supported by the historical record.

11.    Finally, this declaration turns to the history of handgun licensing in the United

States, explaining why researchers like myself struggle to find relevant nineteenth-century

records.  The local nature of licensing laws (which were often municipal ordinances) and their

administration by police or other governmental agencies complicates their preservation by

archivists and their discovery by researchers.  The accompanying documentary record, in the

form of historical license applications, revocation notices, and internal review standards, is also

sparse and poorly preserved.  These factors do not indicate that such laws were non-existent or

unenforced; rather, they illustrate the very real challenge of conducting historical research in this

subject area.  Lacking as we do a comprehensive record, the historian must analyze historical

licensing laws in light of the pertinent twentieth-century sources that remain extant.

I.    **Weapons and Violence in the Nineteenth Century**

12.    The carrying of deadly weapons, such as revolvers, bowie knives, dirk knives, and metal knuckles, as an everyday matter of course became a significant cause of concern during the nineteenth century.  Though Americans at times carried weapons close on their bodies in previous periods, the historical record does not indicate that it was widespread prior to the nineteenth century.[1]  Americans of the early nineteenth century attributed the rise of everyday weapon-carrying to various influences—all of them negative.[2]  Though they struggled to diagnose why this practice was spreading before their eyes, historians today have the benefit of hindsight and can identify contributing factors.  Weak government institutions, political conflict, embroilment in personal feuds, rising rates of homicide, and the maintenance of racial hierarchy

---

[1] Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 218 ("Few whites had carried pistols or fighting knives in the eighteenth century, but the practice became popular in the plantation South in the nineteenth century as fears of black violence grew and whites became more anxious and belligerent.").  On pocket pistols from the pre-1900 period, see Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 114–116 at 117 ("These [pocket pistols] were intended to be carried in the pocket of a person wearing normal civilian attire.").

[2] For examples, see William Newnham Blane, *An Excursion through the United States and Canada during the Years 1822-1823* (London: Baldwin, Cradock, and Joy, 1824), 305 (Attributing the new popularity of weapon-carrying to the "better class of the Western states," meaning the affluent men of the Old Southwest); B.T. Kavanaugh, "Moral Reform – Deadly Weapons," *Western Christian Advocate* (Cincinnati, Ohio), January 12, 1838, 149 (Attributing the new popularity of weapon-carrying to the influence of French and Mexican culture in the Old Southwest).

all acted to encourage the carrying of weapons in the nineteenth century.[3]  So, too, did the

development of small, easily concealable, repeat-fire pistols.[4]

13.    While the carrying of weapons was growing more common, the lethality of those

weapons increased as well.[5]  Repeat-fire pistols posed far greater dangers than single-shot

predecessors not only because they afforded more chances to hit someone, but also because they

could be stored or carried loaded for indefinite periods of time.  Thus, guns capable of firing self-

contained cartridges were far more likely to be used recklessly than muzzle-loaders had been.[6]

## II.    Regulatory Response

14.    Americans responded to this new landscape of weapon-carrying and its bloody

consequences with regulations.  Although the approaches varied, one proved fundamental—

restricting the carrying of certain weapons.

---

[3] Roth, *American Homicide*, 218-219 (on growth of weapon-carrying in the post-Revolutionary South), 233-234 (on lack of government legitimacy encouraging lawlessness and gun-carrying), 281, 285 (on availability of handguns as one causal factor in growth of "romance homicides"), 432-433 (on pistol-carrying by young Black men at the turn of the twentieth century).

[4] Randolph Roth, "Why Guns Are and Are Not the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker et al, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Scholarly Press, 2019), 121-122 ("Once Americans had the new weapons, they kept them everywhere: in their homes, in their wagons, in saddle bags, purses, and pockets. As a result, the proportion of homicides of unrelated adults committed with guns increased . . .  [and] continued to rise . . . even when and where the homicide rate among unrelated adults declined.").

[5] On the lethality of firearms and the Theoretical Lethality Index created by military scholar Trevor DuPuy, see Darrell A. H. Miller and Jennifer Tucker, "Common Use, Lineage, and Lethality," *UC Davis Law Review* 55, no. 5 (June 2022), 2507 and accompanying notations ("But it was the 'Age of Technological Change' (middle of the 19th century to middle of the 20th century), he [Trevor DuPuy] thought, that ushered in major advances in weaponry." DuPuy used the phrase "a quantum jump in lethality.").

[6] Roth, "Why Guns Are and Are Not the Problem," 117 (on "limitations" of muzzle-loading firearms as murder weapons), 121 (on technologies that made "breech-loading guns" surpass those limitations).

A.    **Public Carry Laws**

15.    In the nineteenth century, state legislatures responded to rising levels of violence by enacting new laws that restricted the carrying of weapons in public spaces.  These new statutes built upon a deep Anglo-American tradition and generally took two forms.  The first, so-called "going armed" laws, tended to invoke sureties and peace bonds for anyone who carried "offensive weapons" outside of normal circumstances, like militia or patrol service, providing assistance to authorities, and taking a firearm to a gunsmith for repair, among others.[7]  The second regulatory form developed in the Old Southwest and relied upon criminal penalties to restrict the carrying of certain enumerated deadly weapons and most often explicitly prohibited carrying *concealed*.  Taken together, the two regulatory strategies tightly restricted the public carrying of deadly weapons by prohibiting "going armed" without proper cause and forcing would-be carriers to wear their weapons in full open view—a way of carrying weapons that was not only inconvenient in light of men's dress at the time, but also reflected poorly upon the wearer as a ruffian or coward pitting himself against social norms.[8]

---

[7] On the English origins of this tradition in American history, see Saul Cornell, "The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace," *Law and Contemporary Problems* 80 (2017), 30–43.  The phrase "offensive weapons" referred to arms that were not, like armor and shield, strictly defensive; firearms were considered "offensive" weapon in England.  *Id*., 20.

[8] *See e.g.*, *Stockdale v. State*, 32 Ga. 225 (1861) (describing the state's protection of open-carry as a way "to compel persons who carried those weapons to so wear them . . . that others . . . might see that they were armed, and dangerous persons, who were to be avoided in consequence"); "Carrying Concealed Weapons: True Comment on an Almost Universal American Custom," *Daily Constitution* (Atlanta, Georgia), May 23, 1877, 1, Reprinted from *Baltimore American* ("The very fact that men are careful to conceal their revolvers argues that they are doubtful as to the propriety of carrying of them," and that if a young man were to walk along the street "with his silver-mounted deringer hanging from his waist belt, he would expose himself to unlimited ridicule."); "That Hip Pocket Nerve," *The Pascagoula Democrat-Star* (Pascagoula, Mississippi) November 2, 1888 (After a concealed weapon is used in a shooting,

16.    The "going armed" laws derived from the Statute of Northampton, reiterating that the longstanding rule applied to their jurisdictions.[9]  For instance, Massachusetts situated its "going armed" law within a broader set of activities like disturbing the peace, assault, and affray.[10]  Anyone violating this rule would have been subject to questioning by local officials and "bound" to the peace through a peace bond or surety, which was itself part of the common law inheritance.[11]  Between 1800 and 1850, Tennessee, Maine, and Delaware emulated this

---

"Now the question arises, would this tragedy have happened had this young desperado been as he ought, in the habit of going constantly unarmed? We say not."); *State v. Huntly*, 25 N.C. 418 (1843) ("No man amongst us carries [a gun] about with him, as one of his every day accoutrements—as a part of his dress—and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment.").

[9] *See e.g.*, 1786 Virginia ch. 49 "An Act forbidding and punishing Affrays;" 1792 North Carolina ch. 3 "No Man shall come before the Justices, or go or ride armed."

[10] 1795 Mass. Ch. 2, 436 (ordering officials to "cause to be staid and arrested" anyone who, among other things, "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth.").  On the historical significance of the phrase "to the terror of the people" and its inherent association with weapon-carrying, see Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328–1928," *U.C. Davis Law Review* 55 (June 2022), 2555–56 ("There was no requirement that one establish an intent to terrify or that the armed travel terrorized any specific person, the injury was to the King's Peace and sovereignty."); Patrick J. Charles, "The Fugazi Second Amendment: *Bruen's* Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (May 2023), 635 ("What [English jurists'] restatements inform is that by the early-to-mid-seventeenth century, England's preeminent legal minds understood that the act of carrying dangerous weapons was sufficient to amount to an affray, 'strike a feare' or 'striketh a feare.'").

[11] The peace bond was one of many processes inspired by America's common law heritage.  *See* Laura Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009), 73–74, 96; Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Scholarship: Limits on Armed Travel under Anglo-American Law, 1688–1868," *Law and Contemporary Problems* 83, no. 3 (Summer 2020), 73–95; Saul Cornell, "Right to Carry Firearms outside of the Home: Separating Historical Myths from Historical Realities," *Fordham Urban Law Journal* 39, no. 5 (October 2012), 1719–1723.  Edwards's passage on peace bonds is worth quoting at length: "Peace bonds threw enforcement back on the community, summoning family, friends, and neighbors to police the troublemakers.  Bonds required one or more other

approach.[12]  Later on, Massachusetts lawmakers adopted a criminal code that separated "going

armed" from these other offenses so that it read: "If any person shall go armed with a dirk,

dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear

an assault or other injury, or violence to his person, or to his family or property, he may, on

complaint of any person having reasonable cause to fear an injury, or breach of the peace, be

required to find sureties for keeping the peace, for a term not exceeding six months, with the

right of appealing as before provided."[13]  Numerous other states adopted similar (if not identical)

verbiage when drafting their own criminal codes.[14]

---

people to put up the amount, making them liable if the accused broke the peace again.  That
economic obligation represented the signers' promise to keep the offender in line.  Peace bonds
put everyone else in the community on notice as well, investing them with the responsibility of
policing the peace until the end of the probation period."

[12] Tennessee (1801): 1801 Tennessee ch. 22, § 6, "That if any person…shall publicly ride or go
armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other
dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or
justice . . . to bind such person . . . to their good behavior . . . ."  Maine (1821): 1821 Maine ch.
76, "An Act describing the power of Justices of the Peace in Civil and Criminal Cases," 285, §1.
"That it shall be within the power, and be the duty of every Justice of the Peace within his
county, to punish…all affrayers, rioters, disturbers or breakers of the peace, and such as shall
ride or go armed offensively, to the fear or terror of the good citizens of this State . . . ."
Delaware (1852): *Revised Statutes of the State of Delaware, to the Year of Our Lord 1852*
(Dover: S. Kimmey, 1852), Title XV, ch. 97, 333 § 13.  "Any justice of the peace may also cause
to be arrested and bind to surety of the peace all affrayers, rioters, breakers and disturbers of the
peace, and all who go armed offensively to the terror of the people, or are otherwise disorderly
and dangerous."

[13] *Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835* (Boston:
Dutton & Wentworth, 1836), ch. 134, 70 § 16.  This section cites "Persons who go armed may be
required to find sureties for the peace &c., 1794, 26 § 2," which appears to be a reference to
1795 Mass. ch. 2, 436.

[14] Wisconsin (1839): 1838–1839, Wisconsin, *Statutes of Wisconsin*, "An Act to Prevent the
Commission of Crimes," 381 § 16; Maine (1840): *Revised Statutes of the State of Maine, Passed
October 22, 1840* (Augusta: W. R. Smith, 1841), ch. 169, "Of Proceedings for the Prevention of
Crimes," 709 § 16; Michigan (1846): *Revised Statutes of the State of Michigan, Passed and
Approved May 18, 1846* (Detroit: Bagg & Harmon, 1846), Title 31, ch. 162, "Of Proceedings to
Prevent the Commission of Crime," 692 § 16; Virginia (1847): 1847 Virginia, 1847–1848

17.     Another type of public carry law emerged during the nineteenth century, modeled less on historical English predecessors than on clearly enumerated lists of restricted weapons. These laws often carried criminal penalties like fines or jail terms as opposed to peace bonds or sureties.  Tennessee's 1801 weapon law illustrates the evolution of this second type of regulation out of the common-law-descended "going armed" laws.  The "going armed" law of that year included a clause penalizing anyone who would "privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person."[15]  Other regulators latched onto this phrasing, and it spread over the ensuing decades.  For example, Louisiana's public carry law penalized "any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view."[16]  Kentucky's held that " any person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined in any sum, not less

---

Session, Title 3, ch. 14, "Of Proceeding to Prevent the Commission of Crimes," 129, §16; Minnesota (1851): *Revised Statutes of the Territory of Minnesota, Passed at the Second Session of the Legislative Assembly, Commencing January 1, 1851* (St. Paul: J. M. Goodhue, 1851), ch. 12, "Of Proceedings to Prevent the Commission of Crimes," 528 § 18; Oregon (1853): 1853 Oregon, General Laws, 5th Regular Session, 220 § 17.  *See also* John Purdon, et al, comps., *Digest of the Laws of Pennsylvania* (Philadelphia: Kay & Brother, 1862), 250, § 6 and accompanying notation.

[15] 1801 Tennessee ch. 22, § 6.  The law also held that violation was to be prosecuted as common law riot.

[16] 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1.

than one hundred dollars."[17]  Numerous other states followed suit over the course of the nineteenth century.[18]

      18.      Though many of these public carry laws explicitly targeted the concealed carrying of deadly weapons, some—such as those in Texas, West Virginia, Idaho Territory, and North Dakota—applied to openly carried weapons as well.[19]  Municipal public carry ordinances could also restrict open-carry of deadly weapons, as was the case in Los Angeles after 1866.[20]  In Oklahoma Territory, an 1890 penal code even restricted the carrying of rifles and shotguns (generally carried openly) to "hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise."[21]

---

[17] 1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89 § 1.

[18] 1819 Indiana ch. 23; 1821 Tennessee ch. 13; 1835 Florida Territory ch. 860; 1837 Georgia, 90; 1838 Virginia ch. 101; William McK. Ball, et al, eds., *Revised Statutes of the State of Arkansas* (Boston: Weeks, Jordan, 1838), 280, § 13; 1838 Alabama ch. 77; 1859 Ohio 3:56; 1859–1860 New Mexico Territory 94–99 (English and Spanish); 1862 Colorado Territory 56 (applied to "any city, town, or village"); 1863 California ch. 485; 1864 Dakota Territory 128, § 455; 1864 Montana Territory 355; 1873 Nebraska 724, § 25; 1874 Missouri 43; 1875 Wyoming Territory ch. 52 (applied to "any city, town or village"); 1878 Mississippi ch. 46; 1879 North Carolina ch. 127; 1880 South Carolina 447–448; 1881 Delaware ch. 548; 1881 Illinois 73–74; *Code of Washington* (Olympia: C. B. Bagley, 1881), 181, § 929; 1886 Maryland ch. 375; 1890 Oklahoma Territory 476, § 20; Ch. 159, 52 Congress, Public Law 52-159, 27 Stat. 116 (1892), § 1; 1893 Rhode Island ch. 1180; Fred F. Barker, *Compilation of the Acts of Congress & Treaties Relating to Alaska* (Washington, D. C.: U.S. Gov. Print Off., 1906), Appendix A, 139, § 117.

[19] 1871 Texas ch. 34, § 1; 1882 West Virginia ch. 135, § 1; 1888 Idaho Territory 23; *Revised Code of the State of North Dakota* (Bismark: Tribune Co., 1895), 1203, § 7313.

[20] Ordinance printed in *Los Angeles Tri-Weekly News* (Los Angeles, California), July 22, 1865, 2.  Also available in the Duke Repository of Historical Gun Laws.

[21] *Oklahoma, 1st Regular Session*, (1890), ch. 25, Art. 47, 495–96 § 5.

19.     Generally, weapon-carry restrictions prohibited carrying, concealing, or wearing the specified weapons "about his person."[22]  Some used more capacious language, as in Louisiana, where an 1813 law penalized anyone "who shall be found with any concealed weapon . . . concealed in his bosom, coat or in any other place about him that do not appear in full open view."[23]  The laws usually do not specifically address carrying weapons in bags because the people whom the laws were designed to rein in—men—carried their belongings in pockets as opposed to purses or other personal bags.[24]  But there are examples of public carry laws applying to "saddle bags," such as the 1871 Texas law prohibiting open- and concealed-carry "on or about his person, saddle, or in his saddle bags."[25]  Some courts held that "about the person" embraced carrying in a manner described by Plaintiffs as "off-body."[26]  For example, nineteenth-century courts affirmed convictions for persons carrying in a "travel-bag or

---

[22] For examples, see *Revised Code of the State of North Dakota* (Bismark: Tribune Co., 1895), 1203, § 7313; 1886 Maryland ch. 375; 1874 Missouri 43; 1882 West Virginia ch. 135, § 1; 1873 Nebraska 724, § 25; 1881 Illinois 73–74, § 4.  This is merely an illustration, not an exhaustive list.

[23] 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1. The law's preamble addressed the measure to "the dangerous and wicked practice of carrying about in public places concealed and deadly weapons.").  *See also* 1837 Georgia, 90 (restricting, among other things, to "have about their person or elsewhere, any of the hereinafter described weapons.").

[24] By about the eighteenth century, European men had shifted from carrying their small personal belongings in pouches to carrying them within pockets sewn into their coats.  *See* Hannah Carlson, *Pockets: An Intimate History of How We Keep Things Close* (Chapel Hill: Algonquin Books of Chapel Hill, 2023).

[25] 1871 Texas ch. 34.  *See also* 1889 Arizona Territory ch. 13.  A Tennessee public carry law from 1821 included a proviso exception for the carrying of "a knife of any size in a conspicuous manner on the strop of a shot pouch."  1821 Tennessee ch. 13.

[26] *See* "Concealed Weapons," *Criminal Law Magazine and Reporter* 8, no. 4 (October 1886), 406-408.

satchel,"[27] in a "basket or bag upon his arm,"[28] and in "a hand-basket, or other receptacle, held by the hand."[29]   A North Carolina judge expressed the reasoning behind decisions like these by describing concealed-carry statutes as prohibiting the concealment "near, in close proximity to him, and within his convenient control and easy reach, so that he could promptly use it, if prompted to do so by any violent motive," and that "[i]t makes no difference how [the weapon] is concealed, so it is on or near to and within the reach and control of the person charged."[30] When it was lawful to carry weapons in bags, such exceptions generally applied to travelers rather than residents going about their daily lives.[31]

### B.    Contextualizing Plaintiffs' Statements About Public Carry

20.    In their Complaint and Motion for Preliminary Injunction, Plaintiffs make some references or arguments that deserve some additional contextual information.  First, they discuss a Tennessee public carry law requiring would-be weapon carriers to do so "openly in the hand."[32]  Plaintiffs describe this law as an "outlier" that is "unthinkable today" and "would result at the very least in public alarm if not innocent deaths."[33]  In fact, Tennessee was not alone in adopting this form of regulation.[34]  Furthermore, the Tennessee policy (which took effect in

---

[27] *Willis v. State*, 105 Ga. 633 (1898).

[28] *Boles v. State*, 86 Ga. 255 (1890).

[29] *Diffey v. State*, 86 Ala. 66 (1888).

[30] *State v. McManus*, 1883 N.C. 555 (1883).

[31] *See* Joshua Hochman, "The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation," *Yale Law Journal* 133, no. 5 (March 2024), 1697-1701 (explaining rail company policies that generally prohibited uncased firearms within passenger cars or required all firearms to be stowed in baggage cars.).

[32] *See* Compl. [1] ¶ 13; Mem. of P. & A. in Supp. of Pls.' Mot. for a Prelim. Inj. (Pls.' Mot.) [9-1] at 18. Both referring to 1879 Tennessee ch. 186, § 1.

[33] Compl. ¶ 13.

[34] Arkansas adopted an almost identical policy in 1881.  *See* 1881 Arkansas ch. 96 § 1-2.

1871) represented lawmakers' efforts to tightly restrict public carrying while also respecting a recent state supreme court decision.[35]  Lawmakers were not encouraging the carrying of weapons in people's hands, ready to shoot on a whim; rather, they sought to discourage as much as possible the carrying of deadly weapons outside of immediate emergencies.  The net result of the open-in-hand policy was not appreciably different from jurisdictions that prohibited both open- and concealed-carry, in which persons experiencing an emergency could invoke a self-defense exception.[36]  The open-in-hand rule permitted pistol-carrying the way a person experiencing an immediate emergency would carry one, and it fell within the broader tradition of restricting open-carry.

21.    At other times, Plaintiffs discuss an 1837 Georgia law placing restrictions upon the sale and carrying of deadly weapons.[37]  Plaintiffs describe it as "sanction[ing] a form of off-

---

[35] 1870 Tennessee ch. 13, "An Act to Preserve the Peace and Prevent Homicide," § 1 ("That it shall not be lawful for any person to publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol or revolver.").  A court opinion held this law unconstitutional insofar as it criminalized the open carrying of revolvers that were conducive to militia or military service.  *See Andrews v. State*, 50 Tenn. 165 (1871).  Lawmakers responded by adopting a new law in 1871 that prohibited carrying "publicly or privately" any of the enumerated deadly weapons, with the exception that "army pistol[s], or such as are commonly carried and used in the United States Army" could be carried "openly in his hands."  *See* 1871 Tennessee ch. 90, § 1.

[36] The self-defense exception to public carry restrictions often assumed that the weapon would be carried openly, and that the threat would be urgent and pressing.  *See State v. Reid*, 1 Ala. 612 (1840) ("If the emergency is pressing, there can be no necessity for concealing the weapon, and if the threatened violence, will allow of it, the individual may be arrested and constrained to find sureties to keep the peace, or committed to jail.").  *See also, e.g.*, 1871 Texas ch. 34, § 1-2 (prohibiting the carrying of deadly weapons "unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing," and that those endeavoring to prove self-defense "shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage."); 1889 Arizona ch. 13, § 2 (that the public carry law shall not apply to, among others, "one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process.").

[37] Compl. ¶ 14; Pls.' Mot. at 18.

body handgun carry while drastically restricting both open and concealed handgun carry."[38] Plaintiffs' description of this exception to Georgia's law does not adequately contextualize the size and purpose of horse pistols. These were the largest type of pistol, and at the time of the Georgia law's enactment in 1837, they were single-shot, muzzle-loaders. Horse pistols were intended for use by mounted troops, like cavalry, whose primary weapon was the sabre. They were too large to be worn on the person and were indeed designed to be carried within a saddle holster. Invoking them as an example of lawful "off-body" carry misses the point—which is that they were not carried "on the person." Such an argument also overlooks the purpose behind the exception for horse pistols carried in their appropriate holsters, which was their use in militia service.[39]

22.     Finally, Plaintiffs posit a "manner-of-carry" argument that might be called a "manner-of-carry exchange"—in which the restriction of concealed-carry is legally acceptable only in exchange for no restriction placed upon open-carry.[40] They argue that "the only well-established regulation respecting the manner of carrying firearms has been restrictions on the concealed carry of firearms, provided that open carry of firearms was not prohibited."[41] The manner-of-carry exchange argument is appealing in its simplicity, but the historical record does not support it. As explained earlier, a substantial number of American jurisdictions restricted open-carry of firearms—from the "going armed" laws to the explicit regulators of open-carry and Oklahoma Territory's rules for openly carrying long arms. Indeed, America's history and

---

[38] Idem.

[39] Nineteenth-century Americans generally understood the Second Amendment to protect those firearms conducive to military or militia service. There is significant literature on this subject, but the previously cited case *Andrews v. State* addresses the matter.

[40] Compl. ¶ 12; Pls.' Mot. at 17.

[41] Idem.

tradition of gun regulation is much more complex than Plaintiffs imply. A noteworthy point is that, even though historic public carry laws shared a similar intent to today's gun regulations (to reduce violent crime and protect the peace), they functioned differently from licensing laws. Where licensing laws accepted that some people might need to carry a handgun on a daily basis for self-defense, public carry laws did not. Instead, they defied Americans who wanted to be constantly armed to do so openly—in a manner that was not socially acceptable and therefore not common within organized communities.[42] Fundamentally, then, public carry laws intended to reduce as much as possible the number of deadly weapons carried in public, while licensing laws (historical and present-day) do not; rather, they seek to allow approved individuals to carry. Both have the same ultimate goal, but they go about achieving it differently. As such, Plaintiffs' manner-of-carry exchange argument misrepresents how nineteenth-century Americans understood their public carry laws.

---

[42] *See e.g.*, *Stockdale v. State*, 32 Ga. 225 (1861) (describing the state's protection of open-carry as a way "to compel persons who carried those weapons to so wear them…that others…might see that they were armed, and dangerous persons, who were to be avoided in consequence."; "Carrying Concealed Weapons: True Comment on an Almost Universal American Custom," *Daily Constitution* (Atlanta, Georgia), May 23, 1877, 1, Reprinted from *Baltimore American* ("The very fact that men are careful to conceal their revolvers argues that they are doubtful as to the propriety of carrying of them," and that if a young man were to walk along the street "with his silver-mounted deringer hanging from his waist belt, he would expose himself to unlimited ridicule."); "That Hip Pocket Nerve," *The Pascagoula Democrat-Star* (Pascagoula, Mississippi) November 2, 1888 (After a concealed weapon is used in a shooting, "Now the question arises, would this tragedy have happened had this young desperado been as he ought, in the habit of going constantly unarmed? We say not."); *State v. Huntley*, 25 N.C. 418 (1843) ("No man amongst us carries [a gun] about with him, as one of his every day accoutrements—as a part of his dress—and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment."). All cited previously at n.8.

C.    **Licensing and Manner of Carry**

23.    Licensing laws as we know them today emerged during the latter nineteenth century as a way of resolving persistent problems posed by public carry laws.  Public carry laws were challenging to enforce because most weapon-carriers chose to conceal their knives, pistols, etc.  They were also cold comfort for those experiencing real emergencies, or whose regular business exposed them to constant danger.  Licensing laws thus allowed people with prior approval to carry weapons despite the continuation of broad restrictions that applied to the rest of the population, and in so doing resolved these problems.

24.    Extensive records pertaining to early licensing systems are difficult to find, but that reflects the realities of historical recordkeeping and not that licensing laws did not exist.  In the nineteenth century, pistol licensing laws were generally enacted at the municipal level rather than the state level.  Municipal police departments were then growing in their sophistication and developing the bureaucratic capacity to administer licensing programs.  As a result of their enactment at the local level, it is challenging to identify nineteenth-century licensing laws.  Municipal ordinances have not been retained, published, and digitized the way that state and federal laws have, which means that the databases scholars rely on for this research do not provide access to historical municipal laws.  Instead, scholars and researchers must rely on publications of ordinances in digitized newspapers (which represent only a portion of the papers which were published in the past) or historical code books that may be available in local archives or digitized online by organizations like Google Books and The Internet Archive.  Two excellent example sets are available online today, but they are far from comprehensive in their coverage.[43]

---

[43] The Duke Repository of Historical Gun Laws contains a subject heading called "Carrying Weapons," which contains nineteenth-century licensing laws:

25.    The research challenges do not stop at finding the laws themselves.  The accompanying records from within local government agencies and police departments are difficult (if not impossible) to find as well.  Departments capable of administering a licensing program surely had records along the lines of copies of approved license applications, internal review standards, and revocation notices.  If there are extant collections of such records from the nineteenth century, they have yet to be found by myself or other researchers in this field.  My research into the District's historical licensing laws provides an apt illustration of this challenge.  As of 1892, would-be pistol-carriers had to obtain a permit (valid for up to one month) from a police judge and post a bond.[44]  Records of such permits—the bonds if nothing else—would have been entered into Police Court record books, but such documents do not appear to have been preserved by any government agency.[45]  The District's next significant change to its public carry law came in 1932 with the passage of a more modern licensing program overseen by the Metropolitan Police Department (MPD).[46]  Licenses could be issued by the superintendent of police to people who met certain criteria, and the law ordered MPD to deliver originals of approved licenses to the licensees and keep a duplicate "preserved in his [the superintendent's] office for six years."[47]  In other words, the earliest records a researcher could hope to find (from

---

https://firearmslaw.duke.edu/repository-of-historical-gun-laws/advanced-search.  Another set is available within the Appendix of Patrick Charles's amicus brief in *Bruen*.  *See* Brief of Amicus Curiae Patrick J. Charles, Appendix 1 at 8-30, *New York State Rifle and Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022).

[44] Ch. 159, 52 Congress, Pub. L. No. 52-159, 27 Stat. 116 (1892), § 2.

[45] See, for example, the response to an inquiry about the DC Police Court records on History Hub, a website describing itself as "a support community managed by the National Archives for researchers, citizen historians, and archival professionals": https://historyhub.history.gov/court-records/f/discussions/28859/guidance-on-police-court-records/73039

[46] Ch. 465, 72 Congress, Pub. L. No. 72-275, 47 Stat. 650 (1932).

[47] Ibid., § 6.

1932) were probably moved or destroyed as long ago as 1938.  The archival records for MPD do

not indicate that the superintendent's records have been preserved, or that historical licensing

documents remain extant.[48]

26.    Lacking as we do the accompanying administrative records for historical licensing

laws, our analysis of them must rely upon their text in conjunction with the twentieth-century

documents that are available.  It is clear from the text of historical laws themselves that not all

ordinances established guidelines for determining who may receive a license.  It was not

uncommon for such laws to bestow wide discretion upon mayors, trustees, and police officials.[49]

At times, licensing laws required that applicants be "peaceable" or "law-abiding," terms which

government authorities and officials had to define, apparently based on an applicant's criminal

---

[48] See a brief description of MPD records within the National Archives' "Records of the Government of the District of Columbia," (Record Group 351.5), https://www.archives.gov/research/guide-fed-records/groups/351.html?_ga=2.83078998.1305703715.1726856806-1811202220.1726415668. See also a more detailed description of these records, "The District of Columbia Metropolitan Police Force, 1861–1968," RR #618, last revised August 2013, www.archives.gov/files/research/district-of-columbia/police-force-1861-1968.pdf.

[49] Ordinance No. 201: To Prohibit the Carrying of Firearms or Deadly Weapons, and Providing Penalties Therefore, February 5, 1890, reprinted in *Coffeyville Weekly Journal* (Coffeyville, Kansas), February 7, 1890, 2; "Ordinance No. 6," reprinted in *Fresno Weekly Republican* (Fresno, California), November 7, 1885, 3; "Ordinance No. 49: To Prohibit the Carrying of Concealed Weapons, January 5, 1892," reprinted in *The Ordinances and Charter of the City of Monterey* (Monterey, California: 1913), 112; "Ordinance No. 6," reprinted in *Delphos Carrier* (Delphos, Kansas), August 1, 1884, 2; M. J. Sullivan, ed., "Article II: Offenses Against Public Morals and Decency, undated," reprinted in *The Revised Ordinance of the City of St. Louis* (St. Louis: 1881), 611-612; "Offenses, April 12, 1881," reprinted in *Laws and Ordinances for the Government of the City of Wheeling, West Virginia* (Wheeling, WV: 1891), 204, 206; "Amendment de Ordinance de Carrying of Concealed Weapons, July 21, 1886," reprinted in *Morning Journal-Courier* (New Haven, Connecticut), July 27, 1886, 4.  All Quoted in Brief of Amicus Curiae Patrick J. Charles, Appendix 1 at 8-30, *New York State Rifle and Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022).

history, reputation, and appearance.[50]  Some of these laws also explicitly empowered officials to

revoke licenses, though the causes or terms were (unsurprisingly) left to official discretion.[51]

Revocation procedures continued to be implemented by licensing organizations, as evidenced by

the annual report of Boston's police commissioner, which provided the number of revocations

carried out per year.[52]

      27.    Historical licensing laws generally mimicked some of the familiar language of

public carry laws by prohibiting the carrying of concealed weapons "on the person" or "about the

person" without a requisite permit.  There was some variation, though, as in the Brooklyn

licensing law which prohibited (unless having a permit) "hav[ing] in his possession, within the

City of Brooklyn, concealed on his person" any kind of pistol.[53]  A collection of "pistol permits"

---

[50] Examples of licensing laws requiring applicants to be "peaceable" or "law-abiding" include but are not limited to: Pistols—Carrying Of: Ordinance to Regulate the Carrying of Pistols, October 25, 1880, reprinted in *Brooklyn Daily Eagle* (Brooklyn, New York), October 26, 1880, 1; Article XXVII: Carrying of Pistols, reprinted in Elliott F. Shepard et al, eds., *Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881* (1881), 214–216; Ordinance No. 84, Prohibiting the Carrying of Concealed Weapons, April 24, 1876, reprinted in R. M. Clarken, ed., *Charter and Ordinances of the City of Sacramento* (1896), 173.  All quoted in Brief of Amicus Curiae Patrick J. Charles, Appendix 1 at 21-24, 2-3, *New York State Rifle and Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022).

[51] For examples, see Article XVI: Concealed Weapons, An Ordinance Regulating the Carrying of Concealed Weapons in the City of Lincoln, August 26, 1895, reprinted in *Revised Ordinances of Lincoln Nebraska* (1895), 209–210; and Ordinance No. 6," reprinted in *Fresno Weekly Republican* (Fresno, California), November 7, 1885, 3.  All quoted in Brief of Amicus Curiae Patrick J. Charles, Appendix 1 at 40-42, 8, *New York Rifle and Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).  These are merely two examples and do not constitute an exhaustive list from within Charles's amicus brief.

[52] *See e.g.*, Commonwealth of Massachusetts, Public Document – No. 49, *Thirtieth Annual Report of the Police Commissioner for the City of Boston for the Year Ending November 30, 1935* (Boston: Office of the Police Commissioner, 1935), 80–81.

[53] Pistols—Carrying Of: Ordinance to Regulate the Carrying of Pistols, October 25, 1880, reprinted in *Brooklyn Daily Eagle* (Brooklyn, New York), October 26, 1880, 1. Quoted in Brief of Amicus Curiae Patrick J. Charles, Appendix 1 at 40-42, 8, *New York Rifle and Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

issued to New York City residents during the early 1930s shows that their licenses were for carrying "a Revolver or Pistol concealed Upon my Person."[54]  Applicants filled out pre-printed application forms that collected information about their firearms (make, model, caliber, serial number), themselves (height, weight, fingerprints, etc.), and their police history (arrest record, whether previous licenses have been "disapproved" or revoked).[55]  These sources tend to indicate that, under historical licensing laws, administrators could impose conditions on manner of carry.

## CONCLUSION

28.     This Declaration has presented evidence showing that American governments (state and local) during the nineteenth century exercised the power to regulate the carrying of weapons, including the manner in which they could be carried by residents and visitors.  Public carry laws emerged during the nineteenth century in response to growing societal concern about the number of weapons circulating in public spaces and their consequent use in crimes and homicides.  Public carry laws generally assumed that deadly weapons—readily concealable weapons like pocket pistols, bowie knives, brass knuckles, and dirks—were worn "on the person" under one's clothes or within one's pocket.  There are examples of historical court decisions in which such laws also restricted the carrying of weapons within bags, baskets, and other such personal accessories.  Though the police records pertinent to the administration and

---

[54] "Pistol permits for 1932 to 1933," Accession ACC-1968-005 (Unprocessed), The New York City Municipal Archives, New York City Department of Records and Information Services, https://a860-collectionguides.nyc.gov/repositories/2/accessions/6879.  I have received from NYCMA a small sample of "pistol permits" from 1932, all of which consisted of pre-printed forms allowing an applicant to indicate whether he/she intended to "Apply for a License to Carry a Revolver or Pistol concealed Upon my Person or Possession on Premises."  Copies of these licenses can be provided upon request.

[55] Idem.

oversight of licensing programs have largely been lost, it is clear that local officials exercised some discretion in setting standards for issuing and revoking applications—all of which supports the assertion that such officials had the power to regulate the manner in which licensed persons could carry firearms in compliance with the law.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

09/25/2024
_____
Date

*Brennan Rivas*
_____
BRENNAN RIVAS

23

# Brennan Gardner Rivas

Curriculum Vitae · Aug 2024

*brennan.rivas.phd@gmail.com*
*Professional Website*

## Employment

Senior Postdoctoral Researcher, Center for the Study of Guns and Society, Wesleyan University, 2024-present

Senior Title Agent, Norfleet Land Services, LLC, 2022-2024

Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022

Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist University, Clements Center for Southwest Studies, 2020-2021

Lecturer in American History (full-time), Texas Christian University, Department of History, 2019-2020

## Education

Ph.D., History, Texas Christian University, 2019
    Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in the Lone Star State, 1836-1930"
    Advisor: Gregg Cantrell

M.A., History, Texas Christian University, 2013
    Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"

B.A. with Honors, History, Oklahoma State University, 2010

## Publications

*Refereed Journal Articles*

"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*

"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship" in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society* (New York: Oxford University Press, 2023)

"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review* (May 2022)

"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*

"Reflections on the American Gun Control Culture," *The Panorama: Expansive Views from the Journal of the Early Republic*, October 17, 2023.

"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU Press, 2019.

Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in *Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History

"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made by History Blog* (Jun 2022)
~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"

"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
~ Public lecture featuring special insights for genealogical researchers

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
~ Research presentation focusing on interpretation of county court records

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Firearm Issues Research Grant, 2023-2024
~ Awarded by the Harvard Injury Control Research Center, from grant funding from the Robert Wood Johnson Foundation, for research related to firearm issues

Lloyd Lewis Fellowship in American History, 2021-2022
~ Awarded by the Newberry Library to scholars using its collection to research topics in American history

Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books

The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students

Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*

Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights.

Status: Under contract, Yale University Press

"Going Armed: The Law and Culture of Carrying Deadly Weapons in the Nineteenth Century"
Aim: Scholarly article uncovering the ways in which nineteenth-century gun-toters carried their deadly weapons, and why they generally did so concealed.
Status: In revision

## University Teaching Experience
*Instructor of Record*
Lecturer in American History, Texas Christian University                    2019-2020
    "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
    "American History since 1877: The Quest for Equality" (HIST 10613)
    "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*
Teaching Assistant, Texas Christian University                    2017-2018
    American History to 1877 (HIST 10603)
    American History since 1877 (HIST 10613)

*Teaching Interests*
American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks
Panelist, Roundtable on Reconstruction Historians in the Courtroom: A Roundtable about History, Gun Laws, and the Constitution in the Wake of the *Bruen* Decision, Society of Civil War Historians Biennial Conference, Raleigh, North Carolina, June 2024

Panelist, Roundtable on the Business of Firearms in American History, Business History Conference, Providence, Rhode Island, March 2024

Panelist, Race and the Disparate Impact of Gun Law Enforcement, Historically and Today, Aiming for Answers: Balancing Rights, Safety, and Justice in a Post-*Bruen* America, University of Minnesota Law School Symposium, Minneapolis, Minnesota, October 2023

Panelist, "Use and Abuse of History in Second Amendment Litigation," and "Going Armed: Nineteenth Century Views on Open Carry," Current Perspectives on the History of Guns and Society, Wesleyan University, Middletown, Connecticut, October 2023

"Masculinity, Honor-Violence, and Gun Reform in the Early U.S.," Race, Gender, and Firearms in the Early Republic, Society for Historians of the Early American Republic Annual Meeting, Philadelphia, Pennsylvania, July 2023

"Second Amendment Panel—Issues in Cases Post-*Bruen*," Strategic Litigation Convening: Anti-Democracy Efforts and Political Violence Post-*Bruen*, Institute for Constitutional Advocacy and Protection, Georgetown Law, Washington, D. C., June 2023

3

"A Case for More Case Studies," Originalism, the Supreme Court, Gun Laws, and History, Late-Breaking Roundtable, American Historical Association Annual Meeting, Philadelphia, Pennsylvania, January 2023

"Military Disarmament Orders and the Role of Reconstruction Historiography after *Bruen*," Current Perspectives on the History of Guns and Society Symposium, Wesleyan University, Middletown, Connecticut, October 2022

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Second Amendment Subject Matter Expert

*Duncan et al v. Bonta*, California, Case No. 17-1017-BEN-JLB, S.D. Cal.

*Miller et al v. Bonta*, California, Case No. 3:19-cv-01537-BEN-JLB, S.D. Cal.

*Angelo et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-01878-RDM, D. D.C.

*Hanson et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-02256-RC, D. D.C.

*Christian et al v. Nigrelli et al*, New York, No. 22-cv-00695 (JLS), W.D. N.Y.

*Frey et al v. Nigrelli et al*, New York, Case No. 21 Civ. 5334 (NSR), S.D. N.Y.

*Brumback et al v. Ferguson et al*, Washington, No. 1:22-cv-03093-MKD, E.D. Wash.

*Sullivan et al v. Ferguson et al*, Washington, Case No. 3:22-cv-5403, W.D. Wash.

*Siegel v. Platkin,* New Jersey, No. 22-CV-7463 (RMB) (AMD), D. N.J.

*NAGR v. Campbell*, Massachusetts, No. 1:22-cv-11431-FDS, D. Mass.

*Oregon Firearms Federation, Inc. v. Kotek*, Oregon, No. 2:22-cv-01815-IM, D. Ore.

*NSSF v. Jennings*, Delaware, No. 22-cv-01499-RGA, D. Del.

*Chavez v. Bonta*, California, No. 3:19-cv-01226-L-AHG, S.D. Cal. (f/k/a *Jones v. Bonta*)

*Nguyen v. Bonta*, California, No. 3:20-cv-02470-WQH-BGS, S.D. Cal.

*Baird v. Bonta*, California, No. 2:19-cv-00617-KJM-AC, E.D. Cal.

*Nichols v. Bonta*, California, No. 3:11-cv-09916-SJO-SS, C.D. Cal.

*Wiese v. Bonta*, California, No. 2:17-cv-00903-WBS-KJN, E.D. Cal.

*Rocky Mountain Gun Owners v. Polis*, Colorado, No. 23-cv-01077-JLK, D. Col.

*Wolford v. Lopez*, Hawaii, No. 1:23-cv-00265-LEK-WRP, D. Haw.

*Novotny v. Moore*, Maryland, No. 1:23-cv-01295-GRL, D. Mary.

*Kipke v. Moore*, Maryland, No. 1:23-cv-01293-GRL, D. Mary.

*State of Ohio v. City of Columbus*, Ohio, No. 2022-cv-00657, Ct. Com. Pleas, Fairfield Cty, Ohio

*Schoenthal v. Raoul*, No. 3:22-cv-50326, N.D. Ill.

*May v. Bonta*, No. 8:23-cv-01696 CJC and No. I:23-cv-01798 CJC, C.D. Cal.

*State of Washington v. Gator's Custom Guns, Inc.*, No. 23-2-00897-08, Sup. Ct., Cowlitz Cty, Wash.

*Knife Rights, Inc. v. Bonta*, No. 3:23-cv-00474-JES-DDL, S.D. Cal.

*Hartford v. Ferguson*, No. 3:23-cv-05364-RJB, W.D. Wash.

*California Rifle & Pistol Assoc. v. Bonta*, No. 2:23-cv-10169, C.D., Cal.

*Lane v. James*, No. 22 Civ. 10989 (KMK), S.D. N.Y.

*City of Columbus v. State of Ohio*, No. 23-cv-3555, Com. Pleas, Franklin Cty, Ohio

## Professional Memberships

American Historical Association
Society for Historians of the Gilded Age and Progressive Era
Southern Historical Association